Pánuco Decl. Supp Mtn for Preliminary Injunction

# Exh. 20



ORIGINAL FILED

FEB 17 2000

LOS ANGELES
SUPERIOR COURT

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

| | |
|---|---|
| PEOPLE OF THE STATE OF CALIFORNIA,<br><br>                    Plaintiff,<br><br>         vs.<br><br>LANGDON STREET GANG, an unincorporated association; RAMON ALDAZ (aka "Caco"); RUBEN ALDAZ (aka "Shorty"); NICHOLAS ARMANDO (aka "Psycho"); JOSE CASTANEDA (aka "Lil Clever"); LUIS CEDILLO (aka "Lil Spanky"); ALEX ELIAS (aka "Lumpy"); DANIEL ESPARZA (aka "Cowboy"); FELIX ESPARZA (aka "Lil Monster"); ROSALIO ESPARZA (aka "Junior/LilCowboy"); GUILLERMO FLORES (aka "Triste"); RICARDO FREGOSO (aka "Sharky"); JOSE GALLO (aka "Snoopy"); ADAM GARCIA (aka "Player/ Jokey"); IVAN HIRAZABA (aka "Casper"); JOSE HIRAZABA (aka "Drifter"); HECTOR JUAREZ (aka "Flaco"); STEVEN LEFFINGWELL (aka "Fester"); ANGEL LUVIANO (aka "Stranger"); LUIS MARTINEZ (aka "Lil Termite"); RICKY MATIONG (aka "Lil Ricky"); JOHNNY ORTIZ (aka "Grumpy"); MIGUEL PLASENCIA (aka "Joker"); CARLOS REQUEJO (aka "Bouncer"); JOSE RODRIGUEZ (aka "Lil Rana"); JOSE ROMERO (aka "Smokey"); RUDY SALDANA (aka "Rudy"); MIGUEL SUAREZ (aka "Migi"); ARMANDO TORRES (aka "Lil Largo"); JUAN CARLOS TOVAR (aka "Evil"); ALEX VEGA (aka "Lil Stranger"); FERNANDO VEGA (aka "Vamp"); all as individuals,<br><br>                    *Defendants.* | CASE NO: LC048292<br><br><br>**JUDGMENT FOR<br>PERMANENT<br>INJUNCTION**<br><br><br>Date: 17 February 2000<br>Time: 9:00 a.m.<br>Dept: Z<br><br>Assigned for all Purposes:<br>Honorable Mary Ann Murphy |

1

JUDGMENT FOR PERMANENT INJUNCTION

1    **WHEREAS** the Plaintiff, the People of the State of California, acting by and

2    through James K. Hahn, City Attorney of Los Angeles, filed a Complaint on March 26,

3    1999, seeking injunctive relief against the Langdon Street Gang, a criminal gang sued

4    as an unincorporated association, named individual Defendants and Does 1 through

5    200;

6    **WHEREAS** all defendants [with the exception of NICHOLAS ARMANDO (aka

7    "Psycho"), RICKY MATIONG (aka "Lil Ricky"), and JUAN CARLOS TOVAR (aka

8    "Evil"), and DOES 1-200] have been personally served with the Summons and

9    Complaint in this matter; have failed to answer to complaint; and after due notice

10    defaults have been entered against them;

11    **WHEREAS**  DOE defendants 1-200 inclusive have been dismissed;

12    **WHEREAS** upon Plaintiff's Motion for an Entry of Default Judgment, a prove-

13    up hearing was held in Department B of the above referenced court, the Honorable

14    Mary Ann Murphy presiding.  Plaintiff appeared by Jule A. Bishop, Deputy City

15    Attorney.  Upon consideration of the evidence submitted, including the declarations

16    offered in support of the Preliminary Injunction and in support of the Request for

17    Default, the Complaint, the pleadings and supporting declarations, and the arguments

18    of counsel, and good cause appearing therefor;

19    **IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that judgment is

20    entered in favor of the Plaintiff, (the People of the State of California) against

21    defendants as follows:  DEFENDANTS Ramon Aldaz (aka Caco); Ruben Aldaz (aka

22    Shorty/Santana); Jose Castaneda (aka Lil Clever);  Luis Cedillo (aka Lil Spanky); Alex

23    Elias (aka Lumpy); Daniel Esparza (aka Cowboy); Felix Esparza (aka Lil Monster);

24    Rosalio Esparza (aka Junior/Lil Cowboy ); Guillermo Flores (aka Triste); Ricardo

25    Fregoso (aka Sharky); Jose Gallo (aka Snoopy/Huero); Adam Garcia (aka

26    Player/Jokey); Ivan Hirazaba (aka Casper); Jose Hirazaba (aka Drifter); Hector Juarez

27    (aka Flaco); Steven Leffingwell (aka Fester/Lil One); Angel Luviano (aka Stranger)

28    Luis Martinez (aka Tiny/Lil Termite); Johnny Ortiz (aka Grumpy); Miguel Plascencia

2

JUDGMENT FOR PERMANENT INJUNCTION

1  (aka Joker); Carlos Requejo (aka Bouncer); Jose Luis Rodriguez (aka Lil Rana); Jose

2  Romero (aka Smokey); Rudy Saldana (aka Rudy); Miguel Suarez (aka Migi);

3  Armando Torres (aka Lil Largo);  Alex Vega (aka Stranger); Fernando Vega (aka

4  Vamp), and each of them, and the **Langdon Street Gang**, and all Langdon Street

5  gang members, associates and agents, and all persons acting under, in concert with,

6  for the benefit of, at the direction of, or in association with them or any of them, are

7  enjoined and restrained from engaging in or performing directly or indirectly, any of

8  the following activities in the **TARGET AREA,** consisting of two rectangular areas.

9  The larger area is bordered by Nordhoff Street to the North, Roscoe Boulevard to the

10  South, Sepulveda Boulevard to the East, and the 405 Freeway to the West.  The

11  smaller area is defined by extending Nordhoff Street west to Gloria Avenue; from

12  there northward to Tupper Street and then eastward back to the 405 freeway.

13       **(a)** Standing, sitting, walking, driving, gathering, or appearing anywhere

14  in public view with any other named Defendant(s) herein and/or with any other known

15  Langdon Street gang member(s), but not to include:  1) when all individuals are within

16  a dwelling unit as defined in LAMC §12.03.

17       **(b)** Selling, attempting to sell, possessing, or using, without a

18  prescription, or knowingly remaining in the presence of anyone selling, attempting to

19  sell, obtaining, attempting to obtain, possessing, or using, without a prescription, any

20  controlled substance or related paraphernalia, including but not limited to, rolling

21  papers and pipes used for illegal drug use;

22       **(c)** Blocking the free passage of any person or vehicle on any street,

23  walkway, sidewalk, driveway, alleyway, or other area of public use.

24       **(d)** Approaching or signaling as a pedestrian any vehicle unless a

25  legitimate emergency situation requires or vehicle is legally parked with the motor off.

26       **(e)** Being present on the private property of others not open to the

27  general public, or portion of private property not open to the general public,  except:

28  (1) with the prior written consent of the person in lawful possession of the property;

1    (f) Being in a public place between 9:00 p.m. on any day and sunrise of

2    the immediately following day, unless (1) going to/from a legitimate meeting,

3    entertainment activity, or legal employment; or (2) involved in a legitimate emergency

4    situation that requires immediate attention;

5    (g) Acting as a lookout, whistling, yelling or otherwise signaling with a

6    flashlight, "walkie-talkie," or other means to warn another person of an approaching

7    law enforcement officer, or soliciting, encouraging or employing another to do so;

8    (h) Drinking any alcoholic beverage in any public place or any place

9    open to public view, but not to include the drinking of alcohol by those who are of legal

10    age to do so within a location possessing a valid license for the on site consumption

11    of alcoholic beverages and while not being in violation of any other provisions of this

12    order;  or knowingly being within 10 feet of an open container of alcohol in a public

13    place or a place open to public view except while being legally  within a location

14    possessing a valid  license for the on site consumption of alcoholic beverages and

15    while not being in violation of any other provisions of this order.

16    (i) Possessing any firearm, ammunition, or illegal weapon as defined in

17    Penal Code § 12020 in any public place or place open to public view, or knowingly

18    remaining in the presence of anyone who is in possession of such firearm,

19    ammunition or dangerous weapon;

20    (j) Possessing or using a toy or replica firearm, or a BB gun, or

21    knowingly remaining in the presence of anyone who is in possession of such an item;

22    (k) Damaging or defacing any public property or private property of

23    another, or possessing any aerosol paint container, a felt tip marker, or any other

24    marking substance as defined by Penal Code § 594.2;

25    /////

26    /////

27    /////

28    /////

4

JUDGMENT FOR PERMANENT INJUNCTION

1    **(l)** Loitering for drug-related activity or for the purpose of engaging in

2    graffiti activity.

3    **(m)** Failing to obey all laws, including Los Angeles Municipal Codes.

4

5    DATED: 2-17-00                           IT IS ORDERED:

6

7                                            JUDGE OF THE SUPERIOR COURT

8

9    Presented by:                           MARY ANN MURPHY

10   **PEOPLE OF THE STATE OF CALIFORNIA**
     James K Hahn, City Attorney of Los Angeles
11   Martin Vranicar, Assistant City Attorney

12   By:

13   Jule A. Bishop
     Deputy City Attorney
14   By:

15

16   Victor Kalustian
     Deputy City Attorney

17   Attorneys for Plaintiff,
     People of the State of California

18

19

20

21

22

23

24

25

26

27

28

5

JUDGMENT FOR PERMANENT INJUNCTION

Pánuco Decl. Supp Mtn for Preliminary Injunction

# Exh. 21

1  ROCKARD J. DELGADILLO, Los Angeles City Attorney
   Martin Vranicar, Ass't City Atty, Supervisor, Gang Unit
2  Lisabeth Shiner, Deputy City Attorney (151792)
   200 North Main Street, 800 City Hall East
3  Los Angeles, California  90012
   213-485-0798
4
   Attorneys for Plaintiff,
5  People of the State of California
6
7
8

**FILED** *F. O₁*

LOS ANGELES SUPERIOR COURT

MAY 1 0 2004

JOHN A. CLARKE, CLERK
*L. Markmiller*
BY L. MARKMILLER, DEPUTY

## IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

9  ## FOR THE COUNTY OF LOS ANGELES (CENTRAL DISTRICT)

10

| | |
|---|---|
| 11  **PEOPLE OF THE STATE OF CALIFORNIA,** | ) Case No. BC 311766 |
| *ex rel.* Rockard J. Delgadillo as the | ) |
| 12  City Attorney for the City of Los Angeles, | ) ~~[PROPOSED]~~ |
| | ) **JUDGMENT GRANTING** |
| 13                          Plaintiff, | ) **PERMANENT INJUNCTION** |
| | ) **BY COURT AFTER DEFAULT** |
| 14                 vs. | ) |
| | ) Assigned for all purposes to the |
| 15  **MARA SALVATRUCHA aka MS,** | ) Honorable Edward A. Ferns |
| **an unincorporated association;** | ) |
| 16  **DOES 1 through 500, inclusive,** | ) DATE:   No hearing required |
| | ) TIME:   N/A |
| 17                          Defendants. | ) PLACE: Dept 69 |
| | )             111 North Hill Street |
| 18 | )             Los Angeles, CA  90012 |
| 19 | ) |
| | ) TRIAL DATE:   Not Set |
| 20  _____ | ) CASE FILED:   March 9, 2004 |

21         Plaintiff, the People of the State of California, *ex rel.* Rockard J. Delgadillo as the City

22  Attorney for the City of Los Angeles, filed a complaint on March 9, 2004, seeking to abate a public

23  nuisance through the use of what is commonly known as a "gang injunction," against defendant

24  Mara Salvatrucha aka MS ("MS"), an unincorporated association alleged to be a criminal street

25  gang, in a "Safety Zone" (as depicted in the map included as page 5) composed of two areas, denoted

26  as "Section A" and "Section B," both of which are located in the City of Los Angeles; "Section A"

27  defined as the area bounded by W. Sunset Blvd. to the north, Vermont Avenue to east, Beverly Blvd.

28  to the south and Gower Street to the west, and extending 100 yards to the outside of each of those

1

**JUDGMENT GRANTING PERMANENT INJUNCTION**

1    boundary streets; and "Section B" defined as the area bounded by the route starting at the
2    intersection of Wilshire Blvd. and Normandie Avenue, continuing north along Normandie Avenue to
3    3rd Street, continuing east along 3rd Street to Alvarado Street, continuing south along Alvarado
4    Street to Olympic Blvd., continuing west along Olympic Blvd. to Western Avenue, continuing north
5    along Western Avenue to Wilshire Blvd. continuing east along Wilshire Blvd. to the starting point at
6    Normandie Avenue, and extending 100 yards to the outside of each of those boundary streets;
7    plaintiff subsequently voluntarily dismissed without prejudice all fictitious "Doe" defendants;
8    default was duly entered against defendant MS; after due consideration of all papers filed in this
9    action, including the declarations, request for judicial notice, and other evidence submitted,
10   plaintiff's memorandum of points and authorities including *People v. ex rel. Gallo v. Acuna*, 14 Cal.
11   4th 1090, *cert. denied*, 521 U.S. 1121 (1997); *People v. Englebrecht*, 88 Cal. App. 4th 1236 (2001);
12   *In re Englebrecht*, 67 Cal. App. 4th 486 (1998), and other argument of counsel, this Court finds by
13   clear and convincing evidence that service is proper under the circumstances and that (1) Mara
14   Salvatrucha is also known as MS; (2) MS is a criminal street gang as defined in Penal Code section
15   186.22 (Street Terrorism Prevention and Enforcement ("STEP") Act) and is a gang as defined for the
16   purpose of a gang abatement injunction in *People v. Englebrecht*, 88 Cal. App. 4th 1236, 1258
17   (2001); and (3) the conduct and activities of defendant MS and its members constitute a public
18   nuisance in the Safety Zone; and
19   **IT IS ORDERED, ADJUDGED AND DECREED** that:
20        1. Defendant MS, its members, agents, servants, employees, and all persons acting under, in
21   concert with, for the benefit of, at the direction of, or in association with them or any of them, are
22   enjoined and restrained from engaging in or performing directly or indirectly, any of the following
23   activities in the Safety Zone:
24        a.    **Do Not Associate:**  Driving, standing, sitting, walking, gathering or
25   appearing, anywhere in public view or anyplace accessible to the public, with any known member of
26   MS including but not limited to those members identified on pages 6 and 7 herein, but not including:
27   (1) when all individuals are inside a school attending class or on school business, (2) when all
28   individuals are inside a church, and (3) when all individuals are inside a vehicle in transit on the 101

2

**JUDGMENT GRANTING PERMANENT INJUNCTION**

1   Freeway; provided however that this prohibition against associating shall apply to all claims of travel

2   to or from any of those locations;

3             b.    **No Intimidation:**  Confronting, intimidating, annoying, harassing,

4   threatening, challenging, provoking, assaulting or battering any person known to be a witness to any

5   activity of MS, known to be a victim of any activity of MS, or known to be a person who has

6   complained about any activity of MS;

7             c.    **No Guns or Dangerous Weapons:**  Anywhere in public view or anyplace

8   accessible to the public, (1) possessing any gun, ammunition, or illegal weapon as defined in Penal

9   Code section 12020, (2) knowingly remaining in the presence of anyone who is in possession of

10  such gun, ammunition or dangerous weapon, or (3) knowingly remaining in the presence of such

11  gun, ammunition or dangerous weapon;

12            d.    **Stay Away From Drugs:**  Without a prescription, (1) selling, possessing, or

13  using any controlled substance or related paraphernalia, including but not limited to rolling papers

14  and pipes used for illegal drug use, (2) knowingly remaining in the presence of anyone selling,

15  possessing, or using any controlled substance or such related paraphernalia, or (3) knowingly

16  remaining in the presence of any controlled substance or such related paraphernalia;

17            e.    **No Open Containers of Alcohol:**  Anywhere in public view or anyplace

18  accessible to the public, except on properly licensed premises, (1) possessing an open container of an

19  alcoholic beverage, (2) knowingly remaining in the presence of anyone possessing an open container

20  of an alcoholic beverage, or (3) knowingly remaining in the presence of an open container of an

21  alcoholic beverage;

22            f.    **No Trespassing:**  Being present on or in any property not open to the general

23  public, except (1) with the prior written consent of the owner, owner's agent, or the person in lawful

24  possession of the property, or (2) in the presence of and with the voluntary consent of the owner,

25  owner's agent, or the person in lawful possession of the property;

26            g.    **Obey Curfew:**  Being outside between the hours of 10:00 p.m. on any day

27  and sunrise of the following day, unless (1) going to or from a legitimate meeting or entertainment

28  activity, (2) actively engaged in some business, trade, profession or occupation which requires such

3

---

**JUDGMENT GRANTING PERMANENT INJUNCTION**

165

1   presence, or (3) involved in a legitimate emergency situation that requires immediate attention;

2        h.   **No Graffiti or Graffiti Tools**: Damaging, defacing, or marking any public

3   property or private property of another, or possessing any spray paint container or felt tip marker;

4        i.   **No Extortion, Including Collecting "Rent" or "Taxes"**: Obtaining property

5   from another with that person's consent induced by invoking the name of the MS gang or by any

6   other use of force or fear, including a threat to injure the person, his or her property or a third person;

7   and

8        j.   **Obey All Laws:** Failing to obey all laws (1) which prohibit violence and

9   threatened violence including murder, rape, robbery by force or fear, assault and battery, (2) which

10   prohibit interference with the property rights of others including trespass, theft, driving or taking a

11   vehicle without the owner's consent, and vandalism, or (3) which prohibit the commission of acts

12   which create a nuisance including the illegal sale of controlled substances and blocking the sidewalk;

13   **[text continued on page 8 after map and photos]**

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

4

**JUDGMENT GRANTING PERMANENT INJUNCTION**



1        2.      This order shall be subject to modification of any of its terms upon noticed

2  application of any party; and

3        3.      Plaintiff shall not be required to post an undertaking pursuant to Code of Civil

4  Procedure section 529(b)(3).

5

6  DATED: _____5/10/04_____               _____

7                                        Judge of the Superior Court

8  Submitted on April 23, 2004 by              EDWARD A. FERNS

9  ROCKARD J. DELGADILLO, Los Angeles City Attorney
   Martin Vranicar, Ass't City Atty, Supervisor, Gang Unit

10  Lisabeth Shiner, Deputy City Attorney
    200 North Main Street, 800 City Hall East

11  Los Angeles, California (213) 847-0134

12

13  _____

14  By: Lisabeth Shiner
    Deputy City Attorney, Gang Unit

15  Attorneys for Plaintiff,
    People of the State of California

16

17

18

19

20

21

22

23

24

25

26

27

28

8

**JUDGMENT GRANTING PERMANENT INJUNCTION**

Pánuco Decl. Supp Mtn for Preliminary Injunction

# Exh. 22

**ORIGINAL FILED**

SEP 2 1 2006

LOS ANGELES
SUPERIOR COURT

FOR THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN THE COUNTY OF LOS ANGELES (CENTRAL DISTRICT)

| | |
|---|---|
| PEOPLE OF THE STATE OF CALIFORNIA, *ex rel.* Rockard J. Delgadillo as the City Attorney for the City of Los Angeles,<br><br>        Plaintiff,<br><br>    vs.<br><br>PLAYBOYS, a criminal street gang sued as an unincorporated association; and DOES 1-200;<br><br>        Defendants. | Case No.: BC351990<br>(Unlimited Civil Case)<br><br>[Proposed]<br>**JUDGMENT GRANTING PERMANENT INJUNCTION**<br><br>Assigned for all purposes to the Honorable Elizabeth Grimes (Dep't 30)<br><br>Date:  [No Hearing Required]<br>Time:<br>Place: Dep't 30<br>        Stanley Mosk Courthouse<br>        111 North Hill Street<br>        Los Angeles, CA 90012<br><br>Trial Date:   Not Set Yet<br>Case Filed:  May 8, 2006 |

Plaintiff, the People of the State of California, *ex rel.* Rockard J. Delgadillo as the City Attorney for the City of Los Angeles, filed a complaint seeking to abate a public nuisance through the use of what is commonly known as a "gang injunction," against defendant Playboys, a criminal street gang sued as an unincorporated association, and against all members of defendant Playboys gang, and all those through whom defendant Playboys acts, in a "Safety Zone" (maps of which are included as pages 3, 4 and 5), located in the City of Los Angeles, comprised of two areas: the first area, known as the "South Park" area, is centered on South Park, and is bounded by Vernon Avenue

1

Judgment Granting Permanent Injunction

170

to the north, Central Avenue to the east, Slauson Avenue to the south, and extending 100 yards to the outside of each of those three boundary streets, and the 110 (Harbor) Freeway to the west; and the second area, known as the "Pico/Fedora" area, is centered on the intersection of Pico Boulevard and Fedora Street, and is bounded by Olympic Boulevard to the north, Vermont Avenue to the east, Venice Boulevard to the south, and Ardmore Avenue to the west, and extending 100 yards to the outside of each of those boundary streets; plaintiff subsequently voluntarily dismissed without prejudice all fictitious "Doe" defendants; default was duly entered against the defendant Playboys; after due consideration of all papers filed in this action, including the declarations and other evidence submitted, and plaintiff's memorandum of points and authorities including *People ex rel. Gallo v. Acuna* (1997) 14 Cal. 4th 1090, *cert. denied*, 521 U.S. 1121; *People v. Englebrecht* (2001) 88 Cal. App. 4th 1236; *In re Englebrecht* (1998) 67 Cal. App. 4th 486, this Court finds by clear and convincing evidence that service is proper under the circumstances, that a public nuisance caused by the conduct and activities of a criminal street gang exists in the Safety Zone, and that the conduct and activities of defendant Playboys and its members, and those persons through whom defendant Playboys acts, is a cause of the public nuisance that exists in the Safety Zone; and good cause appearing for entry of judgment,

**IT IS ORDERED, ADJUDGED AND DECREED** that:

1.    Defendant Playboys, all of its members, and all persons acting under, in concert with, for the benefit of, at the direction of, or in association with Playboys, are enjoined and restrained from engaging in or performing directly or indirectly, any of the following activities in the Safety Zone:

a.    **Do Not Associate:**  Standing, sitting, walking, driving, gathering or appearing, anywhere in public view or anyplace accessible to the public, with any known member of Playboys, but not including:  (1) when all individuals are inside a school attending class or on school business; and (2) when all individuals are inside a church; provided however that this prohibition against associating shall apply to all claims of travel to or from any of those locations;

///

[text continues on page 6 after maps]



"Playboys" Safety Zone
Office of the City Attorney
City of Los Angeles



**"South Park" Area of "Playboys" Safety Zone**
Office of the City Attorney
City of Los Angeles



**"Pico/Fedora" Area of "Playboys" Safety Zone**
Office of the City Attorney
City of Los Angeles

b.    **No Intimidation**:  Confronting, intimidating, annoying, harassing, threatening, challenging, provoking, assaulting or battering any person known to be a witness to, known to be a victim of, or known to have complained about any activity of Playboys;

c.    **No Guns or Dangerous Weapons**:  Anywhere in public view or anyplace accessible to the public, (1) possessing any gun, ammunition, or illegal weapon as defined in Penal Code section 12020, (2) knowingly remaining in the presence of anyone who is in possession of such gun, ammunition or illegal weapon, or (3) knowingly remaining in the presence of such gun, ammunition or illegal weapon;

d.    **No Graffiti or Graffiti Tools**:  Damaging, defacing, or marking any public property or private property of another, or possessing any spray paint can, felt tip marker, or other graffiti tool as defined in Penal Code section 594.2, including "slap tags";

e.    **Stay Away From Drugs**:  Without a prescription, (1) selling, possessing, or using any controlled substance or related paraphernalia, including but not limited to rolling papers and pipes used for illegal drug use, (2) knowingly remaining in the presence of anyone selling, possessing, or using any controlled substance or such related paraphernalia, or (3) knowingly remaining in the presence of any controlled substance or such related paraphernalia;

f.    **Stay Away From Alcohol**:  Anywhere in public view or anyplace accessible to the public, except on properly licensed premises, (1) possessing an open container of an alcoholic beverage, (2) knowingly remaining in the presence of anyone possessing an open container of an alcoholic beverage, or (3) knowingly remaining in the presence of an open container of an alcoholic beverage;

g.    **Obey Curfew**:  Being outside between the hours of 10:00 p.m. on any day and sunrise of the following day, unless (1) going to or from a legitimate meeting or entertainment activity, (2) actively engaged in a legitimate business, trade, profession or occupation which requires such presence, or (3) involved in a legitimate emergency situation that requires immediate attention;

h.    **No Trespassing**:  Being present on or in any property not open to the general public, except (1) with the prior written consent of the owner, owner's agent, or the person in lawful possession of the property, or (2) in the presence of and with the voluntary consent of the owner,

Judgment Granting Permanent Injunction

owner's agent, or the person in lawful possession of the property;

   i. **Don't Force Any Person To Join The Playboys Gang**: Do not make any threats or do anything threatening, including without limitation to strike, batter, destroy the personal property, or disturb the peace, to cause a person to join the Playboys criminal street gang;

   j. **Don't Prevent Any Person From Leaving The Playboys Gang**: Do not make any threats or do anything threatening, including without limitation to strike, batter, destroy the personal property, or disturb the peace, (1) to prevent a person from leaving the Playboys criminal street gang or (2) to any person known to have left the Playboys criminal street gang; and

   k. **Obey All Laws**: Failing to obey all laws (1) which prohibit violence and threatened violence including murder, rape, robbery by force or fear, assault and battery, (2) which prohibit interference with the property rights of others including trespass, theft, driving or taking a vehicle without the owner's consent, and vandalism, or (3) which prohibit the commission of acts which create a nuisance including the illegal sale of controlled substances and blocking the sidewalk;

  2. **No Costs**  Plaintiff waived costs.  Each party shall bear its own costs in this action.

DATED: ___SEP 2 ? 2006___   _Elizabeth A. Grimes_
            Judge of the Superior Court

Submitted on ___July 17, 2006___, 2006 by:

ROCKARD J. DELGADILLO, Los Angeles City Atty (125465x)
Martin J. Vranicar, Ass't City Atty, Supervisor, Gang Unit
Rhonda P. Lowe, Deputy City Attorney (230052)
James A. McDougal, Deputy City Attorney (140408)
200 North Main Street, 800 City Hall East
Los Angeles, California 90012
213-978-4088 office; 213-978-8717 fax

_James A. McDougal_ DCA

By: James A. McDougal, Deputy City Attorney, Gang Unit

Attorneys for Plaintiff, People of the State of California

Judgment Granting Permanent Injunction

Pánuco Decl. Supp Mtn for Preliminary Injunction

# Exh. 23

ORIGINAL FILED

NOV -2-4 2003

LOS ANGELES
SUPERIOR COURT

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

PEOPLE OF THE STATE OF CALIFORNIA,          )     CASE NO.  BC 298646
                                            )
                     Plaintiff,             )
                                            )
             vs.                            )
                                            )
ROLLING SIXTY CRIPS, an unincorporated      )     [PROPOSED]
association; Deandre Adkins (AKA "Tiny Turtle"), )  JUDGMENT BY COURT
Andreaus Bagsby (AKA "Scatterbrain"), Christopher )  GRANTING  PERMANENT
Baker (AKA "Lil Thug"), Shamond Bennett (AKA )    INJUNCTION     AGAINST
"Lil Arch Dog"), Derrick Cleveland (AKA "Lil Blue )  DEFAULTING DEFENDANTS.
Shay"), Javon Curtis (AKA "Tiny Spank"), Kevin )  [CCP §585(b)(d)]
Doucette (AKA "Big Cat"), Deonte Gary (AKA )
"Baby Wee Dog"), Deandre George (AKA "Young C-)
Ball"), Rodney Glaze (AKA "Peedee Wac"), Davon )
Harris (AKA "Papa Loc"), Travon Hassan (AKA )
"Tiny Tad Pole"), Lavon Hoy (AKA "CJ"), Brice )
Jones (AKA "Tiny Mayhem"), Damon Jones (AKA )
"Lil Scooby"), Antjuan Lottie (AKA "Lil Hansom"), )
Rantz Lymon (AKA "Lil Rat Capone"), Grant Lyons )
(AKA "Mad Ronnie"), Terrence Manuel (AKA "Baby )
Deka"), Brian McDonald (AKA "Hammerhands"), )
Cartesus McGregor (AKA "Gotti"), Christopher )
Mosley (AKA "Bodee"), Michael Mosley (AKA )
"Rome"), Jerrell Patrick (AKA "Tiny Mun"), Ernest )
Quinley (AKA "Face"), Kristopher Simmons (AKA )
"Bolt Da House"), Kelon Smith (AKA "Blue Shay"), )
Robert Stewart (AKA "Hoodsta Rob"), Marquise )
Thomas (AKA "Baby Swan Toe"), Randy Williams )
(AKA "Amp"), Ralph Woo (AKA "Tiny Creepy"), )
and DOES 1 through 200, Inclusive,          )
                                            )
                     Defendants             )
_____ )

REC'D  2003  62s.

1    The Clerk of the Court having entered the defaults of the following defendants in this

2    action, namely: ROLLING SIXTY CRIPS, an unincorporated association;  Deandre Adkins (AKA

3    "Tiny Turtle"); Andreaus Bagsby (AKA "Scatterbrain");  Christopher Baker (AKA "Lil Thug");

4    Shamond Bennett (AKA "Lil Arch Dog"); Javon Curtis (AKA "Tiny Spank"); Kevin Doucette

5    (AKA "Big Cat"); Deonte Gary (AKA "Baby Wee Dog"); Deandre George (AKA "Young C-Ball");

6    Rodney Glaze (AKA "Peedee Wac"); Davon Harris (AKA "Papa Loc"); Travon Hassan (AKA "Tiny

7    Tad Pole"); Lavon Hoy (AKA "CJ"); Brice Jones (AKA "Tiny Mayhem"); Damon Jones (AKA "Lil

8    Scooby"); Antjuan Lottie (AKA "Lil Hansom"); Rantz Lymon (AKA "Lil Rat Capone"); Grant

9    Lyons (AKA "Mad Ronnie"); Terrence Manuel (AKA "Baby Deka"); Brian McDonald (AKA

10    "Hammerhands"); Christopher Mosley (AKA "Bodee"); Michael Mosley (AKA "Rome"); Ernest

11    Quinley (AKA "Face") ; Kristopher Simmons (AKA "Bolt Da House"); Kelon Smith (AKA "Blue

12    Shay") ; Robert Stewart (AKA "Hoodsta Rob"); Marquise Thomas (AKA "Baby Swan Toe") ;

13    Randy Williams (AKA "Amp"); Ralph Woo (AKA "Tiny Creepy"), all of whose photographs are

14    attached hereto;

15    AND FURTHER, this court having reviewed the evidence heretofore submitted by

16    plaintiff in support of its motion for judgment after default;

17    NOW THEN, the Court makes the following findings: (1) The ROLLING SIXTY CRIPS

18    is a criminal street gang within the meaning of Penal Code section 186.22(f); (2) the individual

19    defendants are members of the ROLLING SIXTY CRIPS gang; (3) together, these defendants have

20    created and maintain a public nuisance in an area hereinafter described and referred to as the Hyde

21    Park Community Safety Zone; (4) there is no adequate remedy at law to protect the community in

22    the Hyde Park Community Safety Zone from the nuisance activities of these defendants.  Plaintiff

23    has met its burden of proof as to each and every  element of the cause of action for a public nuisance

24    as alleged in the Complaint as against each and every defaulting defendant by  clear and convincing

25    proof;

26    NOW THEREFORE,

27    **IT IS ORDERED, ADJUDGED AND DECREED** THAT JUDGMENT is entered in

28    favor of plaintiff, the People of the State of California, acting by and through Rockard J. Delgadillo,

---

JUDGMENT BY COURT AFTER DEFAULT

2

1  as the City Attorney of the City of Los Angeles, and AGAINST Deandre Adkins (AKA "Tiny

2  Turtle"); Andreaus Bagsby (AKA "Scatterbrain");  Christopher Baker (AKA "Lil Thug"); Shamond

3  Bennett (AKA "Lil Arch Dog"); Javon Curtis (AKA "Tiny Spank"); Kevin Doucette (AKA "Big

4  Cat"); Deonte Gary (AKA "Baby Wee Dog"); Deandre George (AKA "Young C-Ball"); Rodney

5  Glaze (AKA "Peedee Wac"); Davon Harris (AKA "Papa Loc"); Travon Hassan (AKA "Tiny Tad

6  Pole"); Lavon Hoy (AKA "CJ"); Brice Jones (AKA "Tiny Mayhem"); Damon Jones (AKA "Lil

7  Scooby"); Antjuan Lottie (AKA "Lil Hansom"); Rantz Lymon (AKA "Lil Rat Capone"); Grant

8  Lyons (AKA "Mad Ronnie"); Terrence Manuel (AKA "Baby Deka"); Brian McDonald (AKA

9  "Hammerhands"); Christopher Mosley (AKA "Bodee"); Michael Mosley (AKA "Rome"); Ernest

10  Quinley (AKA "Face") ; Kristopher Simmons (AKA "Bolt Da House"); Kelon Smith (AKA "Blue

11  Shay") ; Robert Stewart (AKA "Hoodsta Rob"); Marquise Thomas (AKA "Baby Swan Toe"); Randy

12  Williams (AKA "Amp"); Ralph Woo (AKA "Tiny Creepy"); the ROLLING SIXTY CRIPS, an

13  unincorporated association and all of its members; and all persons acting under, in concert with, at

14  the direction of, or for any one of the defendants, all of whom are hereby

15  1.        **ENJOINED** and **RESTRAINED** from engaging in any of the hereinafter enumerated

16  activities in the FOLLOWING AREA in the City of Los Angeles, referred to as the Hyde Park

17  Community Safety Zone: beginning at Deane Avenue, an area extending eastward along 52nd Street

18  from Deane Avenue to Van Ness Avenue, then southward along Van Ness Avenue to Slauson

19  Avenue, then eastward along Slauson Avenue to Western Avenue, then southward along Western

20  Avenue to 73rd Street, then westward along 73rd Street to Van Ness Avenue, then southward along

21  Van Ness Avenue to 77th Street, then westward along 77th Street to Victoria Avenue,  then

22  northward along Victoria Avenue to 74th Street, then westward along 74th Street  to West Blvd.,

23  then northward along West Blvd. to 64th Street, then westward along 64th Street to Overhill, then

24  northward along Overhill to Slauson Avenue, then eastward along Slauson Avenue to Deane

25  Avenue, then northward along Deane Avenue to the point of origin at 52nd Street, and extending 100

26  yards to the outside of each of those boundary streets, as depicted in the attached map:

27          **a. Do Not Associate:** Standing, sitting, running, walking, riding, driving, gathering,

28  being in the presence of, or appearing anywhere in public or in public view, as defined in Health &

JUDGMENT BY COURT AFTER DEFAULT
3

1  Safety Code section 11530(b), with any other named defendant(s) herein and/or with any other

2  known ROLLING SIXTY CRIPS gang member(s) and/or associate(s), but not to include:  when all

3  gathered individuals are and reside within a dwelling unit as defined in LAMC section 12.03.

4      **b.  Stay Away from Drugs:**  Selling, possessing, or using, without a prescription, or

5  knowingly remaining in the presence of anyone possessing, selling, or using, without a prescription,

6  any narcotics, marijuana, or other controlled substance or related paraphernalia, including but not

7  limited to hypodermic needles, hype kits, hypodermic injection devices, or rolling papers and pipes

8  that may be used for illegal drug use;

9      **c.  Do Not Block Access:**  Blocking the free passage of any person or vehicle on any

10  street, walkway, sidewalk, driveway, alleyway, or other area of public access;

11      **d.  Do Not Approach Cars:**  Approaching and/or signaling any other person's occupied

12  motor vehicle,  whether stopped or parked, unless a legitimate emergency situation requires such

13  conduct;

14      **e.  Do Not Trespass:**  Being present on the private property of any other person, except:

15  (1) with the prior <u>written</u> consent of the person in lawful possession of the property, or (2) in the

16  presence and with the <u>voluntary</u> consent of the person in lawful possession of the property;

17      **f.   Obey Curfew:** (1) If under the age of eighteen (18), being out of your residence

18  between 8:00 p.m. on any day and sunrise of the immediately following day, unless (1) going to or

19  from a legitimate, non gang-related paid-for entertainment activity and with prior parental or legal

20  guardian <u>written consent</u>, or (2) engaged in a legal business, trade, profession, or occupation that

21  requires being out, or (3) responding properly to a legitimate emergency situation that requires

22  immediate attention.   For purposes of this Order, you must have physical evidence of any valid

23  reason for being out of your residence on your person at the time of your deviation from this Order.

24      (2) If eighteen (18) years of age or older,  being out of your residence between

25  <u>10:00 p.m. on any day and sunrise of the immediately following day</u>, unless (1) returning from a

26  legitimate, non gang-related, paid-for entertainment activity,  (2) engaged in a legal business, trade,

27  profession, or occupation that requires being out, or (3) responding properly to a legitimate

28  emergency situation that requires immediate attention. For purposes of this Order, you must have

---

JUDGMENT BY COURT AFTER DEFAULT

4

physical evidence of any valid reason for being out of your residence on your person at the time of your deviation from this Order;

    **g.  Do Not Warn of Police:** Acting as a "lookout" by whistling, yelling or otherwise signaling by any means and any equipment, including, but not limited to, hand signals, flashlights, walkie-talkies, cell phones, pagers, whistles, or by riding a bicycle to warn another person of an approaching law enforcement officer, or soliciting, encouraging, coercing, or employing another person to act as such lookout;

    **h.  No Reckless Driving:** Driving a vehicle in willful or wanton disregard for the safety of persons or property, including but not limited to while evading a peace officer as defined in Vehicle Code sections 2800.1 through 2800.3;

    **I.  Do Not Intimidate:** Confronting, intimidating, harassing, or threatening any person;

    **j.  Stay Away from Alcohol:** Drinking or possessing any alcoholic beverage in any public place or any place open to public view, or knowingly being within 10 feet of an open container of alcohol in a public place or a place open to public view;

    **k.  No Guns or Dangerous Weapons:** Possessing any firearm, ammunition, knife, altered or modified baseball bat, altered screwdriver, or any other illegal weapon as defined in the California Penal Code, or knowingly being in the presence of anyone who is in possession of such gun, knife, bat, screwdriver, ammunition, or illegal weapon, except you may possess legitimate kitchen utensils inside your residence;

    **l.  No Other Weapons:** Possessing or using a toy or replica firearm, gas operated gun, or a BB gun, or knowingly remaining in the presence of anyone who is in possession of such item(s) in any public place or a place open to public view;

    **m.  Do Not Deface Property Nor Possess Marking Items:** Damaging, defacing, or marking any public property or private property of another, or possessing any aerosol paint container, felt tip marker, or any other marking substance as defined by Penal Code section 594.2;

    **n.  Do Not Loiter:** Loitering (delaying or lingering) in any public place without a lawful purpose for being there, including loitering to sell narcotics or other controlled substances;

    **o.  No Pagers:** Possessing or using any pager, beeper, cellular or digital phone,

---

JUDGMENT BY COURT AFTER DEFAULT

1 | walkie-talkie, two-way radio, communication scanner, or table-model scale <u>unless</u> required for a

2 | legitimate business, trade, or profession, or required by a legitimate emergency situation;

3 |      **p.**   **No Gang Apparel:** Wearing any clothing, jewelry, or other article or item which

4 | has any Rolling Sixty significance or relates to or refers to or associated in any way whether by

5 | color, name, lettering, number, or any combination thereof with the defendant Rolling Sixty Crips

6 | or to any of its sets or members, such as, but not limited to, any variations or combinations of the

7 | following: ROLLIN' SIXTY CRIPS, ROLLING 60's, RSC, RSG, R60, NHC, SIXTY, SIXTIES,

8 | 60, 6, 0, SIX-0, NEIGHBORHOOD, CRIPS, HOODSTA, RICH ROLLIN', S, C, NC, NY, including

9 | but not limited to, blue shoelaces, blue bandannas, blue headbands, and blue head coverings;

10 |      **q.**   **No Gang Signs:** Uttering or using any words, phrases, physical gestures, or

11 | symbols commonly known as "throwing" gang or hand signs, which refer in any way, to the gang

12 | known as the Rolling Sixty Crips or to any clique or set thereof;

13 |      **r.**   **No Intimidation:** Displaying any logo or tattoo known to be associated with the

14 | gang known as the Rolling Sixty Crips or which refers to that gang for the purpose of intimidating

15 | anyone;

16 |      **s.**   **Obey Police:** Evading or avoiding law enforcement officers by entering property

17 | enclosed by security fences and gates, and/or loitering on such property behind security fences and/or

18 | locked security gates;

19 |      **t.**   **Correct Information:** Giving false information or false identification to any law

20 | enforcement officer;

21 |      **u.**   **No Noise:** Making, causing, or encouraging others to make noise of any kind that

22 | violates noise restrictions as defined in LAMC section 111.00-116.01, including but not limited to

23 | playing loud music and participating in boisterous parties;

24 |      **v.**   **No Fighting:** Fighting in public or any place open to the public view or hearing;

25 |      **w.**   **Stay Out of Other Gang Areas:** Being in any vehicle, other than a public bus,

26 | with any other named defendant(s) or known Rolling Sixty Crips gang member(s) or associate(s) in

27 | the territories of the following gangs which territories are described as follows: (1) Van Ness

28 | Gangsters (VNG's)– the area bordered by 51st and 52nd Streets in the north, to Slauson Avenue in

---

JUDGMENT BY COURT AFTER DEFAULT

6

1   the south, and from Van Ness Avenue in the west, to Western Avenue, in the east, (2) Eight Trey

2   Gangsters (ETG's)- the area which extends from Gage Avenue in the north, to 95th Street in the

3   south, and from Van Ness Avenue in the west, to Vermont Avenue in the east, excepting therefrom

4   the area west of Western Avenue between Slauson and Florence Avenues, and the area south of 89th

5   Street west of Denker Avenue;  (3) Crenshaw Mafia gang (CMG) - an area extending from Century

6   Blvd in the north, to 108th Street in the south, and from Prairie Avenue in the west, to Crenshaw

7   Blvd in the east; and (4) Inglewood Family (IFG) - extending from Florence Avenue in the north,

8   to Century Blvd in the south, and from Van Ness Avenue in the east, to Crenshaw in the west, and

9   (5) the 62 Brims gang - the area bordered by Western in the west, Hoover in the east, Gage in the

10  south, and Slauson in the north, all of which is indicated on the attached map, unless a legitimate

11  medical emergency requires your presence there.

12  2.      Obey all laws, including the Los Angeles Municipal Code, and orders of the Court.

13  3.      On motion of plaintiff, this action is dismissed without prejudice as to DERRICK

14  CLEVELAND (AKA "Lil Blue Shay"), CARTESUS MCGREGOR (AKA "Gotti"), JERRELL

15  PATRICK (AKA "Tiny Mun"), and as to DOES 1-200.

16  4.      Each party to this judgment shall bear his own costs in this action.

17

18  DATED:  NOV 2 4 2003                         RICHARD C. HUBBELL

19                                               RICHARD C. HUBBELL
                                                 Judge of the Superior Court
20

21  Submitted on November  6, 2003 by:

22  Martin Vranicar, Assistant City Attorney (89706)
    Allan A. Nadir, Deputy City Attorney (59786)
23  222 South Hill Street, Suite 600
    Los Angeles, California 90012
24  Telephone: (213) 485-0798

25
    By: Allan A. Nadir, Esq.
26  Deputy City Attorney, Gang Unit
    Attorneys for plaintiff, People of the State of California
27

28  #20411

---

JUDGMENT BY COURT AFTER DEFAULT
7

Pánuco Decl. Supp Mtn for Preliminary Injunction

Exh. 24

FILED

LOS ANGELES SUPERIOR COURT

SEP 2 2 2006

JOHN A. CLARKE, CLERK

BY H. A. SMITH, DEPUTY

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

| | |
|---|---|
| **PEOPLE OF THE STATE OF CALIFORNIA,** | Case No. BC349468 |
| Plaintiff, | [PROPOSED] |
| vs. | **JUDGEMENT GRANTING PERMANENT INJUNCTION** |
| **SCHOOL YARD CRIPS,** an unincorporated association; and **GEER STREET CRIPS** aka **GEER GANGSTER CRIPS,** an unicorporated association, | Assigned for all purposes to the Honorable Joanne O'Donnell |
| | DATE: N/A |
| Defendants. | PLACE:  Department 37<br>111 North Hill Street<br>Los Angeles, CA  90012 |
| | TRIAL DATE:  Not Set |
| | CASE FILED: March 23, 2006 |

Plaintiff, the People of the State of California, *ex rel.* Rockard J. Delgadillo as the City Attorney

for the City of Los Angeles, filed a complaint on March 23, 2006 seeking to abate a public nuisance

through the use of what is commonly known as a "gang injunction," against Defendants School Yard

Crips, an unincorporated association alleged to be a criminal street gang and Geer Street Crips aka Geer

Gangster Crips, an unincorporated association an unincorporated association alleged to be a criminal

1

[JUDGMENT] PERMANENT **ORDER** GRANTING PRELIMINARY INJUNCTION

1   street gang in a "Safety Zone" (as depicted in the map included as page 7 and incorporated herein)

2   within the City of Los Angeles which is defined by the area bounded by Olympic Boulevard to the

3   north, Crenshaw Boulevard to the east, Jefferson Boulevard to the south and a western boundary that

4   begins at the intersection of Jefferson Boulevard and La Cienega Boulevard and continues north along

5   La Cienega Boulevard to Fairfax Boulevard at which point it continues north along Fairfax Boulevard

6   until it reaches the intersection of Fairfax Boulevard and Olympic Boulevard, and including both sides

7   of the boundary streets, but not including the roadbed of the Santa Monica (I-10) Freeway; default was

8

9   duly entered against Defendants School Yard Crips and Geer Street Crips aka Geer Gangster Crips; after

10  due consideration of all papers filed in this action, including the declarations, requests for judicial notice,

11  and other evidence submitted, Plaintiff's memorandum of points and authorities including *People v. ex*

12  *rel. Gallo v. Acuna*, 14 Cal. 4th 1090, *cert. denied*, 521 U.S. 1121 (1997); *People v. Englebrecht*, 88 Cal.

13  App. 4th 1236 (2001); *In re Englebrecht*, 67 Cal. App. 4th 486 (1998), this Court finds by clear and

14  convincing evidence that service is proper under the circumstances and that (1) School Yard Crips and

15  Geer Street Crips aka Geer Gangster Crips are criminal street gangs as defined in Penal Code section

16  186.22 (Street Terrorism Prevention and Enforcement ("STEP") Act) and are gangs as defined for the

17

18  purpose of a gang abatement injunction in *People v. Englebrecht*, 88 Cal. App. 4th 1236,1258 (2001);

19  and (2) the conduct and activities of defendants School Yard Crips and Geer Street Crips aka Geer

20  Gangster Crips and their members constitute a public nuisance in the Safety Zone; and good cause

21  appearing for entry of judgment,

22

23  **GOOD CAUSE HAVING BEEN SHOWN, IT IS HEREBY ORDERED** that:

24       1.       For injunctive relief enjoining and restraining School Yard Crips and Geer Street Crips

25  aka Geer Gangster Crips, all persons acting under, in concert with, for the benefit of, at the direction of,

26  or in association with them or any of them, and their members, including but not limited to Alfred

27  Atman, Jeremy Baker, Esteine Beadeaux, Uimitua Brooks, Jermaine Brown, Jerry Burke, Roderick

28

2

*PERMANENT*

~~ORDER GRANTING PRELIMINARY INJUNCTION~~

1   Carr, Jared Chaney, DeShawn Cole, Kalese Coleman, James Cotton, Norman Crawford, Clarence

2   Crutcher, Sean Cunningham, Aki Davis, Alex Delaney, Edward Durham, Kevin Flakes, Nathaniel

3   Flowers, Kyle Fuller, Richard Gaines, Cameron Grandison, Christopher Greene, Gabriel Griffon,

4   Shelton Harrell, Eugene Harris, Demond Hicks, Pharoah Hoffman, Derek Howell, Terrance Jackson,

5   Torrie Jackson, Tyshawn Jones, Chrisotopher Kirkland, Verlin Lampkin, Johnlyn Lewis, Donnie Lee

6   Lewis, Anthony Lovelace, Madison Lowery, Christopher Malachi, Vioshan Manuel, Jason McDonald,

7   Dwight McDowell, Billy Moore, Andy Morris, Donald Mosely, Mark Mossiah, Russell Nave, Donald

8   Nesbeth, Marvin Nettles, Ghengis Pitts, Paul Pitts, Sheldon Quamina, Marcus Rainey, Swahili Rainey,

9   Antowine Robinson, Antwaion Robinson , Trent Sanders, Arthur Scott, Chis Simmons, Randy Small,

10  Grover Spearman, Steven Spearman, Mitchell Spears, Michael Stacy, Ernest Stevens, Earl Tate, Dorian

11  Tenner, Darco Thomas, Thommy Thompson, Dale Ukkerd, Lamar Upton, Demond Wallace, Ahmad

12  Washington , Allah Watkins, Larry White, Terrell Williams, from engaging in or performing directly or

13  indirectly any of the following activities in the Safety Zone:

14

15

16          a.      **Do Not Associate:**  Driving, standing, sitting, walking, gathering or appearing,

17  anywhere in public view or anyplace accessible to the public, with any known member of the School

18  Yard Crips and/or Geer Street Crips aka Geer Gangster Crips including but not limited to the inviduals

19  listed above.  This prohibition for association shall not apply to the following situations:  (1) when all

20  individuals are inside a school attending class or on school business, (2) when all individuals are inside a

21  church, and (3) when all individuals are in a classroom attending a licensed gang or drug intervention

22  program; provided however that this prohibition against associating shall apply to all claims of travel to

23  or from any of those locations listed in (1) through (3) above;

24          b.      **No Intimidation:**  Confronting, intimidating, annoying, harassing, threatening,

25  challenging, provoking, assaulting or battering any person known to be a witness, victim, or complainant

26  to any activity of the School Yard Crips and/or Geer Street Crips aka Geer Gangster Crips;

27

28

3

c.    **No Firearms, Imitation Firearms, Dangerous Weapons, or Toy Firearms:** Anywhere in public view or anyplace accessible to the public, (1) possessing any firearm, imitation firearm, ammunition, illegal weapon as defined in Penal Code section 12020, and/or toy firearm, (2) knowingly remaining in the presence of anyone who is in possession of such firearm, imitation firearm, ammunition, dangerous weapon, toy firearm, and/or (3) knowingly remaining in the presence of such firearm, imitation firearm, ammunition, dangerous weapon and/or toy firearm.  For purposes of this provision, an imitation firearm means a replica of a firearm that is so substantially similar in physical properties to an existing firearm as to lead a reasonable person to conclude that the replica is a firearm;

d.    **Stay Away From Drugs:** Without a prescription, (1) selling, possessing, or using any controlled substance or related paraphernalia, including but not limited to rolling papers and pipes used for illegal drug use, (2) knowingly remaining in the presence of anyone selling, possessing, or using any controlled substance or such related paraphernalia, or (3) knowingly remaining in the presence of any controlled substance or such related paraphernalia;

e.    **No Open Containers of Alcohol:** Anywhere in public view or anyplace accessible to the public, except on properly licensed premises, (1) possessing an open container of an alcoholic beverage, (2) knowingly remaining in the presence of anyone possessing an open container of an alcoholic beverage, or (3) knowingly remaining in the presence of an open container of an alcoholic beverage;

f.    **No Trespassing:** Being present on or in any property not open to the general public, except (1) with the prior written consent of the owner, owner's agent, or the person in lawful possession of the property, or (2) in the presence of and with the voluntary consent of the owner, owner's agent, or the person in lawful possession of the property;

g.    **Obey Curfew:** Being outside between the hours of 10:00 p.m. on any day and sunrise of the following day, unless (1) going to or from a gang intervention program, job, school, or non-gang-related entertainment activity, (2) actively engaged in some legal business, trade, profession, occupation, or political activity which requires such presence, or (3) responding properly to a real emergency situation that requires immediate attentions;

4
**ORDER GRANTING PRELIMINARY INJUNCTION**

h.   **No Graffiti or Graffiti Tools**: Damaging, defacing, or marking any public property or private property of another, or possessing any spray paint container or felt tip marker;

i.   **Gang-Free School Zones :** (1) Stay away from any school in the Safety Zone in which you, your family member, or minor whom you have legal custody are not enrolled or in the process of enrolling; (2) Stay away from the following schools outside the Safety Zone in which you, your family member, or minor whom you have legal custody are not enrolled or in the process of enrolling: Hamilton High school, located at 2955 S. Robertson Blvd; Dorsey High school, located at 3537 Farmdale Ave.; University High school, located at 11800 Texas Ave.; and Crenshaw High school, located at 5010 11th Ave. For purposes of this section, schools include but are not limited to their classrooms, hallways, parking lots, athletic fields, sidewalks, and common areas. This stay away provision does not exlcude an individual's presence at any non-gang-related community or political forum open to the general public and held on school premises.

j.   **Do Not Warn of Police:**   Acting as a "lookout" by whistling, yelling or otherwise signaling by any means and any equipment, including, but not limited to, hand signals, flashlights, walkie-talkies, cellular telephones, whistles, or riding a bicycle, to warn another person of an approaching law enforcement officer, or soliciting, encouraging, coercing, or employing another person to act as such lookout;

k.   **Protection of Children from Gangs :**     (1) Do not solicit or actively recruit anyone under the age of 18 to join, actively participate in, or associate with the intent to join a gang including but not limited to the School Yard Crips and/or the Geer Street Crips aka Geer Gangster Crips. (2) Do not actively and knowingly permit any minor in your custody to associate with any member of a criminal street gang, other than members of the minor's family, except while enrolled and attending a school or licensed job training, gang rehabilitation, or drug intervention program; provided however that this prohibition against associating shall apply to all claims of travel to or from any of those locations;

l.   **No Reckless Driving:** Driving a vehicle in willful or wanton disregard for the safety of persons or property, including to but not limited to while evading a peace officer as defined in Vehicle Code sections 2800.1 through 2800.3. and

m.    **Obey All Laws:**  Failing to obey all laws (1) which prohibit violence and threatened violence including murder, rape, robbery by force or fear, assault and battery, (2) which prohibit interference with the property rights of others including trespass, theft, driving or taking a vehicle without the owner's consent, and vandalism, or (3) which prohibit the commission of acts which create a nuisance including the illegal sale of controlled substances, gambling on the street, and blocking the sidewalk;

2. Pursuant to the June 8, 2006 court hearing, Erick Epps shall be excluded from this Judgement.

DATED: SEP 2 2 2006

_Jo Donnell_

Judge of the Superior Court

Joanne O'Donnell

Submitted on July 5, 2006 by

ROCKARD J. DELGADILLO, Los Angeles City Attorney
Martin Vranicar, Ass't City Atty, Supervisor, Gang Unit
Kelly Manderino, Deputy City Attorney
Kurt Knecht, Deputy City Attorney
200 North Main Street, 800 City Hall East
Los Angeles, California (213) 978-4090

By: Kurt Knecht, Deputy City Attorney
Attorney for Plaintiff
People of the State of California

By: Kelly Manderino, Deputy City Attorney
Attorney for Plaintiff
People of the State of California

THE DOCUMENT TO WHICH THIS CERTIFICATE IS ATTACHED IS A FULL, TRUE AND CORRECT COPY OF THE ORIGINAL ON FILE AND OF RECORD IN MY OFFICE.

SEP 2 5 2006

ATTEST

JOHN A. CLARKE

Executive Officer/Clerk of the Superior Court of California, County of Los Angeles.

By _____, Deputy

PATRICIA JOHNSON

6

_JUDGMENT &_ ~~ORDER GRANTING PRELIMINARY~~ PERMANENT INJUNCTION



**Mid-City Safety Zone : School Yard and Geer Street Crips**
Office of the City Attorney
City of Los Angeles

Pánuco Decl. Supp Mtn for Preliminary Injunction

# Exh. 25

1

2

3

4

5

6

7

8

9

10

ORIGINAL FILED

NOV 1 5 2004

LOS ANGELES
SUPERIOR COURT

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES (CENTRAL DISTRICT)

| | |
|---|---|
| 11 PEOPLE OF THE STATE OF CALIFORNIA, *ex rel.* Rockard J. Delgadillo as the City Attorney for the City of Los Angeles, | Case No.  BC319981 |
| 12 | [PROPOSED] |
| 13               Plaintiff, | JUDGMENT GRANTING PERMANENT INJUNCTION |
| 14     vs. | Assigned for all purposes to the Honorable James R. Dunn |
| 15 VARRIO NUEVO ESTRADA aka VNE, an unincorporated association; | DATE: N/A |
| 16 DOES 1 through 500, inclusive, | TIME: N/A |
| 17            Defendants. | PLACE: Dept 26          111 North Hill Street          Los Angeles, CA  90012 |
| 18 | |
| 19 | TRIAL DATE:  Not Set<br>CASE FILED:  August 12, 2004 |

20

21

22      Plaintiff, the People of the State of California, *ex rel.* Rockard J. Delgadillo as the City

23 Attorney for the City of Los Angeles, filed a complaint on August 12, 2004, seeking to abate a

24 public nuisance through the use of what is commonly known as a "gang injunction," against

25 defendant Varrio Nuevo Estrada aka VNE ("VNE"), an unincorporated association alleged to be a

26 criminal street gang, in a "Safety Zone" (as depicted in the map included as page 7 and incorporated

27 herein) located in the City of Los Angeles, bounded by the Santa Ana (I-5) Freeway to the north,

28 Soto Street to the west, and the Los Angeles City limits to the south and east, but not including the

1

JUDGMENT GRANTING PERMANENT INJUNCTION

1  roadbed of any freeway or portion thereof; plaintiff subsequently voluntary dismissed without

2  prejudice all fictitious "Doc" defendants; default was duly entered against defendant VNE; after due

3  consideration of all papers filed in this action, including the declarations, requests for judicial notice,

4  and other evidence submitted, plaintiff's memorandum of points and authorities including *People v.*

5  *ex rel. Gallo v. Acuna,* 14 Cal. 4th 1090, *cert. denied,* 521 U.S. 1121 (1997); *People v. Englebrecht,*

6  88 Cal. App. 4th 1236 (2001); *In re Englebrecht,* 67 Cal. App. 4th 486 (1998), this Court finds by

7  clear and convincing evidence that service is proper under the circumstances and that (1) Varrio

8  Nuevo Estrada is also known as VNE; (2) VNE is a criminal street gang as defined in Penal Code

9  section 186.22 (Street Terrorism Enforcement and Prevention "STEP" Act) and is a gang as defined

10  for the purpose of a gang abatement injunction in *People v. Englebrecht,* 88 Cal. App. 4th 1236,

11  1258 (2001); and (3) the conduct and activities of defendant VNE and its members constitute a

12  public nuisance in the Safety Zone; and good cause appearing for entry of judgment,

13  **IT IS ORDERED, ADJUDGED AND DECREED** that:

14       1. Defendant VNE, its members, agents, servants, employees, and all persons acting under,

15  in concert with, for the benefit of, at the direction of, or in association with them or any of them, are

16  enjoined and restrained from engaging in or performing directly or indirectly, any of the following

17  activities in the Safety Zone:

18           a.      **Do Not Associate:**  Driving, standing, sitting, walking, or gathering,

19  anywhere in public view or anyplace accessible to the public, with any known member of VNE, but

20  not including:  (1) when all individuals are inside a school attending class or on school business, (2)

21  when all individuals are inside a church, and (3) when all individuals are inside the Los Angeles

22  Youth Opportunity Movement ("LAYOM") located at 1260 S. Soto Street, Suite 16, Los Angeles,

23  California, and are enrolling in or are enrolled in and attending a youth development or workforce

24  development program established by LAYOM, or are present at the above location for the purpose of

25  obtaining services provided by or through the Gang Reduction Program ("GRP") and/or its affiliated

26  entities; provided however that this prohibition against associating shall apply to all claims of travel

27  to or from any of those locations;

28           b.      **No Intimidation:**  Confronting, intimidating, annoying, harassing,

2

**JUDGMENT GRANTING PERMANENT INJUNCTION**

threatening, challenging, provoking, assaulting or battering any person known to be a witness to any activity of VNE, known to be a victim of any activity of VNE, or known to be a person who has complained about any activity of VNE;

c.    **No Guns or Dangerous Weapons:**  Anywhere in public view or anyplace accessible to the public, (1) possessing any gun, ammunition, or any weapon defined in Penal Code section 12020, (2) knowingly remaining in the presence of anyone who is in possession of such gun, ammunition or weapon, or (3) knowingly remaining in the presence of such gun, ammunition or weapon;

d.    **Stay Away From Drugs:**  Without a prescription, (1) selling, possessing, or using any controlled substance or related paraphernalia, including but not limited to rolling papers and pipes used for illegal drug use, (2) knowingly remaining in the presence of anyone selling, possessing, or using any controlled substance or such related paraphernalia, or (3) knowingly remaining in the presence of any controlled substance or such related paraphernalia;

e.    **Stay Away From Alcohol:**  Anywhere in public view or anyplace accessible to the public, except on properly licensed premises, (1) possessing an open container of an alcoholic beverage, (2) knowingly remaining in the presence of anyone possessing an open container of an alcoholic beverage, or (3) knowingly remaining in the presence of an open container of an alcoholic beverage;

f.    **No Trespassing:**  Being present on or in any property not open to the general public, other than the Estrada Courts Housing Development, except (1) with the prior voluntary written consent of the owner, owner's agent, or the person in lawful possession of the property, or (2) in the presence of and with the voluntary consent of the owner, owner's agent, or the person in lawful possession of the property;

g.    **No Trespassing in Estrada Courts:**  Being present on or in the Estrada Courts Housing Development (the "Development"), except (1) with the prior voluntary written consent of a person who is listed on a lease for the Development, which written consent shall be presented to any peace officer or Housing Authority official upon request, or (2) in the presence of and with the voluntary consent of a person who is listed on a lease for the Development.  To be

3

**JUDGMENT GRANTING PERMANENT INJUNCTION**

1  valid, written consent must identify the authorizing party and unit number and be specific as to the

2  date and time for each entry into the Development.  Such written consent shall be valid only in the

3  following areas: the authorizing party's unit, common areas in the building containing the unit,

4  access to parking for the unit, and a direct route to and from the building where the unit is located.

5  When the authorizing party is a parent, sibling, child, spouse, or a parent of a child of the person

6  authorized, all of the above restrictions apply with the exception that the written consent need not be

7  specific as to the date and time for each entry into the Development;

8        h.    **Obey Curfew:**  Being outside between the hours of 10:00 p.m. on any day

9  and sunrise of the following day, unless (1) going to or from a legitimate meeting or entertainment

10  activity, (2) actively engaged in some business, trade, profession or occupation which requires such

11  presence, or (3) involved in a legitimate emergency situation that requires immediate attention;

12        I.    **No Graffiti or Graffiti Tools:**  Damaging, defacing, or marking any public

13  property or private property of another, or possessing any spray paint container or felt tip marker;

14  and

15        j.    **Obey All Laws:**  Failing to obey all laws (1) which prohibit violence and

16  threatened violence including murder, rape, robbery by force or fear, assault and battery, (2) which

17  prohibit interference with the property rights of others including trespass, theft, driving or taking a

18  vehicle without the owner's consent, and vandalism, or (3) which prohibit the commission of acts

19  which create a nuisance including the illegal sale of controlled substances and blocking the sidewalk;

20    2.    **Renunciation:**  Any VNE gang member or any person who has been served with

21  this injunction (hereinafter "applicant") may move this Court under this provision for an order that

22  this judgment is not enforceable against him/her.

23        a.    Requirements:  Plaintiff agrees not to object to an applicant's motion to be

24  excluded from this judgment, so long as the exclusion is to be without prejudice and with each side

25  to bear its own costs and fees, and so long as the motion satisfies the following requirements:

26        I.    Proper Notice:  A motion under this provision shall be made on proper

27  notice properly served on plaintiff's counsel, and shall not be made on shortened time;

28        ii.    Public Renunciation:  Applicant must truthfully declare under penalty

4

**JUDGMENT GRANTING PERMANENT INJUNCTION**

1  of perjury that he/she is not or is no longer a VNE gang member, and that he/she has renounced the

2  VNE gang.  Renunciation of the VNE criminal street gang is an essential part of this provision.

3            iii.     Proof of Renunciation:  The applicant must truthfully declare under

4  penalty of perjury that, for the continuous period of three (3) years preceding the date of the

5  renunciation, with the starting date being no earlier than the date of this judgment, and not including

6  any time spent incarcerated, any time on supervised release (parole or probation), and/or any time

7  spent outside the country after having been deported, all of the following are and have been true:

8            A.     Applicant has not claimed membership in any gang;

9            B.     Applicant has not associated with any gang members, other

10                 than immediate family members;

11           C.     Applicant has not obtained any new gang-related tattoos and/or

12                 used, owned, or possessed any criminal street gang

13                 paraphernalia;

14           D.     Applicant has not been arrested for, committed, or assisted in

15                 the commission of any felony or misdemeanor.

16           E.     Applicant has in the 18 months prior to his/her renunciation

17                 consistently (1) been gainfully employed and/or (2) has

18                 attended an educational institution and made consistent

19                 progress toward an educational goal that qualifies him/her for a

20                 job, career, or a higher level of education.  Applicant must

21                 provide documentation substantiating his/her employment

22                 and/or educational attendance.

23           iv.     No Third-Party Beneficiaries:  It shall not be a defense to any civil or

24 criminal contempt charge that the applicant was eligible to apply for this Renunciation provision.

25           b.     No Effect in Other Proceedings:  This provision and any orders resulting from

26 it shall not be admissible in any civil or criminal action, and cannot be used for or against an

27 applicant for any purpose whatsoever, other than in a civil or criminal contempt proceeding brought

28 for violation of this judgment.

5

**JUDGMENT GRANTING PERMANENT INJUNCTION**

1    c.    Renounced Applicant Committing New Violation: Anyone who moves for

2  and successfully receives an order under this provision and who then violates any of subsections A

3  through D of (2)(a)(iii) above (by claiming membership in a gang, associating with known gang

4  members other than immediate family, obtaining any gang-related tattoos, possessing any gang

5  paraphernalia, or being arrested for, committing, or assisting in the commission of any felony or

6  misdemeanor), will, notwithstanding such order, be again subject to all of the provisions of this

7  Judgment Granting Permanent Injunction upon being re-served with this Judgment.

8    3.    No Costs  Plaintiff waived costs.  Each party shall bear its own costs in this action.

9

10  DATED:  NOV 1 5 2004            James R. Dunn
                                    _____
11                                  Judge of the Superior Court

12  Submitted on  October 7, 2004 by

13  ROCKARD J. DELGADILLO, Los Angeles City Attorney
    Martin Vranicar, Ass't City Atty, Supervisor, Gang Unit
14  Max Shiner, Deputy City Attorney (187125)
    200 North Main Street, 800 City Hall East
15  Los Angeles, California (213) 978-4090

16

17  _____
    By: Max Shiner, Deputy City Attorney
18  Attorneys for Plaintiff,
    People of the State of California
19

20

21

22

23

24

25

26

27

28

6

**JUDGMENT GRANTING PERMANENT INJUNCTION**

199



Varrio Nuevo Estrada Safety Zone
Office of the City Attorney

Pánuco Decl. Supp Mtn for Preliminary Injunction

# Exh. 26



Entered in Sustain

FILED
LOS ANGELES SUPERIOR COURT

JAN 1 2 2001

JOHN A. CLARKE, CLERK

BY D. West DEPUTY

RECEIVED

OCT 1 8 2000

SUPERIOR COURT
WEST DISTRICT
SANTA MONICA

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

| | |
|---|---|
| PEOPLE OF THE STATE OF CALIFORNIA,<br><br>Plaintiff,<br><br>vs.<br><br>VENICE 13 GANG, an unincorporated association; SALVADOR (JESSE) AGUAYO (aka "Rebel"); RAFAEL AGUAYO (aka "Grande"); ROBERT ALVAREZ, JR. (aka "Lil Guppy"); ROBIN BARRENO (aka "Cyclone"); LUIS BAUTISTA (aka "Monster"); PAUL BAUTISTA (aka "Lil Trippy"); RUDOLFO CASTILLO (aka "Lil Monster"); GERARDO ESPINOZA (aka "Mugsy"); GILBERT GARCIA (aka "Big Gil"); JOSE RAMIREZ GARCIA (aka "Chango"); LOUIE MARIO GARCIA (aka "Lil Louie"); OSWALDO (OSWALD) GARCIA (aka "Ozzie"); JUAN HEREDIA (aka "Buffy"); ARTURO HERRERA (aka "Art"); STEVEN HERRERA (aka "Gordo"); JOSE JACQUEZ (aka "Nutty"); JAIME JAUREGUI (aka "Fat Boy"); JOSE ANTONIO (TONY) JAUREGUI; VALENTIN LIMON (aka "Lil Midget"); BYRON LOPEZ (aka "Bishop"); JACOB MARQUEZ (aka "Trooper"); MICHAEL MARQUEZ (aka "Puppet"); RICHARD MICHAEL MEJIA (aka "Slim"); HUGO MORENO (aka "HUGH"); RICARDO MYERS (aka "Fester"); MICHAEL ROBLES (aka "Flaco") LUCIO SUAREZ (aka "Diablo"); ANDREW URBINA (aka "Sweet Pea"); ANGEL VASQUEZ (aka "Lil Smiley"); IVAN VASQUEZ (aka "Woody"); all as individuals; and DOES 1 through 200, Inclusive,<br><br>Defendants. | CASE NO. SC060 ... ANTONIO E. BARRETO, JR.<br>JUDGE<br>ABD JAN 2 4 2001<br><br>JUDGMENT BY COURT PURSUANT TO CCP §585(b)(d) GRANTING PERMANENT INJUNCTION AGAINST DEFAULTING DEFENDANTS; BIFURCATION OF ACTION AS TO DEFENDANT ROBIN BARRENO ONLY |

1

1    The Clerk of the Court having entered the default of the following defendants in this

2  action, namely: DEFENDANTS SALVADOR (JESSE) AGUAYO (aka "Rebel"), an individual;

3  RAFAEL AGUAYO (aka "Grande"), an individual; ROBERT ALVAREZ, JR., (aka "Lil Guppy"),

4  an individual; LUIS BAUTISTA (aka "Monster") an individual; PAUL BAUTISTA (aka "Lil

5  Trippy") an individual; RUDOLFO CASTILLO (aka "Lil Monster") an individual; GERARDO

6  ESPINOZA (aka "Mugsy") an individual; GILBERT GARCIA (aka "Big Gil") an individual; JOSE

7  RAMIREZ GARCIA (aka "Chango") an individual; LOUIE MARIO GARCIA (aka "Lil Louie"),

8  an individual; OSWALDO (OSWALD) GARCIA (aka "Ozzie") an individual; JUAN HEREDIA

9  (aka "Buffy"), an individual; ARTURO HERRERA (aka "Art") an individual; STEVEN HERRERA

10 (aka "Gordo"), an individual; JOSE JACQUEZ (aka "Nutty") an individual; JAIME JAUREGUI

11 (aka "Fat Boy") an individual; JOSE ANTONIO (TONY) JAUREGUI, an individual; VALENTIN

12 LIMON (aka "Lil Midget"), an individual; BYRON LOPEZ (aka "Bishop") an individual; JACOB

13 MARQUEZ (aka "Trooper"), an individual; MICHAEL MARQUEZ (aka "Puppet") an individual;

14 RICHARD MICHAEL MEJIA (aka "Slim") an individual;  HUGO MORENO (aka "Hugh")

15 RICARDO MYERS (aka "Fester") an individual; MICHAEL ROBLES (aka "Flaco") an individual;

16 LUCIO SUAREZ (aka "Diablo") an individual; ANDREW URBINA (aka "Sweet Pea"),  an

17 individual; ANGEL VASQUEZ (aka "Lil Smiley"), an individual;  IVAN VASQUEZ (aka

18 "Woody") an individual, and the VENICE 13 GANG;

19    And this court having reviewed the evidence heretofore submitted by Plaintiff in

20 support of its motion for judgment after default;

21    NOW THEN, this Court finds that Plaintiff has met its burden of proof as to each and

22 every defaulting defendant as to each element of the cause of action for a public nuisance in the

23 Venice Community Safety Zone, as alleged in the Complaint. THEREFORE,

24

25    IT IS ORDERED, ADJUDGED AND DECREED THAT JUDGMENT is entered

26 in favor of Plaintiff, the People of the State of California, acting by and through James K. Hahn, as

27 the City Attorney of the City of Los Angeles, and against DEFENDANTS SALVADOR (JESSE)

28

2

JUDGMENT BY COURT GRANTING
PERMANENT INJUNCTION

1   AGUAYO (aka "Rebel"), an individual; RAFAEL AGUAYO (aka "Grande"), an individual;

2   ROBERT ALVAREZ, JR., (aka "Lil Guppy"), an individual; LUIS BAUTISTA (aka "Monster")

3   an individual; PAUL BAUTISTA (aka "Lil Trippy") an individual; RUDOLFO CASTILLO (aka

4   "Lil Monster") an individual; GERARDO ESPINOZA (aka "Mugsy") an individual; GILBERT

5   GARCIA (aka "Big Gil") an individual; JOSE RAMIREZ GARCIA (aka "Chango") an individual;

6   LOUIE MARIO GARCIA (aka "Lil Louie"), an individual; OSWALDO (OSWALD) GARCIA (aka

7   "Ozzie") an individual; JUAN HEREDIA (aka "Buffy"), an individual; ARTURO HERRERA (aka

8   "Art") an individual; STEVEN HERRERA (aka "Gordo"), an individual; JOSE JACQUEZ (aka

9   "Nutty") an individual; JAIME JAUREGUI (aka "Fat Boy") an individual; JOSE ANTONIO

10   (TONY) JAUREGUI, an individual; VALENTIN LIMON (aka "Lil Midget"), an individual;

11   BYRON LOPEZ (aka "Bishop") an individual; JACOB MARQUEZ (aka "Trooper"), an individual;

12   MICHAEL MARQUEZ (aka "Puppet") an individual; RICHARD MICHAEL MEJIA (aka "Slim")

13   an individual; HUGO MORENO (aka "Hugh") RICARDO MYERS (aka "Fester") an individual;

14   MICHAEL ROBLES (aka "Flaco") an individual; LUCIO SUAREZ (aka "Diablo") an individual;

15   ANDREW URBINA (aka "Sweet Pea"), an individual; ANGEL VASQUEZ (aka "Lil Smiley"),

16   an individual; IVAN VASQUEZ (aka "Woody") an individual; the VENICE 13 GANG, all

17   members of the Venice 13 Gang, and all persons acting under, in concert with, or for any one of

18   them, all of whom

19

20         1. ARE ENJOINED and restrained from engaging in any of the following activities

21   in the FOLLOWING AREAS: (A) an area bounded by Rose Avenue to the north, Venice Blvd. to

22   the south, Pacific Avenue to the west, and Walgrove Avenue to the east; contiguous thereto is (B):

23   an area bounded by Venice Blvd. to the north, Washington Blvd. (from Lincoln Blvd., to Zanja

24   Street) and Washington Place (from Zanja Street to Centinela Avenue) to the south, Lincoln Blvd.

25   to the west, and Centinela Avenue to the east; and (C): the Venice Beach Recreation Center area, an

26   area bounded by 17th Avenue to the north, 19th Avenue to the south, Ocean Front Walk to the east

27   and the Pacific Ocean to the west:

28

3

---

JUDGMENT BY COURT GRANTING<br>PERMANENT INJUNCTION

a.     Standing, sitting, running, walking, riding, driving, gathering, or appearing anywhere in public or in public view with one or more named Defendants herein (photographs of whom are attached to this order) and/or with any other known Venice 13 gang member(s) and/or associate(s), **but not to include the following locations:**

(I)     when all the individuals are together within and reside within a dwelling unit as defined in Los Angeles Municipal Code Section 12.03;

(ii)     within the Venice Skills Center, 611 - 5th Avenue, Venice, California, when enrolling or when enrolled and attending a class or program in which all individuals are enrolled;

(iii)     within the Vera Davis McClendon Center, 610 California Avenue, Venice, California, when enrolling or when enrolled and attending a class or program in which all individuals are enrolled;

(iv)     within the Venice Community Housing Corporation (VCHC) training and workshop site, 718-20 Rose Avenue, Venice, California, when attending a class or training program in which all individuals are enrolled;

(v)     between the hours of 7:00 a.m. and 5:00 p.m. weekdays, when all individuals are within a site at which they are employed by VCHC, or at which they are being trained by VCHC and when in the presence of a VCHC supervisor.  In addition, when all individuals are within a vehicle operated by VCHC during transportation to and from a training construction site.

PROVIDED that all employees and trainees of VCHC must possess a VCHC photo identification card.

/////

/////

4

1    PROVIDED HOWEVER that subsection 1.a shall apply to all means of

2    travel to and from any of the organizations and locations listed in (ii), (iii),

3    and (iv) herein.

4

5    b.    Selling, possessing, or using, without a prescription, or knowingly remaining

6    in the presence of anyone possessing, selling, or using, without a prescription, any controlled

7    substance or related paraphernalia, including but not limited to hypodermic needles, hype kits,

8    hypodermic injection and snorting devices, or rolling papers and pipes used for marijuana or other

9    illegal drug use;

10    c.    Blocking the free passage of any person or vehicle on any street, walkway,

11    sidewalk, driveway, alleyway, or other area of public access;

12    d.    1. Approaching and/or signaling, any other person's occupied motor vehicle,

13    whether stopped or parked, unless a legitimate emergency situation requires such conduct, or

14        2.    Looking into any other person's unoccupied, parked (with motor off)

15    motor vehicle;

16    e.    Being present on the private property of others, except: (1) with the prior

17    written consent of the person in lawful possession of the property, or (2) in the presence and with

18    the voluntary consent of the person in lawful possession of the property;

19    f.    (1) If under the age of eighteen (18), being out of your residence between 8:00

20    p.m. on any day and sunrise of the immediately following day, unless (1) accompanied by a parent

21    or legal guardian, or (2) engaged in a legal business, trade, profession, or occupation that requires

22    being out, or (3) responding properly to a legitimate emergency situation that requires immediate

23    attention;

24        (2) If eighteen (18) years of age or older, being out of your residence between

25    10:00 p.m. on any day and sunrise of the immediately following day, unless (1) engaged in a legal

26    business, trade, profession, or occupation that requires being out, or (2) responding properly to a

27    legitimate emergency situation that requires immediate attention;

28

5

JUDGMENT BY COURT GRANTING
PERMANENT INJUNCTION

1        g.      Acting as a lookout by whistling, yelling or otherwise signaling by any means

2  and any equipment, including, but not limited to flashlights, "walkie-talkies," whistles, or riding a

3  bicycle to warn another person of an approaching law enforcement officer, or soliciting, encouraging

4  or employing another person to act as such lookout;

5        h.      Confronting, intimidating, harassing, or threatening any person;

6        i.      Drinking or possessing any alcoholic beverage in any public place or any

7  place open to public view, or knowingly being within 10 feet of an open container of alcohol in a

8  public place or a place open to public view;

9        j.     (1) Possessing any gun or firearm, ammunition, knife, laser scope, baseball

10  bat, altered screwdriver, dangerous weapon, or illegal weapon as defined in California Penal Code

11  sections 12020 and 12001.1; or (2) knowingly being in the presence of anyone who is in possession

12  of such gun, firearm, ammunition, laser scope, knife, bat, screwdriver, dangerous, or illegal weapon

13  in any public place or place open to public view;

14        k.     (1) Possessing or using a toy or replica firearm, or a BB gun; or (2) knowingly

15  remaining in the presence of anyone who is in possession of such item(s) in any public place or a

16  place open to public view;

17        l.      Possessing picks, multi-tool instruments, pliers, spark plugs, porcelain chips,

18  rocks, bricks, or any other devices capable of being used to break into locked vehicles;

19        m.     Damaging, defacing, or marking any public property or private property of

20  another, or possessing any aerosol paint container, felt tip marker, or any other marking substance

21  as defined by Penal Code § 594.2;

22        n.      Loitering in any public place including loitering for the purpose of engaging

23  in drug-related activity or graffiti activity or any other illegal purpose.

24        o.     Attending any Venice High School event on or off campus including, but not

25  limited to, dances and/or sporting events without the prior written consent from the school principal,

26  vice-principal, or dean;

27  /////

28

6

207

1        p.      Possessing or using any pager, cellular or digital phone, laser pointer, walkie-

2    talkie, or police scanner <u>unless</u> (a) required by a legitimate business, trade, profession, or

3    employment; or (b) required by a legitimate emergency situation;

4        q.      Being in any vehicle, other than a public bus, with any other named

5    Defendant(s) or known Venice 13 gang member(s) or associate(s) in the Culver City Boys Gang turf

6    described as follows: the area bordered by Venice Blvd. on the north, Jefferson Blvd. on the south,

7    Centinela Ave. on the west, and Sepulveda Blvd. on the east, <u>unless</u> a legitimate medical emergency

8    requires your presence there;

9        2.      Obey all laws, including the Los Angeles Municipal Code, and orders of the Court.

10       3.      This action remains pending against Defendant Robin Barreno who is not subject to

11   this judgment.

12       4.      On motion of Plaintiff, this action is dismissed without prejudice as to all Doe

13   Defendants.

14       5.      Each party to this judgment shall bear his own costs in this action.

15

16   DATED: 1-12-01

17                          Valerie L. Baker
                       Judge of the Superior Court

18                     Hon. James Albracht

19   Submitted on October 12, 2000 by:

20   Martin Vranicar, Assistant City Attorney (89706)
    Allan A. Nadir, Deputy City Attorney (59786)

21   222 South Hill Street, Suite 600
    Los Angeles, California 90012

22   Telephone: (213) 485-0798

23

24

25   By: Allan A. Nadir, Esq.
    Deputy City Attorney, Gang Unit

26   Attorneys for Plaintiff, People of the State of California

27

28   #11907

                       7

**JUDGMENT BY COURT GRANTING PERMANENT INJUNCTION**

Pánuco Decl. Supp Mtn for Preliminary Injunction

# Exh. 27

FILED
LOS ANGELES SUPERIOR COURT

OCT 1 8 2000

JOHN A. CLARKE, CLERK
BY NICHOLAS HERMSEN, DEPUTY

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES (WEST DISTRICT)

| | |
|---|---|
| PEOPLE OF THE STATE OF CALIFORNIA,<br><br>Plaintiff,<br><br>vs.<br><br>VENICE SHORELINE CRIPS, an unincorporated association; DEANDRE ARMSTRONG ("D-NUT/D-CRAZY"), CALVIN BLOCKMAN ("CAL"), TAYON BLOCKMAN ("LIL GHOST"), WALTER BOYD ("SHORTY"), LAMONT BROCK ("LIL BROCK"), FRANKLIN CASTILE ("TINY GHOST"), JAMES COAKER ("J-BONE"), ALVIN COOLEY ("PUDGE"), LAVERNE COOLEY ("C-BOY"), KEVIN CROSBY ("LIL BLACK CAPONE"), JULIUS DAMPIER ("DROOP"), SHACARL FUQUA ("LOC"), KEVIN GIBSON ("C-RAG"), TRAVAIL GLOSTER ("LIL SPIKE"), STEVE GORDON ("SKINNY CUZ"), KIYON GREEN ("BABY GHOST"), JERMAINE HARRIS ("LIL SHOTGUN"), RICHARD HORTON ("RICH DOG"), ANTWAN IRBEY ("LIL SMOKE"), ANTWON JONES ("MOE DOG"), ANDRE LAURENT ("DOC"), THOMAS LEWIS ("Q-BALL"), VICTOR MURRAY ("VIC DOG"), FREDDIE PAXTON ("LIL C LOC"), LARRY PETTY ("L"), JERICO RICHARDSON ("BABY J ROC"), HERMAN SCALES ("MONSTER"), SCHUNATTEE SNODGRASS ("CASPER"), RICKY LEE THORNTON ("SLICK RICK"), RICKY TODD ("PRETTY RICKY"), JAMES TWINN ("TWINN"), BORIS TYLER ("TANK"), | Case No. SC 057282<br><br>[REVISED] -18<br>JUDGMENT BY COURT UNDER CCP § 437c GRANTING PERMANENT INJUNCTION AGAINST 25 DEFENDANTS; JUDGMENT BY COURT GRANTING PERMANENT INJUNCTION AGAINST SEVEN DEFAULTING DEFENDANTS; BIFURCATION OF ACTION |

1

JUDGMENT GRANTING PERMANENT INJUNCTION

KEATON TYLER ("TOOKIE"), GEORGE )
VICTORIAN ("BABY SPEEDY"), DAMON )
WILLIAMS ("DAMIAN"), ANTHONY WILLIS )
("SNEEZE"), DEANDRE WINDOM ("BLUE )
JAY"); and DOES 1 through ___, inclusive, )
)
                    Defendants. )
)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . )

This court, having at or about 9:00 a.m., on August 18, 2000, in Dept. WE"L" granted the motion for summary judgment against 25 Defendants by Plaintiff and having ordered entry of judgment as requested in said motion.

And the clerk of the court, having entered the default of eight other Defendants, in this action, namely: DEANDRE ARMSTRONG("D-NUT/D"CRAZY"), KEATON TYLER ("TOOKIE"), HERMAN SCALES ("MONSTER"), RICKY LEE THORNTON ("SLICK RICK"), TRACY THOMAS ("BABY S MAN"), BORIS TYLER ("TANK"), and the VENICE SHORELINE CRIPS GANG, on or about July 15, 1999, at the Office of the Clerk of the above-entitled Court;

IT IS ORDERED, ADJUDGED AND DECREED THAT JUDGMENT is entered in favor of Plaintiff, the People of the State of California, acting by and through James K. Hahn, as the City Attorney of the City of Los Angeles, and against DEFENDANTS DEANDRE ARMSTRONG("D-NUT/D"CRAZY"), CALVIN BLOCKMAN [WHO ANSWERED THE COMPLAINT AS "CALVIN BLOCKMON" AS WELL AS "BLOCKMAN"] ("CAL"), TAYON BLOCKMAN [WHO ANSWERED THE COMPLAINT AS "TAYON BLOCKMON"] ("LIL GHOST"), WALTER BOYD ("SHORTY"), LAMONT BROCK ("LIL BROCK"), FRANKLIN CASTILE ("TINY GHOST"), JAMES COAKER ("J-BONE"), ALVIN COOLEY ("PUDGE"), JULIUS DAMPIER ("DROOP"), KEVIN GIBSON ("C-RAG"), STEVE GORDON [WHO ANSWERED THE COMPLAINT AS "STEVEN GORDON"] ("SKINNY CUZ"), KIYON GREEN ("BABY GHOST"), JERMAINE HARRIS ("LIL SHOTGUN"), ANTWAN IRBEY [WHO ANSWERED THE COMPLAINT AS "ANTWON IRBY"] ("LIL SMOKE"), ANTWON JONES ("MOE DOG"), ANDRE LAURENT ("DOC"), THOMAS LEWIS ("Q-BALL"), VICTOR MURRAY ("VIC DOG"), FREDDIE PAXTON ("LIL C LOC"), LARRY PETTY ("L"), JERICO

2

**JUDGMENT GRANTING PERMANENT INJUNCTION**

1  RICHARDSON [WHO ANSWERED THE COMPLAINT AS "JERICOH RICHARDSON"]

2  ("BABY J ROC"), HERMAN SCALES ("MONSTER"), SCHUNATTEE SNODGRASS [WHO

3  ANSWERED THE COMPLAINT AS "SCHAUNTTEE" AND AS "SCHAUNETTEE"]

4  ("CASPER"), TRACY THOMAS ("BABY S MAN"),  RICKY LEE THORNTON ("SLICK

5  RICK"), RICKY TODD ("PRETTY RICKY"),   BORIS TYLER ("TANK"),  KEATON TYLER

6  ("TOOKIE"), GEORGE VICTORIAN ("BABY SPEEDY"), DAMON WILLIAMS ("DAMIAN"),

7  ANTHONY WILLIS ("SNEEZE"), AND THE VENICE SHORELINE CRIPS GANG,  all members

8  of the Venice Shoreline Crips Gang, and all persons acting under, in concert with, or for any one of

9  them, are **ENJOINED** and restrained from engaging in any of the following activities in the

10  PRIMARY SAFETY ZONE bounded by Pacific Ave. to the west, Lincoln Blvd. to the east, Venice

11  Blvd. to the south and Rose Ave. to the north:

12        a.    Standing, sitting, walking, driving, or otherwise appearing anywhere in public

13  or in public view with one or more named Defendants or known Venice Shoreline Crips Gang

14  members, (but not including when all individuals are together within and reside within a dwelling

15  unit as defined in L.A.M.C Section 1203), except at the following locations during their business

16  hours: 1) Venice Skills Center; 2) Vera Davis McClendon Family & Youth Center.

17        b.    Selling, possessing, or using, without a prescription, or knowingly remaining

18  in the presence of anyone possessing, selling or using, without a prescription, any controlled

19  substance or related paraphernalia, including but not limited to, rolling papers and pipes used for MJ

20  or other illegal drug use, hype kits, narcotics injection and snorting devices;

21        c.    Being present on the private property of others except with 1) the prior written

22  consent of the owner or person in lawful possession of the property, or 2) in the presence of and with

23  the voluntary consent of the owner or person in lawful possession of the property;

24        d.    Being in a public place between 10:00 p.m. on any day and sunrise of the

25  immediately following day, unless (1) going to or from a legitimate business meeting or a

26  commercial, remunerative entertainment facility, or (2) actively engaged in some legitimate

27  business, trade, profession, or occupation which requires such presence, or (3) responding to a

28  legitimate emergency situation that requires immediate attention;

3

**JUDGMENT GRANTING PERMANENT INJUNCTION**

1    e.    Acting as a lookout, and whistling, yelling or otherwise signaling another

2    person to warn of the approach or presence of a law enforcement officer;

3    f.    Possessing any gun, ammunition, knife, dangerous weapon, or illegal weapon

4    as defined in Penal Code Section 12020 or knowingly remaining in the presence of anyone who is in

5    possession of such gun, ammunition, knife, or illegal or dangerous weapon.

6    g.    Approaching or signaling, as a pedestrian, any vehicle except a police car or

7    public bus on any street unless a legitimate emergency situation requires such conduct.

8    h.    Being in any vehicle, except a public bus, with any other Defendant or known

9    Venice Shoreline Crip Gang member within the area bordered by Sepulveda Blvd. on the east,

10   Centinela Ave. on the west, Venice Blvd. on the north, and Jefferson Blvd. on the south (the

11   SECONDARY SAFETY ZONE), excluding the I-405 freeway.

12    2.    This action remains pending against Defendants RICHARD HORTON and

13   SHACARL FUQUA, who are not subject to this judgment.

14    3.    On motion of Plaintiff, this action is dismissed without prejudice as to the remaining

15   defendants.

16    4.    Each party to this judgment shall bear his own costs in this action.

17

18   DATED: _10-18-00_                          _Valerie L. Baker_
                                                Valerie L. Baker
19                                              Judge of the Superior Court

20

21   Submitted on October _12_, 2000 by:

22   Martin Vranicar, Assistant City Attorney (89706)
     Allan A. Nadir, Deputy City Attorney (59786)
23   222 South Hill Street, Suite 600
     Los Angeles, California 90012
24   Telephone: (213) 485-0798

25

26   By: Allan A. Nadir, Esq.
     Deputy City Attorney, Gang Unit
27
     Attorneys for Plaintiff, People of the State of California
28
     #11576

     _____4_____
                  JUDGMENT GRANTING PERMANENT INJUNCTION

Pánuco Decl. Supp Mtn for Preliminary Injunction

Exh. 28

**ORIGINAL FILED**

OCT 0 3 2006

LOS ANGELES
SUPERIOR COURT

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES (CENTRAL DISTRICT)

| | |
|---|---|
| PEOPLE OF THE STATE OF CALIFORNIA, *ex rel.* Rockard J. Delgadillo as the City Attorney for the City of Los Angeles,<br><br>Plaintiff,<br><br>vs.<br><br>WHITE FENCE aka CERCO BLANCO, an unincorporated association;<br>DOES 1 through 500, inclusive,<br><br>Defendants. | Case No.: BC353596<br><br>[PROPOSED]<br><br>**JUDGMENT GRANTING PERMANENT INJUNCTION**<br><br>Assigned for all purposes to the Honorable ~~Mary Thornton House~~ **DAVID L. MINNING**<br>DATE:    N/A<br>TIME:    N/A<br>PLACE:  Dep't 17<br>           111 North Hill Street<br>           Los Angeles, CA 90012<br><br>TRIAL DATE:    Not Set<br>CASE FILED:    June 8, 2006 |

Plaintiff, the People of the State of California, *ex rel.* Rockard J. Delgadillo as the City Attorney for the City of Los Angeles, filed a complaint on June 8, 2006, seeking to abate a public nuisance through the use of what is commonly referred to as a "gang injunction," against defendant White Fence aka Cerco Blanco ("White Fence"), an unincorporated association alleged to be a criminal street gang, in a "Safety Zone" (as depicted in the maps included as pages 5 and 6) composed of two areas, denoted as "Section A" and "Section B," both of which

1

**JUDGMENT GRANTING PERMANENT INJUNCTION**

1  are located in the City of Los Angeles; "Section A" defined as the area bounded by 4th Street to

2  the north, Indiana Street to the east, and the 5 Freeway to the south and west, and extending 100

3  yards to the outside of each of those boundaries, but not including the roadbed of any freeway or

4  portion thereof; and "Section B" defined as the area bounded by Franklin Avenue to the north,

5  Vermont Avenue to the east, Santa Monica Boulevard to the south, and Gower Street to the west,

6  and extending 100 yards to the outside of each of those boundaries, but not including the roadbed

7  of any freeway or portion thereof; plaintiff subsequently voluntarily dismissed without prejudice

8  all fictitious "Doe" defendants; default was duly entered against defendant White Fence; after

9  due consideration of all papers filed in this action, including the declarations, requests for

10  judicial notice, and other evidence submitted, plaintiff's memorandum of points and authorities

11  including *People v. ex rel. Gallo v. Acuna*, 14 Cal. 4th 1090, *cert. denied*, 521 U.S. 1121 (1997);

12  *People v. Englebrecht*, 88 Cal. App. 4th 1236 (2001); *In re Englebrecht*, 67 Cal. App. 4th 486

13  (1998), this Court finds by clear and convincing evidence that service is proper under the

14  circumstances and that (1) White Fence is also known as Cerco Blanco (2) White Fence is a

15  criminal street gang as defined in Penal Code section 186.22 (Street Terrorism Prevention and

16  Enforcement ("STEP") Act) and is a gang as defined for the purpose of a gang abatement

17  injunction in *People v. Englebrecht*, 88 Cal. App. 4th 1236, 1258 (2001); and (3) the conduct and

18  activities of defendant White Fence and its members constitute a public nuisance in the Safety

19  Zone; and good cause appearing for entry of judgment,

20  **IT IS HEREBY ORDERED, ADJUDGED AND DECREED** that:

21      1. Defendant White Fence, its members, agents, servants, employees, and all persons

22  acting under, in concert with, for the benefit of, at the direction of, or in association with them or

23  any of them, are enjoined and restrained from engaging in or performing directly or indirectly,

24  any of the following activities in the Safety Zone:

25          a.      **Do Not Associate:**  Driving, standing, sitting, walking, gathering or

26  appearing, anywhere in public view or anyplace accessible to the public, with any known

27  member White Fence, but not including:  (1) when all individuals are inside a school attending

28  class or on school business, and (2) when all individuals are inside a church; provided however

2

**JUDGMENT GRANTING PERMANENT INJUNCTION**

that this prohibition against associating shall apply to all claims of travel to or from any of those locations;

        b.    **No Intimidation:**  Confronting, intimidating, annoying, harassing, threatening, challenging, provoking, assaulting or battering any person known to be a witness to any activity of White Fence, known to be a victim of any activity of White Fence, or known to be a person who has complained about any activity of White Fence;

        c.    **No Firearms, Imitation Firearms, or Dangerous Weapons:**  Anywhere in public view or anyplace accessible to the public, (1) possessing any firearm, imitation firearm, ammunition, or illegal weapon as defined in Penal Code section 12020, (2) knowingly remaining in the presence of anyone who is in possession of such firearm, imitation firearm, ammunition or dangerous weapon, or (3) knowingly remaining in the presence of such firearm, imitation firearm, ammunition or dangerous weapon.  For purposes of this provision, an imitation firearm means a replica of a firearm that is so substantially similar in physical properties to an existing firearm as to lead a reasonable person to conclude that the replica is a firearm;

        d.    **Stay Away From Drugs:**  Without a prescription, (1) selling, possessing, or using any controlled substance or related paraphernalia, including but not limited to rolling papers and pipes used for illegal drug use, (2) knowingly remaining in the presence of anyone selling, possessing, or using any controlled substance or such related paraphernalia, or (3) knowingly remaining in the presence of any controlled substance or such related paraphernalia;

        e.    **No Open Containers of Alcohol:**  Anywhere in public view or anyplace accessible to the public, except on properly licensed premises, (1) possessing an open container of an alcoholic beverage, (2) knowingly remaining in the presence of anyone possessing an open container of an alcoholic beverage, or (3) knowingly remaining in the presence of an open container of an alcoholic beverage;

        f.    **No Trespassing:**  Being present on or in any property not open to the general public, except (1) with the prior written consent of the owner, owner's agent, or the person in lawful possession of the property, or (2) in the presence of and with the voluntary consent of the owner, owner's agent, or the person in lawful possession of the property;

3

---

**JUDGMENT GRANTING PERMANENT INJUNCTION**

1           g.    **Obey Curfew**:  Being outside between the hours of 10:00 p.m. on any day

2    and sunrise of the following day, unless (1) going to or from a legitimate meeting or

3    entertainment activity, (2) actively engaged in some business, trade, profession or occupation

4    which requires such presence, or (3) involved in a legitimate emergency situation that requires

5    immediate attention;

6           h.    **No Graffiti or Graffiti Tools**:  Damaging, defacing, or marking any

7    public property or private property of another, or possessing any spray paint container or felt tip

8    marker;

9           i.    **Obey All Laws:**  Failing to obey all laws (1) which prohibit violence and

10   threatened violence including murder, rape, robbery by force or fear, assault and battery, (2)

11   which prohibit interference with the property rights of others including trespass, theft, driving or

12   taking a vehicle without the owner's consent, and vandalism, or (3) which prohibit the

13   commission of acts which create a nuisance including the illegal sale of controlled substances

14   and blocking the sidewalk;

15   **[Text continued on page 7 after maps]**

16   ///

17   ///

18   ///

19   ///

20   ///

21   ///

22   ///

23   ///

24   ///

25   ///

26   ///

27   ///

28   ///

4

**JUDGMENT GRANTING PERMANENT INJUNCTION**



White Fence Safety Zone
Section A (Boyle Heights)
Office of the City Attorney
City of Los Angeles

9



White Fence Safety Zone

Section B (Hollywood)

Office of the City Attorney
City of Los Angeles

1      2.    **No Costs**   Plaintiff waived costs. Each party shall bear its own costs in this

2 action.

3

4 DATED: _____ <u>OCT 0 3 2006</u>            **DAVID L. MINNING**

5                                          Judge of the Superior Court

6 Submitted on July 27, 2006, by

7 ROCKARD J. DELGADILLO, Los Angeles City Attorney
   Martin Vranicar, Ass't City Attorney, Supervisor, Gang Unit
8 Max Shiner, Deputy City Attorney
   200 North Main Street, 800 City Hall East
9 Los Angeles, California 90012
   (213) 978-0490

10

11 _____

12 By: Max Shiner
   Deputy City Attorney, Gang Unit

13
   Attorneys for Plaintiff,
14 People of the State of California

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                  7

**JUDGMENT GRANTING PERMANENT INJUNCTION**

Pánuco Decl. Supp Mtn for Preliminary Injunction

Exh. 29

OFFICE OF OPERATIONS

OPERATIONS ORDER NO. 2                           December 9, 2009

SUBJECT:    SERVICE AND ENFORCEMENT OF GANG INJUNCTIONS

EFFECTIVE:   IMMEDIATELY

PURPOSE:    The State of California has approved the use of gang
            injunctions (GI) to combat chronic gang activity.
Due to the Department's responsibility for enforcing GIs within
the City, protocols have been established to ensure that GIs are
implemented uniformly and equitably.  This Order formalizes
procedures for the service and enforcement of permanent GIs in
accordance with the Los Angeles City Attorney's Office (CA) Gang
Injunction Guidelines, published in June 2009.  The CA's Gang
Injunction Guidelines are accessible on the Department's
Infoweb.  The hyperlink to the Gang Injunction Guidelines is on
the Guides page, under Reference Library.

PROCEDURE:

    I.  GENERAL GUIDELINES.

        A.  Service.  The service of a permanent GI can only be
            completed by a gang officer who is assigned to a
            specialized gang detail and has received the
            requisite training from an approved CA representative
            - generally referred to as a Gang Deputy.

            Note:  A Gang Deputy is a Deputy City Attorney (DCA)
            assigned to the City Attorney's Gang Division.

        B.  Enforcement.  Upon notification that a GI has been
            made permanent, the Gang Impact Team (GIT), Officer
            in Charge (OIC), from the respective Area shall
            contact and coordinate training with the assigned
            Gang DCA.  Enforcement of the GI shall not occur
            until such training has been provided and documented
            in the injunction package.  However, the enforcement
            of a GI can be administrated by any Department
            employee who has received the requisite training from
            an approved Gang DCA.

   II.  SERVICE OF GANG INJUNCTIONS.  The formal service of an
        injunction is accomplished by completing the Proof of
        Service (POS) and Record of Service (ROS) forms and
        physically providing the GI to the gang member.  If the

2

OPERATIONS ORDER NO. 2          -2-              December 9, 2009

gang member refuses to accept the GI, it is permissible to leave it at the service location (e.g., at the gang member's feet, on the doorstep, on their vehicle windshield, etc.) and document it on the ROS.

A.  **Documentation Required.**  A gang member may be served with the GI if, at the time of service, there is documented evidence that establishes beyond a reasonable doubt that:

*  The person being served is a gang member; and,
*  The gang member's participation in the enjoined gang has, in the past five years, been more than nominal, passive, inactive, or purely technical.

B.  **Prior Approval.**  Prior to serving a GI to a gang member, employees shall receive approval from a Gang DCA.  Prior approval may be obtained by completing and submitting a Service Worksheet form to a Gang DCA for approval.

   **Exception:**  If due to exigent circumstances, an employee serves a gang member with a GI without obtaining approval from a Gang DCA, that employee shall submit a Service Worksheet, ROS, and a written explanation as to why prior approval was not obtained from a Gang DCA, as soon as reasonably possible.  The Gang DCA may approve the service retroactively if it is determined that the requirements for service were met and the employee was acting reasonably based on the totality of the circumstances.

There may be an occasion where the Gang DCA provisionally does not approve the person who was served and may require additional investigation and documentation.  In this instance, the person served shall not be subject to enforcement.  The service papers should be marked "CASE CONTINUED" and include documentation from the Gang DCA.

   Note:  The need to serve an individual with an injunction does not constitute a legal reason to detain that individual.  However, the injunction may be served on an individual who is already detained, in custody for a separate and lawful

3

OPERATIONS ORDER NO. 2          -3-          December 9, 2009

   reason, or when the contact is consensual.
   If this occurs, the reason for detention, custody,
   or an account of the consensual contact shall be
   recorded on the POS and ROS forms.

  C. **Service of Injunction to Juveniles.**  An employee
   serving a juvenile gang member with a GI shall also
   attempt to notify the juvenile's parent or guardian
   in person.  The manner of notification, date, and the
   name of the employee making the notification shall be
   documented in the ROS form.  When an in-person or
   telephonic notification to the parent or guardian is
   not possible, the GIT OIC shall cause notification to
   be mailed to the parent or guardian.  The date and
   the name of the individual mailing the notification
   shall be documented on the ROS form.

III. **ENFORCEMENT OF GANG INJUNCTIONS.**  The enforcement of a
  violation of a GI requires that a person was served with
  the injunction prior to making an arrest.  Any injunction
  enforcement requires Department employees to sufficiently
  document evidence that establishes <u>all</u> of the following
  criteria that are applicable to the person involved:

  * Membership in the enjoined gang, and therefore subject
   to the GI, at the time of the alleged violation;
  * Violation of one or more of the provisions of the GI
   within the specific geographical boundaries set forth
   by the GI (i.e., the "Safety Zone"); and,
  * Previous service of the GI and verification of service
   was made at the time of the violation.

IV. **OFFICER'S RESPONSIBILITIES.**  Employees seeking to serve a
  GI shall:

  * Complete and submit a Service Worksheet for each
   individual to be served;
  * Submit the Service Worksheet to a Gang DCA for
   approval; and,
  * Complete the ROS and the POS according to the
   instructions provided on each form.

  Gang officers and gang detectives shall adhere to the
  following guidelines when photographing a suspected gang
  member or gang affiliate:

4

OPERATIONS ORDER NO. 2          -4-          December 9, 2009

* Officers shall not use physical force or any other
  form of coercion or ruse in acquiring a photograph;
* Officers shall request and receive permission from the
  person prior to taking a photograph when that person
  is not being arrested or otherwise legally detained;
* Officers shall not pose the person with name or gang
  identification card(s);
* Persons photographed shall be unrestrained and on
  public property;
* Officers shall take the photograph at approximately
  the time of the completion of the Field Interview
  Report ("Card"), Form 15.43.00;
* Photographing may not extend the time necessary to
  complete the interview process; and,
* A full explanation shall be provided to the person as
  to the purpose of the photograph.

> Note:  The Record of Service provides for the
> attachment of a photograph of the person being
> served.  Non-booking identification and field
> photographs of gang members shall comply with
> Department Manual Section 4/269.60, which states that
> only gang officers and gang detectives are authorized
> to take non-booking identification photographs of
> active and affiliate gang members.

V. **GANG IMPACT TEAM, OFFICER IN CHARGE, RESPONSIBILITIES.**
The Gang Impact Team, OIC, of each Area maintaining a
permanent GI shall:

* Maintain an Injunction Package for each GI, including
  all source documents used in support of the GI
  application, permanent GI court order, POS and ROS
  pertaining to the GI, and any other documentation
  supporting a person's inclusion in the GI;

> Note:  In coordination with the CA's Gang Division, a
> periodic review of Area injunction packages will be
> conducted to verify evidence of ongoing gang
> membership.

* Secure and coordinate the requisite GI service and
  enforcement training from the CA;
* Maintain a list of Department employees who are
  trained in GI service and enforcement;

5

OPERATIONS ORDER NO. 2          -5-                December 9, 2009

     * Establish a roster of Area gang experts, including who
       is court qualified and list the gangs to which their
       individual expertise applies;
     * Ensure that upon service of the injunction on a
       juvenile, an attempt is made to notify the juvenile's
       parent or guardian; and,
     * Maintain the following gang member lists:

       (a)  Number of gang members served with a GI;
       (b)  Gang members who have been served with a GI and
           remain subject to its enforcement (maintain and
           reconcile the list with the CA on a monthly
           basis); and,
       (c)  Gang members arrested for the violation of an
           injunction (maintain and reconcile the list on a
           monthly basis with the CA).

VI.   AREA COMMANDING OFFICER'S RESPONSIBILITY.  The Area
      commanding officer shall be responsible for ensuring
      compliance with this Order.

AUDIT RESPONSIBILITY:  The Commanding Officer, Internal Audits
and Inspections Division, shall monitor compliance with this
directive in accordance with Department Manual Section 0/080.30.

Any questions regarding this Order can be directed to Gang
Support Section, Gang and Narcotics Division, at (213) 847-1771.

EARL C. PAYSINGER, Assistant Chief
Director, Office of Operations

DISTRIBUTION "A"

6

Pánuco Decl. Supp Mtn for Preliminary Injunction

# Exh. 30

```
 1              SUPERIOR COURT OF THE STATE OF CALIFORNIA

 2                    FOR THE COUNTY OF LOS ANGELES

 3    DIVISION LX "141"      HON. MARK ZUCKMAN, COMMISSIONER

 4

 5    THE PEOPLE OF THE STATE OF CALIFORNIA,)
                                            )
 6                          PLAINTIFF,)
                                            )
 7              VS.                     )   NO. 9WA01997
                                            )
 8    01 CHRISTIAN RODRIGUEZ,           )
                                            )
 9                          DEFENDANT.)
      _____)
10

11                    REPORTER'S TRANSCRIPT

12                  TUESDAY, OCTOBER 6, 2009

13    APPEARANCES:

14    FOR PLAINTIFF:      CARMEN TRUTANICH, CITY ATTORNEY
                          BY:  ALLAN A NADIR, DEPUTY
15                        11701 S. LA CIENEGA BLVD.
                          LOS ANGELES, CALIFORNIA 90045
16

17
      FOR THE DEFENDANT:  OLU K. ORANGE
18                        ATTORNEY AT LAW
                          3435 WILSHIRE BLVD., SUITE 2900
19                        LOS ANGELES, CALIFORNIA  90010

20

21

22

23                        SANDRA L. SUTTLE, CSR #10411
24                        OFFICIAL REPORTER
                          11701 S. LA CIENEGA BLVD.
25                        LOS ANGELES, CALIFORNIA  90045

26

27

28
```

ORIGINAL

2

```
 1              LOS ANGELES, CALIFORNIA; TUESDAY, OCTOBER 6, 2009
 2
 3                          P.M. SESSION
 4                             -oOo-
 5          THE COURT:  PEOPLE VS. RODRIGUEZ, 9WA01997.
 6  MR. ORANGE, COUNSEL FOR THE DEFENDANT, APPEARING 977, I ASSUME?
 7          MR. ORANGE:  YES, YOUR HONOR.
 8          THE COURT:  MR. NADIR FOR THE PEOPLE.
 9          MR. NADIR:  THANK YOU, YOUR HONOR.
10          THE COURT:  THE COURT'S GOT SOME INQUIRIES.  I WANT TO
11  NARROW THE SCOPE AS BEST I CAN, AND I THINK THAT BOTH COUNSEL
12  HAD DONE A PRETTY GOOD JOB IN FOCUSING ON RELEVANT ISSUES.
13  MY INQUIRY IS GOING TO BE AS TO A SECTION (A) AND SECTION (E) OF
14  THE INJUNCTION.
15          MR. NADIR:  BEFORE YOU GO ON, YOUR HONOR, JUST TO
16  ALERT YOU, THE ONLY ISSUE HERE IS COUNT 2.  COUNT 1, THE
17  PREVIOUS DEMURRER, WAS OVERRULED, SO ONLY COUNT 2 IS INVOLVED
18  TODAY.
19          THE COURT:  COUNT 2 BEING --
20          MR. ORANGE:  SECTION (E).
21          MR. NADIR:  SECTION (E), THE CURFEW.  I DID NOT FILE A
22  RESPONSE SO THERE'S NOTHING FROM OUR OFFICE.
23          THE COURT:  JUST OUT OF CURIOSITY, WHO RULED ON
24  SECTION (A) AND WHEN?
25          MR. ORANGE:  JUDGE NEWMAN WHILE YOU WERE ON VACATION.
26          THE COURT:  I SEE.
27          MR. NADIR:  WE WORKED IT OUT SPECIALLY FOR YOU SO YOU
28  WOULDN'T HAVE TO WORRY ABOUT THIS.
```

230

3

```
 1              THE COURT:  SOMEBODY SHOULD HAVE TOLD ME ABOUT THIS
 2   BECAUSE I SPENT MOST OF MY TIME LOOKING INTO SECTION (A).
 3              MR. NADIR:  I DIDN'T REALIZE THAT, BECAUSE THIS
 4   DEMURRER ONLY REFERS TO SECTION (E).
 5              THE COURT:  AS A MATTER OF FACT, I SAW THAT LATE IN
 6   THE PROCESS.  I SPENT A LITTLE MORE TIME ON SECTION (A) THAN
 7   SECTION (E), ALTHOUGH I THINK THAT LEARNING SECTION (A) IS
 8   RELEVANT BECAUSE WE'RE DEALING WITH A LOT OF THE SAME ISSUES.
 9   BUT THANK YOU, MR. NADIR.  THAT HELPS TO FOCUS IT EVEN MORE.
10              MR. ORANGE:  YOUR HONOR, IF YOU HAVE A DIFFERENT
11   RULING ON SECTION (A) THAN JUDGE NEWMAN HAD, WE'LL GLADLY TAKE
12   IT.
13              THE COURT:  YOU'LL NEVER KNOW.
14              MR. ORANGE:  FAIR ENOUGH.
15              THE COURT:  THERE'S AN APPELLATE PROCESS FOR THAT AND
16   I'M SURE YOU ARE AWARE OF THAT.
17              MR. ORANGE:  YES, YOUR HONOR.
18              THE COURT:  WHY DIDN'T JUDGE NEWMAN HANDLE
19   SECTION (E)?  WAS IT NOT BRIEFED AT THAT POINT, IS THAT IT?
20              MR. NADIR:  PRECISELY THAT.  MY ARGUMENT ORIGINALLY
21   WAS THAT COUNSEL SHOULD NOT BE ALLOWED TO FILE A DEMURRER
22   SERIATIM THAT WAS OVERRULED SO THAT'S WHY HE FILED THE SECOND
23   DEMURRER.
24              THE COURT:  ONE SECOND.
25              MR. ORANGE:  YOUR HONOR, IF I MAY.  THE SECTION (A)
26   AND SECTION (E) DEMURRERS ARE VIRTUALLY IDENTICAL UP THROUGH
27   PAGE EIGHT OF THE SECTION (E) DEMURRER.  EARLIER I WAS
28   MENTIONING THAT PAGES EIGHT THROUGH TWELVE --
```

4

```
 1              THE COURT:  OF YOUR MOVING PAPERS?
 2         MR. ORANGE:  RIGHT, OF THE SECOND DEMURRER, ARE THE
 3    PAGES WHERE THE ISSUE REALLY APPEARS.
 4              THE COURT:  RIGHT.  EIGHT THROUGH TWELVE SEEM TO BE
 5    THE RELEVANT PORTIONS WITH REGARD TO SECTIONS (A) AND (E), I
 6    BELIEVE, BUT LET ME DISCARD YOUR MOVING PAPERS SO AS NOT TO
 7    CONFUSE MYSELF WITH REGARDS TO SECTION (A).
 8         MR. ORANGE:  YES, YOUR HONOR.
 9              THE COURT:  LET ME HANDLE THIS, IF I MIGHT, ALMOST
10    LIKE THE APPELLATE COURT IN TERMS OF POSING SOME QUESTIONS TO
11    COUNSEL TO HELP CLARIFY THE ISSUES IN MY MIND A LITTLE BIT AND
12    DON'T BE MISLED BY WHO I TURN TO FIRST.  MR. NADIR?
13         MR. NADIR:  YES.
14              THE COURT:  IS IT YOUR CLAIM WITH REGARD TO
15    SECTION (E) THAT IT IS NOT VAGUE -- THE STATUTE?  OR IS YOUR
16    CLAIM THAT WHETHER IT'S VAGUE OR NOT IS IRRELEVANT?  THE
17    DEMURRER DOES NOT LIE FOR OTHER REASONS.
18         MR. NADIR:  WELL, BOTH.  FIRST OF ALL, I BELIEVE THAT
19    COUNSEL USED UP HIS DEMURRERS WITH THE FIRST ONE, THAT THERE'S
20    NO RIGHT TO HAVE TWO DEMURRERS, WHICH WOULD MEAN THAT THIS ONE
21    IS WITHOUT JUSTIFICATION.
22              THE COURT:  THERE'S A RULING ON THAT THEORY, AS I
23    UNDERSTAND IT.
24         MR. NADIR:  RIGHT.
25              THE COURT:  BY THE WAY, IT'S DICTA, BUT I WOULD BE IN
26    AGREEMENT WITH THAT RULING.  I THINK COUNSEL'S GOT A RIGHT TO
27    FILE A SECOND MOTION.
28         MR. NADIR:  FINE.
```

5

```
 1            THE COURT:  SO LET'S DISCUSS THE MERITS.
 2            MR. NADIR:  MERITS.  I DO BELIEVE IT'S NOT VAGUE.
 3   COUNSEL CITES THE COLONIA CHIQUES CASE WHICH DOES DISCUSS THE
 4   VAGUENESS OF THIS KIND OF LANGUAGE.
 5            I HAVE TO TELL THE COURT I DON'T REALLY AGREE.  I DO
 6   NOT AGREE WITH THE INTERPRETATION OF THE COURT WHICH WAS MORE OF
 7   A SPECULATIVE ANALYSIS.  I THINK THE COURTS ARE CLEAR.  IF YOU
 8   ARE OUTSIDE AFTER TEN P.M. THEN YOU'RE IN VIOLATION OF THE
 9   INJUNCTION WITH -- EXCEPT FOR THE EXCEPTION.
10            THE COURT:  LET ME ASK YOU THIS.  I'M GOING TO CALL IT
11   THE CHIQUES CASE
12            MR. NADIR:  CHIQUES CASE.
13            THE COURT:  YOU'RE SAYING YOU DON'T AGREE WITH THE
14   WRITTEN OPINION IN CHIQUES?
15            MR. NADIR:  CORRECT.  DOESN'T MEAN MUCH IF I DON'T
16   AGREE WITH IT BECAUSE IT'S THE LAW.
17            THE COURT:  RIGHT.  SO LET'S FOCUS ON WHAT THE COURT
18   IN CHIQUES SAID.  DID THE COURT, IN YOUR ESTIMATION, CONCLUDE
19   THAT A VIRTUALLY IDENTICAL STATUTE WITH REGARD TO THEIR
20   EQUIVALENCE OF SECTION (E) WAS UNCONSTITUTIONAL FOR VAGUENESS?
21            MR. NADIR:  I WOULD HAVE TO SAY STATUTORY LANGUAGE IS
22   PRETTY CLOSE BETWEEN THE TWO INJUNCTIONS.
23            THE COURT:  IS IT YOUR UNDERSTANDING IN THIS CHIQUES
24   CASE THAT THAT COURT RULED THAT THE LANGUAGE WHICH WAS SIMILAR
25   TO THE LANGUAGE HERE WAS UNCONSTITUTIONALLY VAGUE?
26            MR. NADIR:  I BELIEVE SO.
27            THE COURT:  SO HOW WOULD YOU ARGUE I SHOULD
28   DIFFERENTIATE MY RULING FROM THE CHIQUES RULING IF THAT BE THE
```

6

```
 1   CASE?
 2           MR. NADIR:  WELL, I DON'T KNOW.  I'M NOT SURE THAT THE
 3   COURT CAN.  THEY ARE PRETTY CLOSE.  IN FACT, IT'S PROBABLY THE
 4.  CASE THAT THE COLONIA CHIQUES DISTRICT ATTORNEY COPIED THE WORDS
 5   FROM THIS ONE SINCE IT CAME AFTER.
 6           WE WERE PRETTY CLOSE IN DISCUSSING CASES, SO THE
 7   LANGUAGE IS VIRTUALLY THE SAME, SO I DON'T SEE TOO MUCH
 8   DIFFERENCE.  IT IS "OUTSIDE."   IF THE COURT DOESN'T LIKE THE
 9   WORD "OUTSIDE," THIS IS WHAT THE LANGUAGE HERE IS, "OUTSIDE,"
10   AND DON'T LIKE THE WORD "ENTERTAINMENT."
11           TO ME, IT'S PRETTY CLEAR AS TO WHAT IT IS.  I DON'T
12   THINK EITHER WORD IS VAGUE.  IF THE COURT FOUND THAT THEY ARE
13   VAGUE, I CAN'T ARGUE WITH WHAT THE COURT FOUND.  I DISAGREE WITH
14   IT BECAUSE I THINK IT'S -- THE LANGUAGE IS CLEAR.
15           THE COURT:  WELL, TO THE EXTENT THAT THE LANGUAGE IS
16   IDENTICAL OR VIRTUALLY IDENTICAL, HAVING IDENTICAL IMPORT EVEN
17   THOUGH THE ACTUAL WORDS MAY BE DIFFERENT, IF I WERE TO DENY THE
18   DEMURRER, IT WOULD BE BASED ON A COURT -- THIS COURT BASICALLY
19   IGNORING APPELLATE COURT PRECEDENT.  IT'S ON ALL FOURS.
20           MR. NADIR:  BUT CORRECTLY SO.  IF YOU WANT TO UTILIZE
21   YOUR PUBLIC DEFENDER'S JUDGMENT, I THINK THIS WOULD BE A GOOD
22   TIME.
23           THE COURT:  WELL, THERE'S A RULE CALLED "STARE
24   DECISIS."
25           MR. NADIR:  I'VE HEARD OF IT, BUT I'M -- DEFENSE
26   ATTORNEYS HAVE NO PROBLEM ARGUING THAT THE COURT SHOULD
27   DISREGARD STARE DECISIS, SO I FEEL COMPELLED TO ARGUE THE SAME
28   WAY WHEN I'VE -- ACTUALLY, I BELIEVE THAT MY INTERPRETATION IS
```

7

```
 1    CORRECT.  I DON'T KNOW.
 2            THE COURT HAS ITS OWN OPINION, BUT I THINK THE COLONIA
 3    CHIQUES CASE DEFINED WORDS OR SPECULATED ON THE DEFINITION,
 4    WHICH MAKES THEM VAGUE.
 5            I DON'T THINK THEIR DICTIONARY DEFINITION OF THESE
 6    WORDS WOULD MAKE THE STATUTE OR THE INJUNCTION VAGUE, BUT THE
 7    JUDGE IN THE COLONIA CHIQUES CASE DECIDED THE ENGLISH DICTIONARY
 8    WASN'T ADEQUATE BUT SPECULATION WAS WASHBOARD.
 9            I WOULD SAY, YOUR HONOR, I'M NOT SURE IF I COULD ADD
10    MUCH MORE.  THERE IS GREAT SIMILARITY BETWEEN THE TWO.  I THINK
11    THAT THE STATUTE AND THE INJUNCTION AS WRITTEN IS NOT VAGUE.
12    IN MANY CASES STATUTORY INTERPRETATION COURTS WILL, AS THE COURT
13    DID IN THE GALLO CASE, NARROW THE DEFINITION TO SUIT THE
14    SITUATION.  THE COURT EVEN IN THAT CASE -- IN FACT, THIS COUNSEL
15    HERE IN HIS PREVIOUS ARGUMENT TALKED ABOUT THE EMENDATION ISSUE,
16    AND THE SUPREME COURT SAYS THAT EVEN THOUGH IT MAY BE VAGUE ON
17    IT'S FACE, IT COULD BE INTERPRETED TO MAKE IT CERTAIN AS THE
18    COURT DID WITH (INAUDIBLE) --
19            THE COURT:  AS THE COURT DID WITH WHAT?
20            MR. NADIR:  THE SUPREME COURT.  THE QUESTION IS
21    WHETHER THE PERSON THAT YOU'RE ASSOCIATING WITH IS A KNOWN GANG
22    MEMBER.  THE WORD "KNOWN" WAS NOT IN THE STATUTE, NOT IN THE
23    INJUNCTION, BUT THE COURT MADE THAT ASSUMPTION AND INTERPRETED
24    NARROWLY TO SAY, "YES, IT'S GOT TO BE A KNOWN GANG MEMBER TO
25    YOU."
26            I THINK IN THE SAME WAY HERE THE COURT COULD -- THIS
27    COURT COULD INTERPRET THE WORD "OUTSIDE" TO MEAN OUTSIDE OF THE
28    RESIDENCE AS OPPOSED TO JUST OUTSIDE IN THE BACKYARD SOMEWHERE,
```

8

```
 1   WHICH IS WHAT THE COLONIA CHIQUES CASE HOLDS.
 2           SO WHAT I'M SUGGESTING IS THAT THIS COURT COULD DO
 3   WHAT THE CALIFORNIA SUPREME COURT DID IN THE GALLO CASE, WHICH
 4   IS INTERPRET IT A LITTLE MORE NARROWLY WITHIN THE CONTEXT OF THE
 5   INJUNCTION TO SAY THAT "OUTSIDE" JUST MEANS OUTSIDE THE HOUSE,
 6   OUTSIDE THE RESIDENCE, IN WHICH CASE IT WOULD BE PERFECTLY NOT
 7   VAGUE BUT CERTAIN.
 8           AND I THINK THIS COURT WOULD BE WITHIN IT'S
 9   DISCRETION, AND CORRECTLY SO, ACTING LIKE THE SUPREME COURT IN
10   THE GALLO CASE TO SAY, "YES, 'OUTSIDE' COULD BE SPECULATIVE" IF
11   YOU THINK OUTSIDE THE REAR WINDOW IN THE BACKYARD THAT WOULD BE
12   PUBLIC -- A PRIVATE PLACE.  SO I THINK THAT'S WHAT I ASK THE
13   COURT TO DO IS INTERPRET THIS TO MAKE IT MORE CONCISE AND NOT
14   VAGUE.
15           THE COURT:  IN WHAT CONTEXT -- STAYING WITH YOU FOR A
16   MOMENT MORE, MR. NADIR.  IN WHAT CONTEXT DID THE CHIQUES COURT
17   RULE AS TO THE VAGUENESS ISSUE?  DID THE COURT IN CHIQUES PERMIT
18   AN AMENDMENT TO IMPROVE THE LANGUAGE TO NARROW THE VAGUENESS, OR
19   DID THE COURT IN CHIQUES MERELY RULE THAT THE LANGUAGE WAS
20   UNCONSTITUTIONALLY VAGUE, THEREFORE, THE DEFENDANT WAS NOT BOUND
21   BY THE INJUNCTION?
22           MR. NADIR:  YEAH.  I DON'T REMEMBER IF THE COURT
23   NARROWED THE SCOPE OR THE LANGUAGE AT ALL.  I WAS TALKING ABOUT
24   THE CALIFORNIA SUPREME COURT CASE IN GALLO VS. ACUNA THAT DID
25   THAT, AS FAR AS AN ASSOCIATION CLAUSE.
26           IN THIS CASE THE COURT SAID "OUTSIDE" COULD MEAN
27   ANYTHING BASICALLY, AND "ENTERTAINMENT" COULD BE ANYTHING.  SO,
28   THEREFORE, WE'RE GOING TO NARROW IT DOWN SO THE CHIQUES CASE DID
```

1    NOT -- IN THIS PARTICULAR CLAUSE, DID NOT NARROW IT DOWN.

2            THE COURT:  I LOST THE LAST PART WHEN YOU SAY,

3    "CHIQUES IN THIS PARTICULAR CASE DID NOT NARROW IT DOWN."  WHAT

4    DID YOU MEAN?

5            MR. NADIR:  THE COLONIA CHIQUES CASE DID NOT ATTEMPT

6    TO NARROW THE INTERPRETATION OF THE SO-CALLED VAGUE LANGUAGE IN

7    SUBSECTION (E).  JUST SAID, "IT'S TOO VAGUE.  IT'S TOO BROAD AN

8    INTERPRETATION."

9            THE COURT:  SO TO THE EXTENT THAT I'M BOUND BY

10   CHIQUES, WOULD YOU CONCUR THAT CHIQUES IS ON ALL FOURS WITH

11   REGARD TO DEFENSE COUNSEL'S ARGUMENT THAT THE VIRTUALLY

12   IDENTICAL LANGUAGE IN CHIQUES WAS DECLARED UNCONSTITUTIONALLY

13   VAGUE, AND THE COURT IN CHIQUES DID NOT PERMIT THE TRIAL COURT

14   TO, IN THE GIVEN CASE OF CHIQUES, REMEDY THAT ERROR BY TAILORING

15   THE LANGUAGE TO THAT PARTICULAR DEFENDANT, TO NARROW IT FOR THAT

16   PARTICULAR DEFENDANT?

17           MR. NADIR:  I WOULD HAVE TO SAY THE CHIQUES CASE DID

18   NOT NARROW IT DOWN, DID NOT REMAND THE CASES BACK TO THE TRIAL

19   COURT TO DO SO.  THE CHIQUES CASE DID NOT FORBID THE TRIAL

20   COURTS FROM DOING SO, SO I THINK IT'S A -- IF I WERE TO SAY IF

21   THE TRIAL COURT HAD INTERPRETED A CERTAIN WAY, IT WOULD BE FINE.

22   AS IS, THE APPELLATE COURT HAS A PROBLEM WITH THE LANGUAGE, THE

23   TWO OR THREE WORDS, "OUTSIDE" AND "ENTERTAINMENT ACTIVITY," BUT

24   I WOULD SUGGEST THAT, IF THIS COURT WERE TO NARROW AND TAILOR IT

25   DOWN TO "OUTSIDE" MEANING OUTSIDE IN PUBLIC, AND A JURY WERE TO

26   BE INSTRUCTED THAT "OUTSIDE" MEANS THAT, NARROW IT DOWN TO THAT,

27   THEN I THINK THE APPELLATE COURT WOULD FIND THAT IT IS NOT

28   UNCONSTITUTIONALLY VAGUE OR OVERBROAD.

10

1          THE COURT:  ALL RIGHT.  MR. ORANGE?

2          MR. NADIR:  SO I'M THINKING THE COURT -- THE TRIAL

3   COURT SHOULD BE GIVEN THE OPPORTUNITY TO DO SO UNLESS THIS COURT

4   WOULD WANT TO DO IT.

5          THE COURT:  MR. ORANGE.  I THINK I CAN ANTICIPATE YOUR

6   RESPONSE, BUT LET ME DIRECT THAT LAST INQUIRY TO YOU.  COULD WE

7   RECTIFY THE VAGUENESS BY NARROWING THE VERBIAGE IN THE COMPLAINT

8   AND/OR BY WAY OF A JURY INSTRUCTION SO THAT, AS TO YOUR

9   PARTICULAR CLIENT, THE STATUTE IS NOT UNCONSTITUTIONALLY VAGUE?

10         MR. ORANGE:  NO.  AND "NO" FOR TWO REASONS.  THE FIRST

11  REASON IS THAT THE COURT IN COLONIA CHIQUES SAID EXPLICITLY THAT

12  "THE VAGUE LANGUAGE IMPERMISSIBLY DELEGATES BASIC POLICY MATTERS

13  TO POLICEMEN, JUDGES, AND JURIES FOR RESOLUTION ON AN AD HOC AND

14  SUBJECTIVE BASIS," AND I'M QUOTING FROM COLONIA CHIQUES AT

15  156 CALAPP. 4TH, 31 AT 49.  SEE, THE COURT, IN SAYING THAT, SAYS

16  EXPLICITLY THAT THAT ISSUE CANNOT BE DELEGATED TO JUDGES OR

17  JURIES.  IT'S GOT TO BE SET FORTH.

18         THE NEXT REASON IS BECAUSE THE COURT SAID EXPLICITLY

19  THAT THAT CURFEW PROVISION VIOLATES DUE PROCESS OF LAW AND IT'S

20  UNENFORCEABLE.  IT DID NOT GIVE THE TRIAL COURT AN OPPORTUNITY

21  TO FIX IT AND THEN ENFORCE IT.

22         THE COURT:  MR. NADIR, IF IT'S VAGUE AND

23  CONSTITUTIONALLY DEFECTIVE, ISN'T THERE PREJUDICE TO THE

24  DEFENDANT BEING -- BY BEING ARRESTED FOR THIS PARTICULAR OFFENSE

25  AND SPENDING TIME IN CUSTODY BEFORE IT'S LATER FIXED BEFORE A

26  JURY?

27         MR. NADIR:  WELL, IT IS NO DIFFERENT THAN THE COURT --

28  THE CALIFORNIA SUPREME COURT IN THE GALLO CASE NARROWING DOWN

238

11

```
 1    INTERPRETATION OF WHO THE GANG MEMBER IS, WHETHER IT'S KNOWN TO

 2    THE WORLD OR KNOWN TO THE DEFENDANT.

 3              THE COURT HELD THAT LOGIC REQUIRED THE NARROWING DOWN

 4    TO "KNOWN" AS BEING IMPLIED.  SO I THINK THE COURT IN THIS CASE

 5    CAN DO THE SAME THING.  AND COLONIA CHIQUES DID NOT SAY THAT

 6    CANNOT BE DONE.  BUT THE WAY IT WAS LEFT AT THAT PARTICULAR

 7    APPELLATE LEVEL, THAT'S HOW THE COURT RULED.

 8              MR. ORANGE:  ACTUALLY, YOUR HONOR, IF I MAY?

 9              THE COURT:  YES.

10              MR. ORANGE:  COLONIA CHIQUES POST DATES GALLO BY

11    APPROXIMATELY TEN YEARS.  THE DATE UPON WHICH THE CALIFORNIA

12    SUPREME COURT DENIED REVIEW OF COLONIA CHIQUES AND, THUS,

13    ESTABLISHED COLONIA CHIQUES AS THE LAW OF THE LAND WITH REGARD

14    TO SUBSECTION (E) OF SIMILAR GANG INJUNCTIONS WAS JANUARY OF

15    2008, WHICH WOULD BE ELEVEN YEARS OR, ACTUALLY, TEN YEARS AND, I

16    THINK, SIX MONTHS AFTER GALLO.  COLONIA CHIQUES ALSO CITES GALLO

17    IN THIS DECISION AND LOOKS TO GALLO FOR SOME THINGS.  BUT, AS

18    FAR AS LOOKING TO GALLO FOR WHETHER OR NOT EMENDATION CAN BE

19    MADE, COLONIA CHIQUES DOES NOT, AND I BELIEVE THE REASON IS IS

20    BECAUSE, WITH REGARD TO GALLO, THE ISSUE WAS A SIMPLE LACK OF

21    THE TERM.  IT WAS THE LACK OF TO HIM "MEMBERS," "MEMBERS KNOWN

22    TO HIM" LANGUAGE WHICH, WHERE COLONIA CHIQUES IS THE ISSUE WITH

23    THE USE OF TERMS THAT ARE ACTUALLY VAGUE.  SO, AS FAR AS WHETHER

24    OR NOT YOU CAN IMPLY SOMETHING TO MAKE A CORRECTION BECAUSE

25    SOMETHING WAS ABSENT, THAT'S IN THE ISSUE.  THE ISSUE HERE IS

26    WHETHER IT WAS PRESENT ACTUALLY PUTS THE DEFENDANT ON NOTICE,

27    AND THE APPELLATE COURT HAS SAID VERY CLEARLY IN THIS DISTRICT,

28    SECOND DISTRICT COURT OF APPEALS, THAT YOU CANNOT.
```

12

```
 1                THE COURT:  FINAL WORD, IF YOU WISH, MR. NADIR.
 2                MR. NADIR:  I THINK I'VE SAID ALL THAT CAN BE SAID, SO
 3     I WOULD SUBMIT IT.
 4                THE COURT:  DEMURRER IS GRANTED.
 5                MR. ORANGE:  THANK YOU, YOUR HONOR.
 6                MR. NADIR:  JUST AS TO COUNT 2?
 7                THE COURT:  JUST AS TO COUNT 2.
 8                MR. ORANGE:  YOUR HONOR, WHAT ARE THE STANDING DATES
 9     FOR --
10                THE COURT:  LET ME CHECK.
11                LET ME MAKE A NOTE AND YOU PROBABLY HAVE AN INTEREST
12     IN MY MAKING THIS NOTE.
13                10/22 IS THE TRIAL DATE.
14                MR. ORANGE:  YOUR HONOR, IF I COULD HAVE THE COURT'S
15     CONSIDERATION ON PERHAPS ADJUSTING THAT DATE.  I'D LIKE TO FILE
16     A 1050, AND I KNOW THE COURT'S CALENDAR IS VERY CROWDED BETWEEN
17     NOW AND THEN.  IF IT'S A QUICK MATTER, WOULD THE COURT ALLOW ME
18     TO DO IT AND BE HEARD ON IT?
19                THE COURT:  WELL, IF YOU ARE MOVING TO CONTINUE THE
20     CASE, AND THE PEOPLE HAVE NO OBJECTION, YOU DON'T NEED TO
21     FORMALLY FILE A 1050.  SOMETIMES THE PEOPLE ASK FOR A
22     STIPULATION IN EXCHANGE, SOMETIMES THEY DON'T.  WHAT DATE DO YOU
23     HAVE IN MIND?
24                MR. ORANGE:  I HAD IN MIND NOVEMBER THE 24TH.
25                THE COURT:  PEOPLE?
26                MR. NADIR:  WELL, I DIDN'T HAVE TO -- I DIDN'T HAPPEN
27     TO BRING MY CALENDAR, YOUR HONOR, BUT THAT DOES NOT SEEM TO
28     BE -- I CAN'T SAY IT'S A BAD DAY OR GOOD DAY SO I HAVE TO GO
```

13

```
 1   ALONG.   IS THAT FOR PRETRIAL OR FURTHER PRETRIAL?
 2              THE COURT:   HE'S ASKING FOR ZERO OF TEN, I BELIEVE.
 3              MR. ORANGE:   YES, YOUR HONOR.
 4              THE COURT:   ONLY PROBLEM IS WHAT DATE IS THAT?   THAT
 5   PUTS THE TRIAL, I GUESS, DECEMBER 2ND WHICH WOULD BE ALL RIGHT.
 6   OKAY.   11/24, ZERO OF TEN.   TIME IS WAIVED.
 7              MR. NADIR:   SORRY.   WHAT DATE WOULD THE TRIAL BE?
 8              THE COURT:   I BELIEVE IT WOULD BE 12/2.
 9              MR. NADIR:   I'M GOING TO BE OUT OF TOWN THE FOLLOWING
10   WEEK, THE WEEK OF DECEMBER 17TH, AND I JUST -- I'M NOT
11   COMFORTABLE WITH FINISHING THIS CASE IN THREE DAYS, ALTHOUGH
12   THAT MAY BE REASONABLE.
13              MR. ORANGE:   YOUR HONOR, I --
14              MR. NADIR:   THAT'S A BAD DAY FOR ME FOR TRIAL
15   PURPOSES.
16              MR. ORANGE:   I'M WILLING TO ACCOMMODATE MR. NADIR.
17   ACTUALLY, LOOKING BACK AT MY CALENDAR OR THINKING ABOUT MY
18   CALENDAR, AS I DON'T HAVE IT IN FRONT OF ME, THAT MAY BE AN
19   ISSUE FOR ME TOO.   CAN I HAVE THIRTY SECONDS TO SPEAK WITH
20   MR. NADIR?
21              THE COURT:   SURE.
22              MR. ORANGE:   YOUR HONOR, CAN WE CONTINUE IT TILL
23   DECEMBER THE 20TH, I'M SORRY -- SORRY.   NOVEMBER 23RD, I THINK,
24   FOR ZERO OF TEN?   IS THAT --
25              THE COURT:   THAT MAKES IT DECEMBER 1.
26              MR. ORANGE:   SORRY, DECEMBER 23RD FOR ZERO OF TEN.   I
27   WAS MISTAKEN.
28              MR. NADIR:   WE'RE ZERO OF SIXTEEN?
```

14

```
 1              MR. ORANGE:  ZERO OF SIXTEEN.

 2              THE COURT:  IF WE DID THE 21ST OR 22ND OF DECEMBER

 3     THAT WOULD BE A ZERO OF TEN.  THE 23RD WOULD BE ZERO OF SIXTEEN.

 4              MR. NADIR:  SO WE WOULD BE TRYING THE FIRST WEEK OF

 5     JANUARY.  WE WOULD BE FRESH.

 6              THE COURT:  THAT'S EVERYBODY'S PREFERENCE?

 7              MR. ORANGE:  YES, YOUR HONOR.

 8              THE COURT:  LET'S DO THAT DECEMBER 23RD, ZERO OF

 9     SIXTEEN.  TIME IS WAIVED.

10              MR. NADIR:  AND COUNSEL INDICATED THAT, INFORMALLY, IF

11     I NEED A CONTINUANCE, HE'LL AGREE WITH IT.

12              MR. ORANGE:  YES, ABSOLUTELY.

13              THE COURT:  I'LL NOTE THE STIP.

14              MR. ORANGE:  THANK YOU, YOUR HONOR.

15              THE COURT:  WOULD THE PEOPLE FILE AN AMENDED COMPLAINT

16     REFLECTING THE COURT'S ORDERS.

17              MR. NADIR:  YOUR HONOR, CAN WE JUST STRIKE COUNT 2?

18     WOULD THAT BE GOOD?

19              THE COURT:  ALL RIGHT.

20              MR. ORANGE:  WE WOULD AGREE TO THAT.

21              THE COURT:  ALL RIGHT.

22              MR. NADIR:  THANK YOU.

23              THE COURT:  OKAY.  NOBODY WANTS A TRANSCRIPT I'M

24     HOPING; RIGHT?  I DON'T CARE FOR MYSELF, JUST THINKING

25     ABOUT --

26              MR. NADIR:  NO.  I'M NOT ORDERING A TRANSCRIPT.  THE

27     COURT WON'T PAY FOR MINE ANYWAY.

28              MR. ORANGE:  AND I'M FINE ON A TRANSCRIPT.
```

15

1       THE COURT:  JUST LOOKING OUT FOR MY REPORTER.  I DON'T
2   CARE ABOUT IT.  THE RECORD SPEAKS FOR ITSELF.
3               (THE PROCEEDINGS WERE CONCLUDED.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

16

```
 1                  SUPERIOR COURT OF THE STATE OF CALIFORNIA

 2                        FOR THE COUNTY OF LOS ANGELES

 3    DIVISION LX "141"        HON. MARK ZUCKMAN, COMMISSIONER

 4

 5

 6    THE PEOPLE OF THE STATE OF CALIFORNIA,)
                                            )
 7                              PLAINTIFF,)
                                            )
 8                    VS.                   )    NO. 9WA01997
                                            )
 9    01 CHRISTIAN RODRIGUEZ,               )    REPORTER'S
                                            )    CERTIFICATE
10                          DEFENDANT.)
      _____)

11

12    STATE OF CALIFORNIA     )
                              )  SS
13    COUNTY OF LOS ANGELES   )

14              I, SANDRA L. SUTTLE, OFFICIAL REPORTER OF THE SUPERIOR

15    COURT OF THE STATE OF CALIFORNIA, FOR THE COUNTY OF LOS ANGELES,

16    DO HEREBY CERTIFY THAT THE FOREGOING PAGES, 1 THROUGH 15,

17    COMPRISE A FULL, TRUE, AND CORRECT TRANSCRIPT OF THE PROCEEDINGS

18    AND TESTIMONY TAKEN IN THE MATTER OF THE ABOVE-ENTITLED CAUSE ON

19    TUESDAY, OCTOBER 6, 2009.

20              DATED THIS 22ND DAY OF DECEMBER, 2009.

21

22

23

24

25              SANDRA L. SUTTLE, CSR #10411
                OFFICIAL REPORTER
26

27

28
```

**244**

Pánuco Decl. Supp Mtn for Preliminary Injunction

# Exh. 31

# No Way Out: An Analysis of Exit Processes for Gang Injunctions

Lindsay Crawford†

## INTRODUCTION

In the past thirty years, gang membership and gang-related violence have proliferated across the nation as gangs in urban and rural areas fight for territorial control and market dominance.[1] Today, the U.S. Department of Justice estimates that there are more than 800,000 gang members and 30,000 gangs in the United States.[2] No state is more affected by gang violence than California, which contains more than one-third of all gang members in the United States and attributes more than twenty five percent of all its homicides to gang activity.[3]

Recognizing that traditional law enforcement techniques alone were insufficient to address the growing problem, leading public officials and residents began to seek new, innovative solutions to slow the spread of gang violence in the 1980s. In greater Los Angeles, home to more than half of all gang members in California, and where more than half of all homicides are

Copyright © 2009 California Law Review, Inc. California Law Review, Inc. (CLR) is a California nonprofit corporation. CLR and the authors are solely responsible for the content of their publications.

†    J.D., University of California, Berkeley School of Law (Boalt Hall) expected 2009; M.P.A., Maxwell School, Syracuse University 2006; M.Phil., Oxford University 2005; B.A., University of California, Davis 2003. Many thanks to Professor Betsy Strauss for her comments on early drafts of this piece, and to the talented members of the California Law Review for their thoughtful edits. I also want to thank my uncle, Robert Denham (Boalt '84), for inspiring me to write this Comment and for supporting and guiding me throughout law school. Finally, I want to thank my husband, Collin O'Mara, for his unwavering love and enthusiastic encouragement.

1.    James Alan Fox & Marianne W. Zawitz, U.S. Dep't of Justice, Office of Justice Programs, Bureau of Justice Statistics, Homicide Trends in the United States (2007), *available at* http://www.ojp.usdoj.gov/bjs/pub/pdf/htius.pdf.

2.    U.S. Dep't of Justice, Office of Community Oriented Policing, Gangs, http://www.cops.usdoj.gov/Default.asp?Item=1593 (last visited Oct. 25, 2008).

3.    News Release, Att'y General Edmund G. Brown Jr., Vicious Gang Takedown (June 6, 2007),    *available    at*    http://ag.ca.gov/cms_attachments/press/pdfs/2007-06-06_stocktontakedownpressrelease.pdf; *see also* Bill Lockyer, Att'y Gen., Cal. Dep't of Justice, Homicide    in    California    3    (2005),    *available    at* http://ag.ca.gov/cjsc/publications/homicide/hm05/preface.pdf.

161

gang-related,[4] the City Attorney turned to the civil justice system for help, and
sought California's first gang injunction in 1987.[5] The state government was
not far behind, and the legislature officially authorized the use of civil
injunctions to control gang violence in 1998.[6]

The negative reaction was strong and swift. In general, gang injunctions
restrict the activities of named gang members in a variety ways, often by
prohibiting gang members from associating with one another, wearing gang-
related clothing, or from appearing in specified places and conducting certain
activities. As a result, civil liberties organizations, most prominently the
American Civil Liberties Union (ACLU), were quick to point out that gang
injunctions implicate a variety of constitutional concerns, from the First
Amendment right of freedom of association to the Fifth and Fourteenth
Amendment rights to due process. However, in the landmark case of *People ex
rel. Gallo v. Acuna*, the California Supreme Court upheld the use of civil gang
injunctions against a variety of constitutional challenges.[7] The decision spurred
the further proliferation of injunctions in cities across California, and helped
solidify the use of injunctions as a tool for law enforcement in their efforts to
reduce gang violence. For its part, while the United States Supreme Court has
never squarely addressed the constitutionality of civil gang injunctions, it
struck down an anti-loitering ordinance as void for vagueness in its one and
only case addressing the constitutionality of anti-gang legislation.[8]

While scholars have questioned the constitutionality of gang injunctions,
few scholars have explored the implications for individuals named in
injunctions. Likewise, academics have yet to publish a study on the problem of
exit from gang injunctions. However, the problem of gang injunctions garnered
popular attention in 2006, after anecdotal evidence emerged from Los Angeles
that described negative consequences for gang members named in long-lived
gang injunctions.[9] In response, community members and local leaders inquired
further, asking whether former gang members had any success removing their
names from injunctions. The answer was startling: in the entire history of the
Los Angeles experience with civil gang injunctions, no gang member had ever
successfully removed his or her name from an injunction.

News of this problem evoked public outcry. While enjoined gang

---

4.  *See* The L.A. Police Dep't, Crime Statistics Summary Archive,
http://www.lapdonline.org/crime_maps_and_compstat/content_basic_view/9098 (last visited Aug.
30, 2008); The L.A. Police Dep't, Crime and Arrests Statistics Summary 2007 (2008), *available
at* http://www.lapdonline.org/home/pdf_view/38265; The L.A. Police Dep't, Citywide Gang
Crime Summary 2007 (2008), *available at* http://www.lapdonline.org/la_gangs/pdf_view/38154.
5.  Paul Feldman, *Judge OKs Modified Measures to Curb Gang*, L.A. Times, Dec. 12, 1987,
at B3.
6.  *See* STEP Act, Cal. Penal Code §§ 186.20-186.33 (West 1999 & Supp. 2008).
7.  People ex rel. Gallo v. Acuna, 929 P.2d 596 (Cal. 1997).
8.  Chicago v. Morales, 527 U.S. 41, 64 (1998).
9.  Patrick McGreevy & Sandy Banks, *On Paper, Leaving a Gang is Difficult*, L.A. Times,
Mar. 23, 2006, at A1.

members had always been able to petition the court for removal, this official process had not actually facilitated exit for gang members trying to find a way out of gang life. In response, in April 2007, the Los Angeles City Attorney unveiled the state's first unofficial[10] exit process, which allows former gang members to petition the City Attorney directly for removal rather than going to court. The San Francisco Public Defender followed suit, proposing a more ambitious and independent exit process in December 2007. The San Francisco City Attorney balked at the proposal, however, and it was not until March 2008 that the two offices reached agreement and San Francisco adopted an exit procedure. To date, despite the growing number of California cities that have obtained gang injunctions, only San Francisco and Los Angeles offer an unofficial way out.

This Comment argues that cities using gang injunctions have a constitutional and moral imperative to create a clearly defined and legally valid exit process to help inactive gang members remove their names from gang injunctions. Part I of this paper describes the current gang crisis and the proliferation of gang injunctions as a tool of law enforcement across California. Part II describes the constitutional concerns implicated by the use of gang injunctions, underlining the importance of creating an exit process. Part III discusses the practical consequences for gang members of being named in injunctions, particularly those who are not active or have never been active in a gang. Part IV considers two different models of unofficial exit processes, using Los Angeles and San Francisco as examples, as a basis for discussion of constitutional and statutory limitations on the creation of local, unofficial exit processes. The paper concludes with a discussion of the implications of these limitations for on the design of exit processes in the future.

## I

### GANG VIOLENCE AND POLITICAL RESPONSE: THE RISE OF THE CIVIL GANG INJUNCTION

Gang violence is one of the most serious and intractable problems facing urban communities across California. The California Department of Justice estimates that there are approximately 300,000 gang members living in California.[11] Over the last twenty-five years, the number of gang members in the United States increased more than fivefold, leading to increased violence

---

10.   Throughout this comment, I use the word "unofficial" to describe the expedited, administrative exit processes proposed or created by local officials in California cities. I use the word "unofficial" to distinguish administrative exit processes from the "official" exit procedure of court petition that has been and continues to be available to gang members named in injunctions. Gang members are free at any time to make a motion to the court requesting removal. The exit processes discussed in this paper are expedited procedures by which gang members may have their names removed from gang injunctions without having to go to court directly—an "official" process that has proven universally ineffective at helping gang members vindicate their rights.

11.   Brown Jr., *supra* note 3.

and other illegal activity. From 1976 to 2005, the number of gang-related homicides increased eightfold nationwide.[12] Despite substantial reductions in crime rates across the nation during the 1990s, the number of gang-related homicides did not decrease. For instance, in Los Angeles, the number of total homicides decreased by 45 percent, but there was no concomitant decrease in gang-related homicides.[13]

The gang problem is not new. Gang violence has plagued Los Angeles in particular since the 1960s, when the Crips and the Bloods formed and became instant rivals.[14] However, it was not until the 1980s that gang violence truly surged. The problem was most acute in California's largest city: in 1989, of an estimated 120,636 gang members reported by cities surveyed nationwide, an estimated 70,000 lived in Los Angeles.[15] As gang violence exploded, public concern intensified.

It was not until gang violence began to affect the affluent that the problem attracted widespread attention. In 1988, the murder of 27-year-old Karen Toshima in a gang shoot-out in a trendy shopping area adjacent to the University of California, Los Angeles, brought the issue to the forefront.[16] As *Time* Magazine reported, "[n]ewspapers and television headlined the story for days. Police patrols in Westwood tripled, and the [Los Angeles Police Department] assigned a 30-member antigang unit to capture Toshima's killer."[17]

By the time of Toshima's death, there was widespread public perception that the gang problem had proven impervious to traditional crime-solving techniques.[18] To thwart law enforcement efforts, gang members operated strategically, committing crimes when police officers were not present and coercing potential witnesses by instructing them to turn a blind eye to gang activities.[19] As gang violence grew, gangs began to present a unique and intractable problem requiring new, innovative solutions. In response, public officials turned to the civil justice system for help.

Civil gang injunctions are court-issued restraining orders that prohibit

---

12. Fox & Zawitz, *supra* note 1, at 66.
13. Nat'l Criminal Justice Serv., *Gang-Related Crime*, Almanac of Pol'y Issues, Aug. 2003, http://www.policyalmanac.org/crime/archive/gangs.shtml.
14. U.S. Dep't of Justice, Bureau of Justice Assistance, Urban Street Gang Enforcement 52 (1997), *available at* http://www.ncjrs.gov/pdffiles/161845.pdf.
15. Office of Juvenile Justice and Delinquency Prevention, Juvenile Justice Reform in the States: 1994-1996 n.98, http://ojjdp.ncjrs.org/PUBS/reform/ch2_e.html (last visited Oct. 25, 2008).
16. John M. Gilonna, *A Murder that Woke Up L.A.*, L.A. Times, Jan. 30, 1998, at A1.
17. Margaret B. Carlson, *The Price of Life in Los Angeles*, Time Mag., Feb. 22, 1988, at 31, *available at* http://www.time.com/time/magazine/article/0,9171,966768-1,00.html.
18. Gregory Walston, *Taking the Constitution at Its Word: A Defense of the Use of Anti-Gang Injunctions*, 54 U. Miami L. Rev. 47, 48 (1999).
19. *Id.* at 49. *See also* Office of the L.A. City Att'y, Gang Injunctions: How and Why They Work 7 (2007), http://www.lacity.org/ATTY/index/ attyindex56044606_04172007.pdf.

named gang members from participating in a variety of specified activities. Common injunction provisions include restricting the ability of gang members to engage in otherwise lawful activities, such as associating with other gang members, demanding entry into another person's residence, wearing certain types or colors of clothing, making certain hand gestures, conducting activities designed to identify and flee from law enforcement, traveling or loitering in public after certain hours (i.e., curfews), and annoying or harassing residents.[20] Often, injunctions also prohibit activity that is already illegal, such as dealing or taking drugs, trespassing, or drinking in public.[21] From a law enforcement perspective, injunctions prohibiting behavior that is otherwise unlawful are useful because they allow violators to be held in contempt of court, which can result in a sentence of up to six months of jail time in California.[22] In addition, because police officers can use injunctions to curtail otherwise lawful activity, injunctions are one of the few tools available to help stop violence before it starts.[23]

In 1987, the Los Angeles City Attorney, James Hahn (later mayor of Los Angeles) sought California's first gang injunction against a gang called the Playboy Gangster Crips.[24] The injunction included specific and general prohibitions against lawbreaking, but also enjoined a variety of nuisance behaviors, including blocking sidewalks and roads; possessing markers, paint, or communications equipment; and approaching cars.[25] After the American Civil Liberties Union stepped in and challenged the injunction on behalf of members of the Crips, the trial court issued a severely limited injunction in which the court refused to enjoin activities that were not otherwise unlawful. The court also limited the reach of the injunction to those gang members who were specifically named and had been given notice.[26] Finally, the court found that indigent gang members had a right to counsel in injunction proceedings.[27] While the City Attorney's Office claimed victory, it did not seek another significant gang injunction for five years, discouraged by the limitations that

---

20.   Christopher S. Yoo, Comment, *The Constitutionality of Enjoining Criminal Street Gangs as Public Nuisances*, 89 Nw. U. L. Rev. 213, 222 (1994).

21.   S.F. Public Defender, Gang Injunction Resources, Frequently Asked Questions, http://sfpublicdefender.org/resources/gang_injx_resources (last visited Oct. 25, 2008).

22.   *See id.*

23.   *See, e.g.*, Office of the L.A. City Att'y, *supra* note 19, at 5.

24.   *See* Complaint for Temporary Restraining Order, and for Preliminary and Permanent Injunction, to Abate Public Nuisance at 11-13, Playboy Gangster Crips (No. WEC 118860) (filed Oct. 26, 1987).

25.   Joan W. Howarth, *Toward a Restorative Constitution: A Restorative Justice Critique of Anti-Gang Public Nuisance Injunctions*, 27 Hastings Const. L.Q. 717, 728 n.54, 729 (2000) (citing Preliminary Injunction (Proposed), People v. Playboy Gangster Crips, No. WEC 118860 (Cal. Super. Ct., filed Oct. 26, 1987)).

26.   People v. Playboy Gangster Crips, No. WEC 118860, slip op. at 3 (Cal. Super. Ct. Los Angeles County Dec. 11, 1987) (preliminary injunction).

27.   *Id.*

the court had placed on this new law enforcement tool.[28]

In the early 1990s, California cities again attempted to use injunctions to curtail gang activity.[29] From 1992 to 1994, various City Attorneys in California sought seven gang injunctions.[30] The City Attorney for the City of San Jose sought the most significant of these gang injunctions, which was eventually upheld by the California Supreme Court in *People ex rel. Gallo v. Acuna* (hereinafter *Acuna*).[31]

### A. Withstanding Legal Challenge in Acuna

*Acuna* was the culmination of what is thus far the most notable legal challenge to a civil gang injunction in California. Five named gang members challenged the preliminary injunction issued against members of the Varrio Sureo Treces (VST) gang in the four-block "Rocksprings" neighborhood of San Jose, California.[32] After hearing extensive evidence of the persistent violence and fear that plagued Rocksprings, the superior court entered a preliminary injunction.[33] The injunction prohibited a wide range of activities in the four-block neighborhood, ranging from fighting and trespassing to littering and possession of pagers.[34] On interlocutory appeal, the California Court of Appeal upheld only those parts of the injunction that proscribed independently criminal conduct, and concluded that other provisions in the injunction violated the First and Fifth Amendments to the U.S. Constitution as unconstitutionally vague or overbroad.[35] The City of San Jose appealed two of the provisions found void by the Court of Appeal, and the California Supreme Court reversed.[36]

The Court described Rocksprings as an "urban war zone."[37] Relying on forty eight declarations submitted by the City in support of the injunction, the court found that residents of Rocksprings were "prisoners in their own homes," that "[v]iolence and threat of violence [were] constant," and that "[v]erbal harassment, physical intimidation, threats of retaliation, and retaliation [were] the likely fate of anyone who complain[ed] of the gang's illegal activities . . . ."[38] The court also held that the specified provisions of the injunction neither violated associational freedoms of gang members, nor were they

---

28.   Howarth, *supra* note 25, at 731.
29.   *Id.*
30.   Matthew Mickle Werdegar, Note, *Enjoining the Constitution: The Use of Public Nuisance Abatement Injunctions Against Urban Street Gangs*, 51 Stan. L. Rev. 409, 415 & n.29 (1999).
31.   People ex rel. Gallo v. Acuna, 929 P.2d 596 (Cal. 1997).
32.   The gang was also known as the Varrio Sureo Town, or Varrio Sureo Locos gang. *Id.* at 601.
33.   *Id.*
34.   *Id.* at 624 (Mosk, J., dissenting).
35.   *Id.* at 602 (majority opinion).
36.   *Id.*
37.   *Id.* at 601.
38.   *Id.* at 601-02.

overbroad; and therefore the specified provisions did not violate the defendant's First Amendment rights.[39] Further, the Court found that the provisions were not "void for vagueness" under the Fifth Amendment.[40]

### B. State Legislative Action—the STEP Act

Following the *Acuna* decision, the California legislature expanded the availability of gang injunctions and other anti-gang law enforcement tools by enacting the California Street Terrorism Enforcement and Prevention (STEP) Act in 1988.[41] In the opening lines of the Act, the legislature noted that the "State of California is in a state of crisis which has been caused by violent street gangs whose members threaten, terrorize, and commit a multitude of crimes against the peaceful citizens of their neighborhoods."[42] The legislature further justified the Act by finding that gangs present a "clear and present danger to public order and safety and are not constitutionally protected."[43]

The core provisions of the STEP Act create new substantive crimes and provide for the use of civil injunctions to curtail gang activity.[44] Both the criminal and civil aspects of STEP have proven controversial. The Act's criminal provisions make it a felony to participate knowingly in a street gang or willingly promote, further, or assist a gang in committing a felony.[45] In addition to its criminal provisions, the STEP Act also provides specifically for the issuance of civil injunctions to curtail gang activity through use of California's public nuisance laws.[46] Critics have attacked these provisions for punishing individuals for mere association with gang members in violation of the First Amendment and for being overbroad in defining "criminal street gang."[47]

---

39.   *Id.* at 608-11.
40.   *Id.* at 612.
41.   STEP Act, Cal. Penal Code §§ 186.20-186.33 (West 1999 & Supp. 2008).
42.   Cal. Penal Code § 186.21 (West 1999).
43.   *Id.*
44.   Cal. Penal Code § 186.22(a) (Supp. 2008).
45.   *Id.*
46.   *Id.* California's public nuisance law provides the following: "Anything which is injurious to health, including, but not limited to, the illegal sale of controlled substances, or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property, or unlawfully obstructs the free passage or use, in the customary manner, of any . . . public park, square, street, or highway, is a nuisance. Cal. Civ. Code § 3479 (West 1997). "A public nuisance is one which affects at the same time an entire community or neighborhood, or any considerable number of persons, although the extent of the annoyance or damage inflicted upon individuals may be unequal." § 3480.
47.   *See, e.g.,* Raffy Astvasadoorian, Note, *California's Two-Prong Attack Against Gang Crime and Violence: The Street Terrorism Enforcement Prevention Act and Anti-Gang Injunctions,* 19 J. Juv. L. 272, 274 (1998); Richard Lee Colvin, *City Going to Court in Bid to Pressure Gang Blythe Street: Lawsuit Paints Vivid Picture of Heavily Armed, Organized Criminals Who Sustain a Lucrative Drug Enterprise in Panorama City,* L.A. Times, Feb. 22, 1993, at B1; Maura Doland & Alan Abrahamson, *State High Court Allows Injunctions to Restrict Gang Safety: Ruling Stresses Public Concerns, Lets Cities Ban Legal Activities of Alleged Members. Officials in O.C., Elsewhere Exult but Civil Libertarians Denounce the Decision,* L.A. Times, Jan.

Proposition 21, which enacted the Gang Violence and Juvenile Crime Prevention Act, further strengthened the criminal provisions of the STEP Act in 2000. The Proposition added an offense of gang conspiracy to the California Penal Code, required gang offenders to register with local law enforcement, and expanded punishment for gang-related offenses. The most dramatic of these expansions made individuals convicted of gang offenses eligible for the death penalty.[48] Proposition 21 also increased prosecutors' ability to charge juveniles as adults, and broadened the applicability of anti-gang laws to juveniles.[49] Finally, Proposition 21 raised additional constitutional and civil liberties concerns for California's minority youth, the group most impacted by the further criminalization of gang activity.

### C. Effectiveness of Gang Injunctions at Reducing Crime

Following the STEP Act, cities across California, from San Diego to Sacramento, sought gang injunctions as part of their law enforcement and anti-gang strategies.[50] With the proliferation of gang injunctions as a law-enforcement tool, many have debated the effectiveness of gang injunctions in reducing crime and increasing community members' sense of safety. Although some gang injunctions currently in effect in Los Angeles have been in place for fifteen years,[51] few studies have evaluated how effective injunctions have been at combating gang violence, and the few existing studies have reached conflicting conclusions.[52] One can speculate that the lack of examination and consensus is due to the difficulty of studying gang violence and community response.

In 2004, a Los Angeles County Civil Grand Jury released the most positive report on gang injunctions to date.[53] The report proclaims:

> Seldom do outcomes of public initiatives produce results of this clarity. The independent analysis of data conducted as part of this study do[es] not simply suggest that lower crime rates are somehow related to CGIs [Civil Gang Injunctions], or that CGIs might be

---

31, 1997, at A1.

48.   *See* Cal. Penal Code §§ 182.5, 186.30-186.33, 190.2 (West 1999 & Supp. 2008).

49.   *Id.* For a critical analysis of Proposition 21 and its impact on juvenile justice, see Jennifer Taylor, *California's Proposition 21: A Case of Juvenile Injustice*, 75 S. Cal. L. Rev. 983 (2002).

50.   Bill Lockyer, Att'y Gen., Cal. Dep't of Justice, Organized Crime in California: Annual Report to the California State Legislature 4 (2005), *available at* http://ag.ca.gov/publications/org_crime2005.pdf.

51.   McGreevy & Banks, *supra* note 9.

52.   *See* Cheryl L. Maxson, Karen M. Hennigan, & David C. Sloane, *"Its Getting Crazy Out There": Can a Civil Gang Injunction Change a Community?*, 4 Criminology & Pub. Pol'y 577 (2005) (citing multiple studies that conflict with each other).

53.   Los Angeles County, Civil Grand Jury, Final Report, Gang Injunction Committee, 2003-2004, at 169-251 (2004), *available at* http://grandjury.co.la.ca.us/gjury03-04/LACGJFR_03-04.pdf.

influential with respect to crime rates. *These data indicate that CGIs do in fact cause a reduction in [crime].*[54]

In conjunction with the grand jury's report, the Los Angeles Police Department issued statistics showing that overall gang-related crime had declined by 13 percent since 2001, and by as much as 53 percent within the Safety Zones designated in the injunctions.[55] Two independent academic studies have found less substantial, but still positive, results.[56] In a study of Los Angeles County from 1993 to 1998, Jefferey Grogger found that violent crime decreased in the year after injunctions by 5 to 10 percent, and found no evidence that injunctions increased crime in neighboring areas not under the injunction.[57] In 2005, Cheryl Maxson, Karen Hennigan, and David Sloane studied the effects of the Verdugo Flats injunction in San Bernardino, California, and concluded that the injunctions resulted in less gang presence in the area and reduced fear of intimidation and confrontation with gang members among residents, as compared to a control area.[58]

However, studies of the effects of gang injunctions have not been universally positive. In 1997, Cheryl Maxson and Theresa Allen studied the results of a gang injunction in Inglewood, California, and concluded that there was little indication that the injunction had any positive effects.[59] The ACLU released the most negative report on the effectiveness of gang injunctions that same year.[60] Reviewing the effects of an injunction issued to address a crime-ridden neighborhood in the San Fernando Valley, the report determined that the Blythe Street Gang Injunction failed to achieve its stated objective—namely, reducing violent crime and drug trafficking in the area and bringing about an immediate increase in community safety.[61] Instead, immediately after the injunction went into effect, violent crime increased in the area covered by the injunction.[62] Further, the ACLU found that violent crime and drug trafficking also increased in areas adjacent to the injunction area. From this evidence, the report concluded that the injunction had, directly or indirectly, raised crime in adjacent areas far larger than the area affected by the injunction.[63] On the basis

---

54.   *Id.* at 214.

55.   Office of the L.A. City Att'y, *supra* note 19, at 1.

56.   Jefferey Grogger, *The Effects of the Civil Gang Injunctions on Reported Violent Crime: Evidence from Los Angeles County*, 45 J.L. & Econ. 69, 89 (2002); Maxson et al., *supra* note 52, at 591-99.

57.   Grogger, *supra* note 56, at 89.

58.   Maxson et al., *supra* note 52, at 591-99.

59.   *Id.* (citing Cheryl L. Maxson & Theresa L. Allen, Univ. of S. Cal., An Evaluation of the City of Inglewood's Youth Firearms Violence Initiative (1997)).

60.   ACLU Found. of S. Cal., False Premise, False Promise: The Blythe Street Gang Injunction and its Aftermath (1997), *available at* http://www.streetgangs.com/injunctions/topics/blythereport.pdf.

61.   *Id.* at 44.

62.   *Id.*

63.   *Id.*

of these results, the ACLU issued a scathing report, concluding that gang injunctions are "based on a series of false premises that have engendered a series of ultimately false promises."[64]

The uncertainty surrounding the effectiveness of gang injunctions provides one compelling reason for cities to provide an exit process. If injunctions may be ineffective at controlling crime when used against active gang members, at least in some situations, inactive gang members should certainly not suffer the consequences of being named in an injunction that does not have an overall positive effect. Constitutional concerns with gang injunctions discussed in Part II provide another justification for exit processes.

II
CONSTITUTIONAL CONCERNS IMPLICATED BY GANG INJUNCTIONS: THE
COMMENTATORS WEIGH IN

While gang injunctions have received the blessing of California's highest court, and enjoy seemingly widespread public support, they have also received heavy criticism for implicating a wide range of constitutional concerns. Advocates for civil anti-gang remedies defend injunctions on the grounds that they present a novel approach to combating gang violence, particularly in deterring criminal activity and allowing law enforcement to stop, question, and disperse congregating gang members prior to the commission of crimes.[65] However, many commentators, academics, and civil liberties organizations have taken a dimmer view of the constitutionality of gang injunctions. Perhaps the best-known statement of concern is that of Justice Mosk, who opened his dissent in *Acuna* by invoking history's great defenders of individual liberties:

> Montesquieu, Locke, and Madison will turn over in their graves when they learn they are cited in an opinion that does not enhance liberty but deprives a number of simple rights to a group of Latino youth you have not been convicted of a crime. Mindful of the admonition of another great 18th century political philosopher, Benjamin Franklin, that '[t]hey that can give up essential liberty to obtain a little temporary safety deserve neither liberty nor safety,' [I dissent].[66]

Constitutional and civil liberties concerns are most significant for those enjoined individuals who are no longer active in a gang or who were incorrectly included in a gang injunction in the first place, making the need for an exit process particularly compelling. While the California Supreme Court upheld two contested provisions of the San Jose gang injunction in *Acuna*, it seems likely that challenges to gang injunctions on constitutional grounds will continue to arise. In addition, it is by no means clear that courts will continue to

---

64. *Id.*
65. *See, e.g.,* Office of the L.A. City Att'y, *supra* note 19, at 4-5.
66. People ex rel. Gallo v. Acuna, 929 P.2d 596, 623 (Cal. 1997).

find gang injunctions constitutional in all forms.[67] Finally, the constitutional arguments below arguably raise a political and moral mandate for cities with injunctions to create exit processes.

Since *Acuna*, many commentators have discussed the constitutionality of gang injunctions. Constitutional challenges have ranged from vagueness and overbreadth, to freedom of association and expression, to procedural due process and equal protection.[68] This Part will explore the range of constitutional concerns that gang injunctions raise, emphasizing the liberty interest at stake for enjoined individuals.

### A. Vagueness and Overbreadth

Gang injunctions are most often challenged as vague and overbroad.[69] Under the Fifth Amendment vagueness doctrine, the underlying concern is the due process right to adequate notice.[70] The doctrine requires that a statute be sufficiently specific such that a person of common intelligence is able to understand the statute and its application.[71] Vagueness doctrine also requires that a statute provide minimum standards to guide law enforcement.[72] Under the overbreadth doctrine, the underlying concern is that a statute will compromise the First Amendment rights of persons not before the court.[73] The injunction provisions most often contested on these grounds are those that limit enjoined gang members' ability to associate with other gang members, and those that prohibit gang members from annoying or harassing residents.[74] I will consider each in turn.

Provisions limiting gang members' ability to associate with other gang members raise both vagueness and overbreadth concerns.[75] With respect to vagueness, one common concern is that injunctions fail adequately to specify the persons with whom gang members are prohibited from associating.[76] The

---

67.  After all, the Court of Appeals struck down 15 of the 24 provisions of the injunction in *Acuna*, some of which it found unenforceable as vague or overbroad under the First and Fifth Amendments. *Id.* at 602. The City of San Jose appealed only two of the provisions to the Supreme Court, which were then upheld. *Id.*

68.  Walston, *supra* note 18, at 54.

69.  Kim Strosnider, *Anti-Gang Ordinances after* City of Chicago v. Morales: *The Intersection of Race, Vagueness Doctrine, and Equal Protection in the Criminal Law*, 39 Am. Crim. L. Rev. 101, 101 (2002).

70.  *Acuna*, 929 P.2d at 611 (citing Lanzetta v. New Jersey, 306 U.S. 451, 453 (1939)).

71.  *See* Kolender v. Lawson, 461 U.S. 352, 357 (1983); Connally v. General Constr. Co., 269 U.S. 385, 391 (1926).

72.  Chicago v. Morales, 527 U.S. 41, 65 (1998) (O'Connor, J., concurring).

73.  N.Y. State Club Ass'n v. New York City, 487 U.S. 1, 11 (1988).

74.  Yoo, *supra* note 20, at 248.

75.  *Id.*

76.  *See, e.g.*, People ex rel. Gallo v. Acuna, 929 P.2d 596, 613 (Cal. 1997) (citing the Court of Appeal's holding that the injunction provision against associating with another gang member was impermissibly vague because a defendant could engage in one of the prohibited activities with someone known to the police but not to him to be a another gang member).

injunction in *Acuna* provides a relevant example. In the *Acuna* injunction, paragraph (a) enjoined "[s]tanding, sitting, walking, driving, gathering or appearing anywhere in public with any other defendant herein, or with any other known 'VST' . . . or 'VSL' . . . member."[77] This was one of the two provisions that caused disagreement between the majority in *Acuna* and the sole dissenter, Justice Mosk, who concluded that the provision was impermissibly vague. The injunction prohibited associating with any "known" VST or VSL member, but did not specify "known by whom?" Justice Mosk worried that this interpretive ambiguity made the provision susceptible to arbitrary enforcement, and argued in his dissent that the provision should be struck from the injunction.[78] The majority disagreed, holding that the language in question implied knowledge on the part of the gang member that the person with which he was associating was a gang member, and therefore that the provision was not impermissibly vague.[79] The majority also held that only those individuals who were named parties could be subject to the decree of the trial court, and therefore there was no risk of infringing on the First Amendment rights of those not before the court.[80] Like the majority in *Acuna*, commentators have expressed far less concern about the overbreadth of gang injunctions than they have about vagueness problems.[81]

Commentators have also expressed concern about injunction provisions restricting gang members from annoying or harassing residents.[82] In the past, the United States Supreme Court has held that a city ordinance that used the term "annoy" to define a new criminal offense was void for vagueness.[83] However, in *Acuna*, the injunction at issue enjoined "[i]n any manner confronting, intimidating, annoying, harassing, threatening, challenging, provoking, assaulting and/or battering any residents or patrons, or visitors to 'Rocksprings' . . . ."[84] Justice Mosk concluded that the portion of the injunction that read "[i]n any manner confronting, . . . annoying, . . . challenging, [or] provoking . . . other[s]" encompassed too much legal, ordinary activity and was too vague to "withstand due process challenge[s]."[85] Therefore, he concluded it should be stricken from the injunction. Again, the majority disagreed, holding that the provision was not unconstitutionally vague when read in the context of the City's declarations detailing specific types of terrorizing behavior in the

---

77.   *Id.* at 629 (Mosk, J., dissenting).
78.   *Id.*
79.   *Id.* at 613 (majority opinion).
80.   *Id.* at 610.
81.   *See, e.g.,* Yoo, *supra* note 20, at 251.
82.   *Id.* at 251-53. *See also* M. Katherine Boychuck, Comment, *Are Stalking Laws Unconstitutionally Vague or Overbroad?*, 88 Nw. U. L. Rev. 769, 784 (1994) (noting that the terms "harass" and "annoy" present vagueness problems).
83.   Coates v. Cincinnati, 402 U.S. 611, 614 (1971).
84.   *Acuna*, 929 P.2d at 624 n.3 (Mosk, J., dissenting) (describing paragraph (k) of the injunction).
85.   *Id.* at 630-31.

Rocksprings neighborhood and the objectives of the injunction.[86]

The United States Supreme Court has weighed in on the constitutionality of modern anti-gang legislation only once.[87] In *Chicago v. Morales*, the Court held that Chicago's anti-loitering ordinance was void for vagueness.[88] However, the opinion provides little guidance on the constitutionality of civil gang injunctions. The Court relied on the vagueness doctrine as applied to criminal laws, under which an ordinance: (1) may fail to give notice such that ordinary people can understand its meaning, or (2) may authorize or encourage arbitrary and discriminatory enforcement to be held unconstitutionally vague.[89] The Court relied exclusively on the second prong to invalidate the ordinance, holding that two provisions of the law were unconstitutionally vague: the definition of "loitering" (i.e. "to remain in any one place with no apparent purpose") and a provision that empowered police to arrest two or more persons who refused to disperse if an officer had a "reasonable belief" that at least one person in the group was a gang member.[90] The Court found that the provisions provided insufficient standards and problematically vested absolute power in law enforcement.[91] However, in her concurrence, Justice O'Connor attempted to foreclose the applicability of *Morales* to civil gang injunctions by emphasizing the "narrow scope" of the Court's holding, and distinguishing the ordinance from laws requiring loiterers have a harmful purpose or those targeting only gang members.[92]

### B. Freedoms of Association and Expression

In addition to concerns about vagueness and overbreadth, many commentators have argued that gang injunctions burden gang members' First Amendment rights. Gang injunctions implicate three First Amendment rights—freedom of association, freedom from guilt by association, and freedom of speech and expression. I will consider each in turn.

The most significant First Amendment concern is that injunctions deprive gang members of their right to freedom of association by prohibiting them from congregating peacefully in the streets.[93] However, the United States Supreme Court has held that the First Amendment protects only "expressive" association—the right of groups to organize for the purpose of engaging in activities protected by the First Amendment (i.e., speech, assembly, petition, and exercise of religion)—and "intimate" association (i.e., the right to enter

---

86.  *Id.*
87.  Strosnider, *supra* note 69, at 102.
88.  Chicago v. Morales, 527 U.S. 41, 64 (1998).
89.  *Id.* at 56 (citing Kolender v. Lawson, 461 U.S. 352, 357 (1983)).
90.  *Id.* at 65-66 (O'Connor, J., concurring).
91.  *Id.*
92.  *Id.* at 62-63; *see also id.* at 67 (O'Connor, J., concurring).
93.  *See, e.g.,* Terence R. Boda, Note, *Turf Wars: Street Gangs, Local Governments, and the Battle for Public Space,* 29 Harv. C.R.-C.L. L. Rev. 477 (1993).

174              *CALIFORNIA LAW REVIEW*              [Vol. 97:161

into and maintain certain intimate human relationships.[94] Gang association does not fit neatly into a protected category since "freedom of association . . . does not extend to joining with others for the purpose of depriving third parties of their lawful rights."[95] Therefore, freedom of association critiques amount largely to criticisms of the modern First Amendment doctrine rather than to arguments that the doctrine extends constitutional protection to gang members.[96] For example, one commentator argues that gangs should be viewed as informal fraternal societies instead of purely criminal entities, but admits that even when social functions are accounted for, social association does not enjoy constitutional protection.[97]

Civil gang injunctions also may violate non-gang members' First Amendment protection against "guilt by association" by raising the risk that persons merely associating with gang members will fall under the ambit of a gang injunction as "suspected" gang members. While gang members do not have a right to associate purely for illegal or illicit purposes, the United States Supreme Court has held that the members of an association may not be held liable for the illegal acts of that association unless they actively participated in them with specific intent to further illegal aims.[98] Gangs present a particularly problematic case, since gang members collectively participate in both legal and illegal activities. The risk is apparent in *Acuna*, where the San Jose City Attorney looked to the following factors in deciding whether a particular person was a gang member: whether the person had admitted being a member of a gang, had a tattoo, wore gang clothing, used gang hand signs, was named as a gang member by at least two other members of a gang or by a reliable informant, and/or had been observed associating with gang members two or more times.[99] As one commentator noted, these factors provide little protection against guilt by association, because they often rely on unreliable (and often

---

94. *See* Roberts v. U.S. Jaycees, 468 U.S. 609, 617-18 (1984) (limiting constitutional protection to "intimate" and "expressive" associations); *see also* Dallas v. Stanglin, 490 U.S. 19 (1989) (holding that city ordinance restricting admission to dance halls to persons between the ages of fourteen and eighteen did not violate defendants' freedom of association).

95. Madsen v. Women's Health Ctr., Inc. 512 U.S. 753, 776 (1994). In *Acuna*, the California Supreme Court held that the injunction provisions at issue did not violate defendants' First Amendment rights, including their right to freedom of association. People ex rel. Gallo v. Acuna, 929 P.2d 596, 608-09 (Cal. 1997). The Court noted that the United States Supreme Court has recognized a limited right of association that does not include a general right of social association. *Id.* at 608. The court concluded that the "street gang's conduct in Rocksprings . . . fail[ed] to qualify as either of the two protected forms of association." *Id.*

96. *See* Boda, *supra* note 93, at 495-99.

97. *Id.* at 498.

98. *See* NAACP v. Claiborne Hardware Co., 458 U.S. 886, 918-20 (1982); *see also* Yoo, *supra* note 20, at 232 & n.124 (listing cases in which the Supreme Court has rejected the concept of guilt by association).

99. Yoo, *supra* note 20, at 234 (citing Defendant's Opposition to Plaintiff's Motion for Preliminary Injunction at 4 n.5, People ex rel. City Attorney v. Acuna, No. 729322 (Cal. Super. Ct. Santa Clara County filed May 28, 1993)).

strategic) statements by gang members about their own participation in a gang
or that of their fellow gang members.[100] Even if a particular gang member
admits to, or is implicated in, gang membership, there is no assurance that such
participation rises to the level necessary to support legal liability,[101] especially
because gangs typically have several levels of membership that range from
gang leaders to peripheral members to a "wannabe" class.[102] The problem is
even more acute when injunctions are sought against gangs as unincorporated
associations, rather than against named defendants.[103]

Finally, the imposition and enforcement of gang injunctions pose a risk to
gang members' right to freedom of expression, including the right to free
speech. The most obvious examples are common injunction restrictions on the
use of gang clothing and hand signs.[104] While acknowledging that the United
States·Supreme Court has given the government greater latitude to regulate
expressive conduct than in regulating pure speech, one critic has argued that the
limits on wearing of gang clothing and using gang hand signs are content-based
restrictions and should be held unconstitutional.[105] He argues that the conduct
satisfies both prongs of the test articulated in *Spence v. Washington*, under
which a court asks (1) whether "an intent to convey a particularized message
was present" and evaluates (2) whether "the likelihood was great that the
message would be understood by those who viewed it."[106] He argues further
that the clothing and hand signs do not fall into designated categories of
unprotected speech—fighting words or words that present a clear and present
danger—since they do not invariably incite others to immediate violence or

---

100.  *Id.* at 234.
101.  *Id.*
102.  Gary Stewart, *Black Codes and Broken Windows: The Legacy of Racial Hegemony in
Anti-Gang Civil Injunctions*, 107 Yale L.J. 2249, 2275 (describing levels of gang membership).
103.  Yoo, *supra* note 20, at 236. One scholar defends gang injunctions on the grounds that
all gang members share one key characteristic—"knowingly promoting the territorial street crimes
of the gang itself." Walston, *supra* note 18, at 66. However, one wonders whether a "wannabe"
class of young teens hanging around with older friends who are active gang members and
replicating their activity—i.e. by wearing similar colors, and carrying pagers—are knowingly
promoting anything. It seems likely that some or all of these hypothetical youth are just trying to
fit in, as their status characterization suggests, and might plausibly be unaware of the specific
street crimes in which other members of the gang engage, but are in danger of being named in an
injunction even by their own admission of being a "member" of the gang. This is even more likely
if peripheral members and wannabes are put out on the street in visible roles because they are less
likely to be known to the cops or have criminal records, and have to prove themselves to move up
the ladder.
104.  These restrictions are common in gang injunctions. For one of many examples, see
People v. Norteño, No. CGC 07-464492 (Cal. Super. Ct. S.F. County Oct. 12, 2007) (order
granting            preliminary            injunction),            *available            at*
http://www.sfgov.org/site/uploadedfiles/cityattorney/MISSION-ORDER.PDF.  For other easily
accessible examples from San Francisco County, see Office of the City Att'y, Civil Gang
Injunctions in San Francisco, http://www.sfgov.org/site/cityattorney_page.asp?id=67356 (last
visited on Aug. 30, 2008).
105.  Yoo, *supra* note 20, 239-46.
106.  *Id.* at 240-42 (quoting Spence v. Washington, 418 U.S. 405, 410-11 (1974)).

constitute an immediate breach of the peace.[107] The response to this argument has been that gang clothing and hand gestures do not include expressive content and are therefore beyond the scope of First Amendment protection.[108]

### C. Procedural Due Process

Another key constitutional concern about the rise in gang injunctions is that they violate gang members' procedural due process rights, protected under the Fifth and Fourteenth Amendments. Although injunctions are civil proceedings, a gang member who violates the injunction is held in criminal contempt and can be subject to fines or jail time.[109] Therefore, some critics are concerned that gang injunctions impose criminal liability without providing the due process protections available to criminal defendants.[110] In particular, critics fear that injunctions inappropriately take advantage of both the lower level of procedural protections (no right to counsel)[111] and the lower burden of proof in civil actions.[112] One commentator has noted that, in *Mathews v. Eldridge*, the United States Supreme Court held that due process requires procedural protections even in civil cases.[113] While he admits that gang injunctions do not meet the criteria for invoking criminal procedural protections, since the Court continues to rely on formalistic civil/criminal distinctions, he argues that two cases—*United States v. James Daniel Good Real Property*[114] and *Lassiter v. Department of Social Services*[115]—provide persuasive support for providing alleged gang members with a contested hearing and appointed counsel (if indigent) before a court imposes an injunction.[116]

The risks of due process violations are often exacerbated by the characteristics of the gang members themselves. Frequently, gang members are indigent, and fail to appear at the hearing to explain why they should not be named in the injunction.[117] Injunction hearings are designed to afford gang members notice and an opportunity to be heard—and courts have enforced

---

107.  *Id.* at 242-43 (citing Terminiello v. Chicago, 337 U.S. 1, 4 (1949); Chaplinsky v. New Hampshire, 315 U.S. 568, 572 (1942)).
108.  Walston, *supra* note 18, at 67-68.
109.  S.F. Public Defender, *supra* note 21.
110.  Yoo, *supra* note 20, at 253-66.
111.  *See* Iraheta v. Superior Court of L.A. County, 70 Cal. App. 4th 1500 (1999) (holding that indigent defendants have no right to counsel in injunction proceedings).
112.  Howarth, *supra* note 25, at 733.
113.  Yoo, *supra* note 20, at 255 (citing Mathews v. Eldridge, 424 U.S. 319 (1976)).
114.  510 U.S. 43 (1993) (applying the three *Mathews v. Eldridge* factors and holding that due process requires notice and a hearing prior to the federal government's seizure of a citizen's real property).
115.  452 U.S. 18 (1981) (holding that petitioner was entitled to appointed counsel in a hearing to terminate her parental rights and discussing the risk of erroneous deprivation as the second *Mathews v. Eldridge* factor).
116.  Yoo, *supra* note 20, at 255-66.
117.  Walston, *supra* note 18, at 73.

these rights.[118] As a result, some observers have argued that the fact that gang members often fail to appear at hearings does not render them ex parte or implicate due process concerns.[119]

In addition, as cities become more creative—and more severe—in the punishments they impose on gang members for violations of civil injunctions, the risks of due process violations will grow. For example, the town of Cicero, Illinois, passed an ordinance in 1999 that provides for civil banishment of gang members as punishment for engaging in gang-related activity that presents a "clear and present danger to the public order and safety."[120] After applying the Supreme Court's tests for determining whether a proceeding is civil or criminal in nature, one commentator concludes that this exile of gang members should be considered a criminal penalty.[121] Among the multiple factors that point to the extreme nature of the sanction, she argues that banishment is far more serious than most civil penalties and has historically been regarded as criminal punishment.[122] In addition, when a substantial right is implicated—for example, the termination of parental rights—the Supreme Court has found a right to counsel in civil proceedings.[123]

As cities impose more and more serious punishments for violations of gang injunctions (or in other civil contexts), they will be more likely to deprive defendants of substantial or fundamental rights. Accordingly, the need for municipalities and courts to use caution in seeking or subjecting gang members to injunctions without proper procedural safeguards will become more pressing. However, as of yet, courts have declined to find that injunctions pose a substantial threat to gang members' liberty, and have rejected the contention that gang members should receive court-appointed counsel in injunction proceedings.[124]

---

118.   *See, e.g.*, Press Release, Office of the Yolo County Dist. Att'y, Amended Civil Injunction Sought Against Broderick Boys Criminal Street Gang (July 31, 2007), *available at* http://www.yoloda.org/PressReleases/Broderick%20-%20Amended%20Complaint.pdf (noting that the California Appellate Court had dismissed the original injunction because of the lack of notice to members of the lawsuit).

119.   Walston, *supra* note 18, at 73.

120.   Stephanie Smith, Comment, *Civil Banishment of Gang members: Circumventing Criminal Due Process Requirements?*, 67 U. Chi. L. Rev. 1461, 1466 (2000) (citing Gang Free Zones Ordinance § 25-300(a)(C)).

121.   *Id.*

122.   *Id.* at 1470-73. For the Supreme Court's tests, see Hudson v. United States, 522 U.S. 93 (1997) (reaffirming the *Ward* rule and holding that the seven factors named in *Mendoza-Martinez* are useful in determining whether a civil penalty should be considered a criminal penalty); United States v. Ward, 448 U.S. 242 (1980) (outlining a two-part test to determine whether an action is civil or criminal); Kennedy v. Mendoza-Martinez, 372 U.S. 144 (1963) (stating a seven-factor test for determining whether a penalty is criminal or civil).

123.   *See* Lassiter v. Dept. of Soc. Servs., 452 U.S. 18, 31-32 (1981) (finding a right to counsel in a proceeding terminating fundamental rights); *see also* Vitek v. Jones, 445 U.S. 480, 500 (1980) (upholding a right to counsel for involuntary commitment to a psychiatric institution).

124.   *See* Iraheta v. Superior Court of L.A. County, 70 Cal. App. 4th 1500, 1500 (1999).

### D. Equal Protection

While the most prevalent constitutional concerns with gang injunctions are presented above, another concern merits brief mention. At least one commentator has suggested that there may be equal protection concerns with gang injunctions.[125] Gang injunctions, on their face, allow for punishment of named gang members for otherwise legal activity, such as congregating in the street or wearing certain colors.[126] While gang members are not a protected class, the argument goes, racial prejudice can influence the identification of gang members by law enforcement.[127]

### E. Conclusions and Implications

The lack of judicial recognition of these constitutional implications of gang injunctions should heighten the concern about the fate of those enjoined. So too should the reality of the way in which the injunctions are issued. While every gang member against whom an injunction is sought has a right to appear before the court and be heard before the injunction is issued, many injunctions are issued in the absence of some or all of the named gang members.[128] The absence of the alleged gang members is due in part to the failure of some courts to enforce rigorously the requirement of notice to individuals against whom an injunction is sought.[129] For example, in West Sacramento, when Yolo County prosecutors sought an injunction against the Broderick Boys gang, they served notice on only one alleged member of the gang, Billy Wolfington, who did not live in West Sacramento and did not appear in court.[130] The ACLU promptly filed a lawsuit challenging the lack of notice to the broader gang membership, but the trial court dismissed the case, because the four defendants denied membership in the gang; since the injunction only enjoined gang members, the court reasoned that defendants did not have standing to challenge it.[131] However, a state appeals court found that defendants had standing without admitting gang membership because they were "aggrieved" by the injunction.[132] The court then granted defendants' motion to set aside the

---

125. Cathy Wang, Note, *Gang Injunctions Under Heat from Equal Protection: Selective Enforcement as a Way to Defeat Discrimination*, 35 Hastings Const. L.Q. 287 (2008).

126. *Id.* at 296-97.

127. *Id.* at 298-300.

128. *See* Cosmo Garvin, *West Sac's Catch-22*, Newsreview.com, Dec. 21, 2005, http://www.streetgangs.com/injunctions/topics/120105sac.html (noting that not a single gang member appeared in court on behalf of the Broderick Boys in West Sacramento who were enjoined in 2004). *But see* Office of the Yolo County Dist. Att'y, *supra* note 118 (noting that while a lower court had issued the Broderick Boys injunction in February 2005 with notice to only one alleged gang member, the Court of Appeals had dismissed the injunction in part because of the "process used to notify the gang").

129. Garvin, *supra* note 128.

130. *Id.*

131. People v. Broderick Boys, 59 Cal. Rptr. 3d 64, 66 (Cal. Ct. App. 2007).

132. *Id.* at 66-67.

injunction.[133]

Despite these constitutional problems, gang injunctions continue to gain popularity as a law enforcement tool.[134] While public outcry has induced some cities to impose limits on seeking and enforcing gang injunctions within their boundaries,[135] and some opinions have narrowed the reach of these injunctions to those who are not gang members, in general courts have failed to restrict meaningfully the use of injunctions. Accordingly, these problems will grow, especially given the longevity of gang injunctions, which rarely, if ever, have expiration dates.[136] Some gang injunctions currently in place in Los Angeles have been in existence for almost fifteen years.[137] As a result, community leaders and public officials have begun to inquire into the practical consequences for gang members of being named in gang injunctions, especially for those attempting to transition out of gang life. Part III considers those consequences, which further underscore the need for an exit process.

III

PRACTICAL CONSEQUENCES OF GANG INJUNCTIONS FOR ENJOINED GANG
MEMBERS: BLOCKING THE WAY OUT

The constitutional concerns implicated by gang injunctions are enough for many to condemn their use outright as a crime-fighting tool. Most, if not all, of the critiques of gang injunctions in the academic literature, and from civil rights groups, have focused on fighting the issuance of gang injunctions in the first instance. However, the constitutional concerns enumerated above are magnified by the practical consequences for gang members named in injunctions—some of whom may not be associated with a gang at all, and the difficulty that former gang members experience in removing their names from injunctions.

The consequences of being named in a gang injunction can be severe, both for those gang members who have tried (or are trying) to exit gang life and for those who were erroneously named in the gang injunction in the first place. For those attempting to transition out of a gang, the consequences of gang injunctions are especially problematic when they make it more difficult to participate in productive activity—particularly work or school—that would help them stay out of trouble for the long term. Injunctions show up on

133.   *Id.*
134.   Lockyer, *supra* note 50.
135.   For example, Los Angeles has agreed to only enforce civil gang injunctions against those individuals who are personally named in the injunction and who have received notice of the injunction. *See* L.A. City Attorney's Office, Petition for Removal From a Gang Injunction 1, http://www.lacity.org/atty/pdf/Petition_for_Removal_from_Gang_Injunction.pdf (last visited Oct. 28, 2008).
136.   For example, the West Sacramento gang injunction against the Broderick Boys imposed a *lifetime* curfew on the gang members identified by West Sacramento police. Garvin, *supra* note 128.
137.   McGreevy & Banks, *supra* note 9.

employment background checks, so former gang members can have trouble getting a job.[138] Young people under injunctions may also have difficulty traveling to work or school, or even participating in school sports or activities, since they are not allowed to be in the presence of other enjoined individuals and former fellow gang members; this includes, for example, riding in the same bus or car.[139] The problem is not limited to young people. Some of the current Los Angeles gang injunctions have been in place for more than a decade, and they continue to include people who have not been active in gangs for years.[140]

The consequences are particularly problematic when individuals have erroneously been listed as gang members. For example, one Los Angeles community leader reported knowing a young man with an undergraduate degree from California State University, Los Angeles, pursuing a Master's degree at the University of Southern California, who was charged with violating an old gang injunction.[141] The student denies ever being a member of gang, but he grew up in a gang-ridden neighborhood, in which mistakes about gang membership are more likely to occur.[142]

The severity of these consequences would seem to create strong incentives for individuals wrongly named in injunctions, or those who are no longer members of the targeted gang, to seek removal of their names from the injunctions. It is unclear how many have tried. However, despite these incentives, no individual has ever been officially removed from a gang injunction in Los Angeles.[143]

## IV
### AN 'UNOFFICIAL' WAY OUT: EXIT PROCESSES IN LOS ANGELES AND SAN FRANCISCO AND IMPLICATIONS FOR OTHER CALIFORNIA CITIES

Individuals named in gang injunctions have, theoretically, always had a way out. Enjoined gang members have the right to make a motion directly to the court seeking removal from a gang injunction.[144] However, the lack of successful motions within Los Angeles highlights the inadequacy of the process provided by the formal civil justice system.

While there has been no comprehensive study on why gang members have been unsuccessful in removing their names from injunctions, or even how many have tried, one can speculate as to the reasons for their lack of success.

---

138.   *Id.*
139.   *Id.*
140.   *Id.* (quoting Los Angeles Police Chief William Bratton).
141.   *Id.*
142.   *Id.*
143.   McGreevy & Banks, *supra* note 9.
144.   *See, e.g.,* S.F. City Attorney's Office, Petition for Removal from Gang Injunction 1, *available at* http://www.sfgov.org/site/uploadedfiles/cityattorney/OPTOUT-PETITION.PDF (stating that petitioners can file a motion in San Francisco Superior Court and bypass the City Attorney's administrative process).

First, gang members, as well as non-members who are likely to be erroneously included in the injunctions, are often young and uneducated, and many face heightened language barriers.[145] They may be unaware or incapable of understanding and exercising their right to petition the court for removal, or they may be intimidated by the process. In addition, since defendants have no right to counsel in gang injunction proceedings, indigent gang members often have no access to the assistance of an attorney to help them understand or exercise their right.[146] Whatever the reasons, as evidenced by the Los Angeles experience, people named in injunctions have no practical way out.

Of course, gang members have a constitutional right to notice and a hearing before the injunctions are issued. However, as discussed briefly above, many individuals fail to appear, either because they are not given notice or choose not to come.[147] Also, California law permits prosecutors to seek gang injunctions against unnamed members of the gang—John Does—which raises further risks of lack of notice.[148] Therefore, given the substantial barriers that prevent individuals from effectively using the courts to seek removal, unofficial exit processes are likely to be the most effective way to provide those named in gang injunctions with a way out.

Both Los Angeles and San Francisco recently adopted unofficial exit processes. This Part compares the Los Angeles process, which is managed by the City Attorney's Office, with the process that the San Francisco Public Defender proposed, which would have placed decision-making power in independent councils. While the San Francisco proposal had the advantage of removing discretion over the exit process from the office charged with enforcing the injunctions, it was rejected because of, among other things, legal obstacles raised by the San Francisco City Attorney. (San Francisco eventually enacted a process modeled after Los Angeles). Applying the City Attorney's

---

145.   For example, several studies estimate that more than 60 percent of gang members in Los Angeles are illegal immigrants. *See, e.g., Immigration and the Alien Gang Epidemic: Problems and Solutions: Oversight Hearing Before the Subcomm. on Immigration, Citizenship, Refugees, Border Security, and International Law*, 109th Cong. (2005) (statement of Heather MacDonald, Senior Fellow, The Manhattan Institute), *available at* http://www.manhattan-institute.org/html/mac_donald04-13-05.htm.

146.   *See* Iraheta v. Superior Court of L.A. County, 70 Cal. App. 4th 1500, 1500 (1999). However, many public defenders offices will provide assistance to gang members who are arrested for engaging in prohibited activities or charged with misdemeanor contempt of court. *See* S.F. Public Defender, *supra* note 21 (providing answers to common questions about gang injunctions and a telephone number for legal assistance); *see also* S.F. City Attorney's Office, *supra* note 144, at 2 (stating that petitioners may obtain opt-out assistance from the Lawyer's Committee for Civil Rights, which will help identify community organization and service providers that will assist in supporting the petition).

147.   *See, e.g.,* Garvin, *supra* note 128 (citing the failure of any gang members to appear at the West Sacramento Broderick Boys gang injunction hearing).

148.   *See* Office of the L.A. City Att'y, *supra* note 19, at 5-6. However, note that establishing an injunction violation requires the government to prove that an individual was a gang member at the time the violation occurred. *Id.* at 6 (citing Berger v. Superior Court, 175 Cal. 719, 721 (1917); People v. Saffell, 74 Cal. App. 2d Supp. 967, 979 (1946)).

critique to both the Los Angeles process and the San Francisco proposal sheds light on three legal and constitutional concerns about gang injunction exit processes more generally. Lessons from this analysis can help other localities craft their own options to give people named in the injunctions a way out.

### A. The Los Angeles Solution

The problem of exit from gang injunctions gained publicity only recently. In January 2006, Los Angeles Councilwoman Janice Hahn, of the gang-ridden 15th District, created the Watts Gang Task Force following a month of intense violence in Watts during which eighteen shootings and seven deaths occurred.[149] The meetings are ongoing, and bring together community members, city officials, and the L.A.P.D. to discuss gang-related violence and solutions.[150] It was during one of these weekly meetings that Councilwoman Hahn first heard about the practical problems with the exit process associated with gang injunctions.[151] She brought her concerns to the media in March 2006,[152] at which time pressure began to mount for the Los Angeles City Attorney and law enforcement community to respond.[153]

The concern about the exit process was part of a larger movement among community members and activists to reform the gang injunction process.[154] In May 2006, community members brought a range of concerns about the use of gang injunctions to the Los Angeles City Council.[155] Public pressure continued to grow until April 2007, when Los Angeles City Attorney Rocky Delgadillo announced new guidelines for the city's gang injunction procedures.[156] In the months following, the City Council set new goals for the gang injunction process, and held a series of hearings to address the variety of concerns that had been expressed by community members, activists, and local officials.[157]

The City Attorney presented the new gang exit process to the City Council

---

149. News Release, Councilwoman Janice Hahn, Community, LAPD Work Together to Achieve Drop in Crime in Watts (Apr. 26, 2007).
150. *Id.*
151. *Id.*
152. McGreevy & Banks, *supra* note 9.
153. Judith Greene & Kevin Pranis, Justice Policy Inst., Gang Wars: The Failure of Enforcement Tactics and the Need for Effective Public Safety Strategies 29 (2007), http://www.justicepolicy.org/images/upload/07-07_REP_GangWars_GC-PS-AC-JJ.pdf.
154. *Id.*
155. *Id.*
156. *Id.* For example, the City Attorney agreed not to prosecute individuals for violations of gang injunctions unless they have been personally served with the injunction. L.A. City Attorney's Office, *supra* note 135, at 1. Under California law, personal service is not required to bind all members of the gang, and gang injunctions can cover unnamed members of the enjoined gang. *See* People v. Poe, 236 Cal. App. 2d Supp. 928, 939-40 (1964).
157. Press Release, City Council, City of L.A., Council Holds Special Meeting on Gang Violence and Youth Development: Councilman Cardena and Councilwoman Hahn, City Att'y Unveil Petition for Removal From a Gang Injunction, a City First (Nov. 29, 2007), *available at* http://lacity.org/cla/pressreleases/clapressreleases286049989_11292007.pdf.

at a special policy meeting on gang violence and youth development.[158] The heart of the exit process is the "Petition For Removal From Gang Injunction" for "use by persons living in the City of Los Angeles who have been served with a Gang Injunction and who want the opportunity to demonstrate that they should not be restrained by the Gang Injunction because they no longer are, or they never were, a gang member."[159] Importantly, the exit process does not require the individual to file papers with a court or appear before a judge. The petitioner only must complete the form Petition, available in a large, bold link at the top of the City Attorney's website,[160] and return it to the City Attorney's Office. The petition itself requires relatively simple information, including contact information, education and employment history, confirmation and explanation of the fact that the petitioner is not now a member of a gang and will not in the future act to promote or assist gang activities, a list of people who can "support your petition," and a signature.[161] A senior attorney within the City Attorney's Office who is not otherwise involved with the enforcement of gang injunctions then reviews the petitions.[162] While only a court may remove a gang member from an injunction, and a court is not bound by the City Attorney's decisions regarding an individual gang member, the City Attorney's Office has agreed that it will stipulate to the court that it has no objection to the removal of those individuals' names whose petitions are approved.[163] Therefore, in all practicality, gang members with successful petitions will have their names removed from the injunctions.

### B. The San Francisco Public Defender's Proposal

While the exit process launched by the Los Angeles City Attorney has been lauded by many as a success, activists and officials in other California jurisdictions that employ gang injunctions as a crime-fighting tool have pushed for an exit procedure that is independent of the discretion of the City Attorney.[164] Specifically, in December 2007, San Francisco Public Defender Jeff Adachi proposed comprehensive legislation that would have created an exit

---

158. *Id.*

159. L.A. City Attorney's Office, *supra* note 135, at 1.

160. L.A. City Attorney's Quick Links, http://www.lacity.org/atty/atty_quicklinks.htm (last visited Oct. 28, 2008).

161. L.A. City Attorney's Office, *supra* note 135, at 7. Specifically, the petitioner must be able to confirm that he or she 1) no longer is, or never was, "a member of the gang named in the Gang Injunction;" 2) is "not now acting, and . . . will not in the future act, to promote, further, or assist any of the activities prohibited by the Gang Injunction on behalf of the gang named in the Gang Injunction;" and 3) is "not a member of any other criminal street gang." *Id.* at 1.

162. *Id.* at 1-2 (describing the petition review process).

163. *See, e.g.*, S.F. City Attorney's Office, *supra* note 144, at 1.

164. Press Release, Office of the Public Defender, City and County of S.F., Public Defender's Office, ACLU, and Lawyer's Committee for Civil Rights Call For Gang Injunction Exit Process (Dec. 19, 2007), *available at* http://sfpublicdefender.org/newsroom/press-releases/gang_injunction_exit_process/.

process using extra-judicial, independent review councils to which gang members named in injunctions could petition for removal.[165] While ultimately unsuccessful, the proposal was a pointed alternative to those leaving these decisions to the discretion of government lawyers.[166] This Part considers the Public Defender's proposal and the critical response of the City Attorney.

During 2007, San Francisco City Attorney Dennis Herrera greatly expanded San Francisco's use of civil injunctions as a gang violence control technique, obtaining injunctions against five criminal street gangs "that [had] long plagued three of San Francisco's most violence-prone neighborhoods."[167] About ten days prior to a default judgment hearing on the latest of these injunctions, the Public Defender wrote a letter to the City Attorney, co-signed by the ACLU of Northern California and the Lawyer's Committee for Civil Rights, requesting that the City Attorney create a "Clear and Accessible Exit Process for Individuals Subject to the Terms of San Francisco Gang Injunctions."[168] The City Attorney's Office did not respond publicly, and the court issued the injunction on December 18, 2007.[169]

On December 19, 2007, the Public Defender's office gave proposed legislation to members of the San Francisco Board of Supervisors.[170] The legislation proposed the creation of a series of extra-judicial "Gang Injunction Review Councils," one for each court-ordered safety zone that would meet to review petitions of gang members and decide whether to remove permanently enjoined gang members from injunctions.[171] The Review Councils would conduct their hearings in secret, and records of the proceedings would not be available to the public.[172] Each ten-member Council would have three members appointed by the Mayor and seven members appointed by the Board of Supervisors.[173] However, both the Mayor and the Board would be limited in whom they could appoint—the legislation would limit the pool of potential members to persons serving on City boards and committees responsible for youth development and intervention, and those persons who represent

---

165. News Release, City Att'y Dennis Herrera, Herrera Criticizes Adachi Proposal to Prioritize Gangs Over Victims, Vulnerable for City Services (Jan. 2, 2008), *available at* http://www.sfgov.org/site/uploadedfiles/cityattorney/ADACHI-LEGISLATION.PDF.
166. *See* Office of the Public Defender, *supra* note 164.
167. Office of the City Att'y, *supra* note 104.
168. Letter from Jeff Adachi, S.F. Public Defender, to Dennis J. Herrera, S.F. City Att'y (Dec. 7, 2007), *available at* http://www.aclunc.org/docs/News_Room/Ltr_to_City_Atty_(Dec_7,_'07).pdf.
169. *See* People v. Chopper City, No. 464-493 (Cal. Sup. Ct. S.F. County Dec. 18, 2007) (order granting permanent injunction), *available at* http://www.sfgov.org/site/uploadedfiles/cityattorney/WA-PERMANENT-ORDER.PDF.
170. San Francisco Public Defender's Office, Proposed Ordinance: Gang Injunction Exit Process (Dec. 19, 2007), *available at* http://www.sfgov.org/site/uploadedfiles/cityattorney/ADACHI-LEGISLATION.PDF (beginning p. 11).
171. *Id.*
172. *Id.*
173. *Id.*

community service organizations that contract with the City to provide outreach and related services.[174]

City Attorney Herrera responded to Adachi's exit process proposal with a scathing critique.[175] In a memorandum to the Board of Supervisors, Herrera cited three legal problems with adopting the proposed legislation: (1) that it would violate the separation of powers clause in the California Constitution by granting judicial powers to an extra-judicial body, (2) that it would violate the Brown Act and Public Records Act by providing that "review councils" meet in closed session and that meeting records not be made available to the public, and (3) that it would conflict with the power granted to the City Attorney to initiate and prosecute actions in the name of the people of the State of California to enjoin nuisances.[176] Mr. Herrera's critique of the proposal provides a basis for a three-part analysis of the legality of alternative exit processes in California cities discussed in Part IV.C below.

### C. The Legal Analysis

This Part will consider each of the three legal obstacles to potential exit processes in turn, referring back to the unsuccessful San Francisco proposal and the Los Angeles process as examples. Part IV.D discusses the implications of the legal analysis and suggests options for other cities that are considering gang injunction exit processes.

### 1. Separation of Powers

The separation of powers problem is a constitutional concern. Article VI, Section I of the California Constitution states that "[t]he judicial power of this State is vested in the Supreme Court, courts of appeal, and superior courts . . . ."[177] California courts have interpreted Article VI to prohibit a state or local legislature from granting judicial powers to government agencies (except as expressly permitted by Article IX[178]—so-called "constitutional agencies").[179] The California Code of Civil Procedure, section 525, clarifies that "[a]n injunction . . . may be granted by the court . . . and when granted by a judge, it

---

174.   *Id.*
175.   Herrera, *supra* note 165. Note that some of Herrera's criticism were overtly political—for example, in the news release, he argues that the legislation restricts membership of the Review Councils to "certain non-profit interest groups, some of which have represented the most vocal and fervent core of political opposition to gang injunctions in San Francisco. The councils . . . offer no parallel membership requirements for victims of gang violence, their families, or their advocates." However, the bulk of his criticism is legal, identifying potential constitutional, state, and local legal conflicts with the legislation. *Id.*
176.   *Id.*
177.   Cal. Const. art. VI, § 1.
178.   Cal. Const. art. IX.
179.   Strumsky v. San Diego County Employees Retirement Ass'n, 11 Cal. 3d 28, 41-42 (1974).

may be enforced as an order of the court."[180] Therefore, modification of an injunction constitutes the exercise of judicial power.[181]

The Los Angeles process does not present a separation of powers problem. After reviewing a petition, if approved, the City Attorney stipulates to the court that it has no objection to the removal of the petitioner's name from the injunction. Therefore, the court retains final authority over the modification of the injunction order, making the process fully consistent with the California Constitution. In contrast, the San Francisco proposal vests a judicial power (namely the power to remove individuals from a court-ordered injunction) in an extra-judicial agency (independent review council), and therefore violates Article VI.[182]

### 2. Public Meetings and Record Laws

The second legal obstacle is that of the public meeting and record laws,[183] specifically the Brown Act[184] and the Public Records Act.[185] The Los Angeles process creates a review process within the City Attorney's Office, and does not create any agencies or other outside review bodies that would constitute "legislative bodies" under the Brown Act. Therefore, the legislation would also not violate the Public Records Act, which requires records of meetings of legislative bodies to be subject to public disclosure, unless they fall under a specific exception.[186] In contrast, if imposed by the city legislature, the San Francisco proposal would likely violate the Brown Act. First, the proposed review councils would constitute "legislative bodies."[187] Therefore, they would be required to hold open, public meetings.[188] Second, while the proposal does not specify whether the hearing would be open to the public, it does contemplate that the council would "meet in private" following the hearing to discuss whether the petitioner had proved his/her case by clear and convincing evidence.[189] Therefore, the closed-door meetings of the review councils would likely violate the Brown Act, since there is no provision exempting the councils

---

180.    Cal. Civ. Proc. Code § 525 (West 1997).

181.    Herrera, *supra* note 165, at 3.

182.    S.F. Public Defender's Office, *supra* note 170.

183.    Herrera, *supra* note 165, at 3.

184.    Brown Act, Cal. Gov't Code §§ 54950-54963 (West 1997 & Supp. 2008).

185.    Public Records Act, Cal. Gov't Code §§ 6250-6270 (West 1997).

186.    Cal. Gov't Code § 6253(a) (West 1997) ("Public records are open to inspection at all times . . . and every person has a right to inspect any public record . . . .").

187.    Cal. Gov't Code § 54952(b) (Supp. 2008) (defining "legislative body" to include "[a] commission, committee, board, or other body of a local agency, whether permanent or temporary, decisionmaking or advisory, created by charter, ordinance, resolution, or formal action of a legislative body.").

188.    Cal. Gov't Code § 54953 (Supp. 2008) ("All meetings of the legislative body of a local agency shall be open and public, and all persons shall be permitted to attend any meeting of the legislative body of a local agency . . . .").

189.    S.F. Public Defender's Office, *supra* note 170.

from the public meeting requirement.[190] The San Francisco proposal would also likely violate the Public Records Act, since the proposal provides that records and votes of the review councils would be confidential, and there is no specific exception in the Act for this type of record.[191]

### 3. Delegation of Power

The third legal obstacle to potential exit processes is state law delegation of power to city attorneys. Gang activities may be enjoined under both state public nuisance laws[192] and state unfair competition laws.[193] Civil actions to abate public nuisances may be brought only by the district attorney or city attorney of the town, city, or county where the nuisance exists.[194] Similarly, actions to abate unfair competition may be brought only by the city attorney.[195] Under California case law, when a city attorney brings an action to abate a public nuisance or unfair competition in the name of the people of the State of California, he or she "is acting as an agent of the State and therefore is subject to the State's exclusive control."[196] Since the review procedure in the Los Angeles process vests power solely in the City Attorney's Office to decide what petitions to review and approve, the process does not conflict with state law. However, under the San Francisco proposal, the City Attorney must: (1) decide within thirty days after receiving a petition by a gang member during an ongoing injunction lawsuit whether to proceed with seeking an injunction against the petition, and (2) review every enjoined gang member's case every three years and automatically remove those gang members that are not found to be "active" by clear and convincing evidence.[197] Only the state legislature may limit or redefine the power of the city attorney to bring civil actions abating public nuisances and unfair competition. Therefore, the provisions of the legislation that curtail the city attorney's power would likely violate state law.[198] It would also be an invalid exercise of the local legislature's police power because the legislation would conflict with the state's general law giving

---

190. Herrera, *supra* note 165, at 3.
191. Cal. Gov't Code § 6253(a) ("Public records are open to inspection at all times . . . and every person has a right to inspect any public record . . . .").
192. *See* Cal. Civ. Code §§ 3479-3480 (West 1997).
193. *See* Cal. Bus. & Prof. Code §§ 17200-17212 (West 1997 & Supp. 2008).
194. Cal. Civ. Proc. Code § 731 (Supp. 2008).
195. Cal. Bus. & Prof. Code § 17206(a) (Supp. 2008).
196. Herrera, *supra* note 165, at 4-5 (citing Coulter v. Pool 187 Cal. 181, 187 (1921) (holding that a public officer is a public agent and performs his duties for solely for the political unit for which he is acting); Sacramento v. Simmons, 66 Cal. App. 18, 24-25 (1924) (holding that when state statute designates local registrars of vital statistics, they are state officers performing state functions and are under the exclusive jurisdiction of the state); Boss v. Lewis, 33 Cal. App. 792, 794 (1917) (holding that a city clerk, when acting as a local registrar of vital statistics as specified by state law, is a state officer)).
197. S.F. Public Defender's Office, *supra* note 170.
198. *See* Herrera, *supra* note 165.

city attorneys the exclusive authority to bring these specific civil actions.[199]

### D. Implications of the Los Angeles and San Francisco Exit Processes

The experiences of Los Angeles and San Francisco in designing gang injunctions have much to teach other California cities that will address this issue. This Part argues that, to be legally adequate, exit procedures initiated at the local level must be conducted at the general discretion of the city attorney. In addition, a court must retain the actual authority to remove individuals named in gang injunctions. It is clear that retaining discretion in the hands of government attorneys has problems—the analogy of the fox guarding the henhouse comes to mind. It is also clear that going to court is slow and expensive and that enjoined individuals have thus far had limited success using the court system successfully to remove their names, regardless of the merits of their claims.[200] However, Part IV.D will argue that these limitations are necessary to ensure compliance with the California Constitution and state law if localities are to create unofficial exit processes at all. This Part considers each limitation in turn and discusses the implications for cities designing exit processes. One key implication is that exit process proposals that create independent review boards—or fail to retain discretion in the city attorney's office—will face certain obstacles under the California constitution and state law, exemplified by the exit process ultimately adopted in San Francisco. Finally, this Part considers the potential for a statewide solution to the exit process problem.

### 1. Retaining Discretion

A viable exit procedure must retain the city attorney's office discretion about how and whether to accept petitions for review and removal, and by what standards to approve such petitions. As discussed in Part IV.C above, under California law, only the state legislature has the authority to modify the power of a city attorney to bring and maintain civil actions.[201] Therefore, local legislative bodies cannot force city attorneys to accept petitions from enjoined gang members, review petitions in a timely fashion, or conduct regular reviews of named gang members. By extension, a court would likely find that local legislatures do not have the power to create independent review boards that can make such decisions in place of the city attorney's office and mandate that those enjoined persons approved by the review council be considered or approved for removal by the city attorney. As such, the power to create and implement a petition and review process (separate from the courts themselves),

---

199.    *See* Cal. Const. art. XI, § 7 ("A county or city may make and enforce within its limits all local, police, sanitary, and other ordinances and regulations not in conflict with general laws.").
200.    *See* Gilonna, *supra* note 16.
201.    *See* Herrera, *supra* note 165, at 5 (citing *Coulter*, 187 Cal. at 187; *Simmons*, 66 Cal. App. at 24-25; *Boss*, 33 Cal. App. at 794).

must remain exclusively with the city attorney's office. However, California law does not limit the authority of a city attorney's office to agree to implement an alternative dispute review process.

A comparison of the Los Angeles exit process with the San Francisco proposal is instructive. The Los Angeles exit process responds to this limit on local legislative control by retaining all discretion in the acceptance and review of petitions in the City Attorney's Office.[202] Under the review process, a senior attorney in the Office who is unconnected to the prosecution of gang injunctions reviews all petitions for removal.[203] The Office has final authority as to whether to accept or decline petitions. In contrast, San Francisco Public Defender's proposal not only gave authority to accept and review petitions to independent review councils, but also imposed burdens upon the City Attorney's Office: first, forcing the Office to review and respond to certain petitions within 30 days, and second, to review all petitions regularly and either find that the petitioner is currently "active" in a gang, or recommend removal of the petitioner to the court.[204] The San Francisco proposal almost certainly violates California law. Therefore, had the Board of Supervisors passed the legislation, a court would likely have struck it down.

While local legislatures cannot curtail the power of city attorneys to seek civil gang injunctions or to approve or deny exit requests, it is important to note that the city attorney can agree to alternative review processes. For example, the city attorney could consent to follow, or at least consider, the recommendations of a legislatively-created independent review council or agency in deciding which exit petitions to approve. Alternatively, the city attorney could appoint an outside panel to review petitions. Such processes might prove productive and successful, keeping final control in the hands of the city attorney but providing some assurance of outside input.[205] The key limitation, under state law, is that local legislatures cannot mandate that the city attorney create such procedures. Ultimately, the unofficial exit process must be subject to the city attorney's discretion.

*2. Court Authority*

Viable exit procedures must also allow a court to have final authority to remove an enjoined individual from an injunction. Article IV of the California Constitution vests judicial power in the courts.[206] California courts have held

---

202.   L.A. City Attorney's Office, *supra* note 135, at 1.
203.   *Id.*
204.   S.F. Public Defender's Office, *supra* note 170.
205.   Several problems might emerge with such a process: 1) To establish the process in the first place, the city attorney would have to agree to unofficially curtail the office's power, which is perhaps unlikely, and 2) The temptation for the city attorney's office to break the agreement and deviate from the agency's recommendation would be great, since the office would still retain official final authority and freedom of action.
206.   Cal. Const. art. VI.

that a local or state legislature may not grant judicial power to government agencies, like independent review boards.[207] Under the California Code of Civil Procedure, modification of an injunction requires a judicial act: an order of a court.[208] Therefore, under the California Constitution, a court must retain the final authority to remove enjoined gang members from injunctions, and any exit process must expressly retain this authority for the court. Neither a city attorney nor an independent review board or agency can constitutionally act in the court's place.

In Los Angeles, although the City Attorney's Office reviews and approves the submitted petitions, the final authority to remove an enjoined gang member remains with the court.[209] When the City Attorney's Office approves removal, it will stipulate to the court that it has no objection to the removal of the named individual, the assumption being that such recommendations will almost certainly result in removal.[210] In comparison, the San Francisco Public Defender's proposal would have empowered independent review counsels to grant removal from the gang injunctions.[211] Such a legislative grant of judicial authority is almost certainly unconstitutional in California.[212] Therefore, however cities choose to design their exit processes, they must give a court final authority to approve removal.

### 3. Use of an Independent Review Council

Each of the limitations described above has implications for the use of an independent review procedure as part of an exit process. Independent review councils cannot constitutionally serve as adjudicative tribunals for the purpose of authorizing removal of enjoined gang members. Under state law, the councils' role must be limited to an advisory one. Therefore, such councils cannot circumvent the discretion of the city attorney in recommending removal by the court. Review councils also cannot force the hand of the city attorney in deciding whether to review or accept removal petitions, regularly review enjoined gang members for proof of "active" status, or otherwise limit the city attorney's options. It seems clear that the city attorney's office must play the central role in any extra-judicial or "unofficial" exit process.

On the other hand, as discussed above, there is nothing that would prevent legislatively-created review councils or agencies from soliciting petitions from

---

207.    Strumsky v. San Diego County Employees Retirement Ass'n, 11 Cal. 3d 28, 41-42 (1974).
208.    Cal. Civ. Proc. Code § 525 (West 1997).
209.    L.A. City Attorney's Office, *supra* note 135.
210.    *See, e.g.*, S.F. City Attorney's Office, *supra* note 144; *see also* News Release, Office of City Att'y Dennis Herrera, Herrera, ACLU, Lawyer's Committee Reach Accord on Gang Injunction Opt Out Procedure (Mar. 24, 2008), *available at* http://www.sfgov.org/site/cityattorney_page.asp?id=77808.
211.    S.F. Public Defender's Office, *supra* note 170.
212.    *See* Cal. Const. art. VI.

*GANG INJUNCTION EXIT PROCESSES*

enjoined gang members requesting removal, reviewing such petitions through a hearing process or otherwise, and then providing recommendations to the city attorney's office. Indeed, assuming the city attorney's office is willing to cooperate (which may become politically expedient or even necessary), such review councils could play an important role in an exit process, perhaps by building community participation to achieve buy-in into the process. Such councils could be of special assistance in those communities in which there is heightened distrust of the police and those communities most affected by the gang injunctions.[213]

To underscore the point that city attorneys may voluntarily limit their discretion, one need only look to the exit process ultimately adopted by the San Francisco City Attorney in March 2008. In San Francisco, enjoined individuals may submit petitions to the City Attorney's Office.[214] Attorneys in the office review the petition and provide a written response accepting or denying the petition within thirty days.[215] The petition itself asks for a variety of straightforward personal information, most importantly gang status, employment history, education information, and corroborating references.[216] If approved, the City Attorney will represent to the court, in writing, that the City Attorney has no objection to the individual's request for removal.[217] Therefore, the process retains discretion in the City Attorney's Office and is consistent with state law. Notably, however, in announcing the exit process, the San Francisco City Attorney agreed to review each gang injunction every three years to determine if the injunction should continue to be in effect and if any individual should be removed.[218] This commitment indicates the ability of city attorneys across the State to curtail their own power, and may foreshadow future cooperation between government lawyers and civil rights activists to create fair opt-out procedures that still comply with state law.

One advantage of maintaining the exit process within the city attorney's office is that the process would remain confidential. In Los Angeles, the Petition for Removal makes clear that all information provided on the petition, or in response to subsequent requests by the office, will be kept confidential to the fullest extent permitted by law.[219] The same is true of the recent San

---

213. *See, e.g.*, John MacDonald & Robert Stokes, *Race, Social Capital, and Trust in the Police*, 41 Urb. Aff. Rev. 358 (2006) (exploring racial differences in trust for police).
214. S.F. City Attorney's Office, *supra* note 144.
215. *Id.* at 1.
216. *Id.* at 4-7.
217. Office of City Att'y Dennis Herrera, *supra* note 210. In deciding whether or not to approve petitions, the City Attorney announced he would consider the totality of the circumstances, including most importantly whether the individual is an active member of gang, but also including: gainful employment, educational pursuits, removal of gang tattoos, ceasing to wear gang colors, ceasing to spend time with known gang members, and pursuing other activities that demonstrate a desire not to engage in gang-related activities. *Id.*
218. *Id.*
219. L.A. City Attorney's Office, *supra* note 135.

Francisco Petition.[220] Under the Brown Act and the Public Records Act, the hearings and records of an independent review council would have to be open to the public, which threaten to discourage enjoined gang members from petitioning for removal, perhaps by subjecting them to a backlash from the gangs they seek to disavow. While there are surely other forms of independent review that would not implicate the public meetings and records laws and would therefore protect the confidentiality of petitioners—for example, the appointment of a single outside person to review applications—any form of independent commission, committee, board, or agency would be subject to these laws. ·

### 4. Prospects for a State Legislative Solution

It is important to note that the limits on local legislative actions do not all apply to the state legislature. With the exception of the Constitutional limitation, the restrictions discussed only apply to local governments. This leaves open the possibility that the state legislature could lawfully mandate an exit process for gang injunctions. Most importantly, while local legislatures cannot curtail the power of city attorneys to bring public nuisance and unfair competition injunctions, the state legislature can do so, as the source of the authority in the first instance.[221] Of course, the state legislature does not have the power to violate the California Constitution; even an exit process authorized or mandated by state law would have to retain the power of the courts officially to modify the injunctions.

While a state solution is possible, it is by no means likely. The state legislature has continually strengthened and expanded anti-gang laws, and has authorized a variety of tools to aid local law enforcement in fighting gang-related crime, including the civil gang injunction.[222] It seems unlikely that the legislature would authorize any measure that removes discretion from city attorneys, who are perceived by the public and lawmakers alike to be at the front lines of the war on gang violence.[223] To the extent there has been a backlash against the use of gang injunctions, it appears to have been highly concentrated within civil rights groups and those communities most impacted by injunctions; there is little evidence of widespread disapproval of gang injunctions that would spur state legislative action to create an unofficial exit process. Therefore, for the moment, it will be incumbent on local governments

---

220.   S.F. City Attorney's Office, *supra* note 144, at 2.
221.   For example, the state legislature vested the exclusive power of the city attorney to bring public nuisance abatement actions in the California Code of Civil Procedure, and therefore could modify that authority. *See* Cal. Civ. Proc. Code § 731 (Supp. 2008).
222.   For example, see the STEP Act, in which the State legislature explicitly authorized the use of civil injunctions against gangs, among other anti-gang remedies. *See* Cal. Penal Code §§ 186.20-186.33 (West 1999 & Supp. 2008).
223.   Even the ACLU acknowledges the positive public perception of gang injunctions. *See* ACLU Found. of S. Cal., *supra* note 60, at 3-4.

to respond to the constitutional and political concerns implicated by gang injunctions by creating exit processes that fall within legal and constitutional limits.[224]

CONCLUSION

Today, there are approximately forty gang injunctions in place in California cities.[225] All indications are that the use of gang injunctions as a crime-fighting tool will continue to grow. As injunctions proliferate and endure, the need for unofficial exit processes will become more acute, especially as enjoined gang members age and become less active, or attempt to transition out of gang life. The constitutional concerns associated with injunctions are certainly more pressing when considered in the context of inactive gang members, and people who were never associated with gangs in the first place. And, as in Los Angeles and San Francisco, exit processes may also become a political imperative in the affected communities.

This Comment has argued that, despite the appeal of exit processes that remove discretion from the city attorney's office and vest it in independent agencies or review boards, these processes would likely violate state law. In addition, any process that circumvents the judicial power of the courts by granting final authority to remove individuals from injunctions to outside review boards would constitute a violation of the California Constitution. Therefore, while both constitutional and political concerns mandate the creation of an unofficial exit process in cities using gang injunctions, city attorneys must retain discretion to review and approve petitions and courts must retain the power to officially order removal. While such processes offer little protection against the unchecked discretion of the government, they do offer a simple and expedited way out. One can only hope that city attorneys will exercise such discretion judiciously.

---

224.    It is perhaps interesting that the two California cities in which the city attorney has been responsive to public concern about gang injunction exit processes are Los Angeles and San Francisco; both cities that have elected City Attorneys. Clearly, a comprehensive study of the responsiveness of elected and appointed city attorneys is a subject for another paper. However, one can speculate that standing for election might limit the freedom of the city attorney to ignore community calls to reform the gang injunction process, but also limit his or her willingness to be flexible in the solution, depending on the need to appeal to law-and-order voters.

225.    S.F. Public Defender, *supra* note 21.

194                     *CALIFORNIA LAW REVIEW*              [Vol. 97:161